FILED 25 NOV '24 10:11 USDC-ORP

PRESTON BERMAN
2600 Center St. NE
Salem, OR 97301-2669
Telephone: 503.947.2704

Plaintiff, appearing Pro Se

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| **PRESTON BERMAN**, on behalf of themselves and a class of those similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>**OREGON; OREGON STATE HOSPITAL; SARA WALKER**, in her official capacity as interim superintendent of the Oregon State Hospital; **SEJAL HATHI**, in her official capacity as Director of the Oregon Health Authority,<br><br>Defendants. | Case No: *6:24-CV-1968-MK*<br><br>**CLASS ACTION**<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>**VIOLATION OF TITLE II OF AMERICANS WITH DISABILITIES ACT 42 U.S.C. § 12131 ET SEQ.**<br><br>**VIOLATION OF 42 U.S.C. § 1983 14TH AMENDMENT** |

PAGE 1 - COMPLAINT

*#109596*

**JURISDICTION**

1. This Court has jurisdiction of this action under Title II of the ADA, 42 U.S.C. §§ 12131-12134, and 28 U.S.C. §§ 1331, 1345. The Court may grant the relief sought in this action pursuant to 28 U.S.C. §§ 2201(a), 2202. Additionally Plaintiff brings this action under 42 U.S.C. § 1983 to redress the deprivation under color of state law of rights secured by the United States Constitution.

**VENUE**

2. Venue is proper in the District of Oregon under 28 U.S.C. § 1391(b)(1) and (2) because defendant Oregon State Hospital ("OSH") maintains official offices in Marion County, Oregon, and is a public entity within the state of Oregon; and because a substantial part of the events giving rise to Plaintiff's claims occurred in this District and Division.

**THE PARTIES**

3. Plaintiff, Preston Berman, has been a resident of Oregon since 2010.

4. Defendant is the State of Oregon, which is a public entity within the meaning of the ADA, 42 U.S.C. § 12131(1), and is therefore subject to Title II of the ADA, 42 U.S.C. § 12131 et seq., and its implementing regulations, 28 C.F.R. pt. 35.

5. Defendant is the Oregon State Hospital ("OSH"), which is a public entity within the meaning of the ADA, 42 U.S.C. § 12131(1), and is therefore subject to Title II of the ADA, 42 U.S.C. § 12131 et seq., and its implementing regulations, 28 C.F.R. pt. 35.

6. Defendant Dr. Sara Walker is sued in her official capacity as the interim superintendent of Oregon State Hospital. As the chief administrative officer of the Oregon State Hospital, one of her duties is to enforce and oversee the mental health regulations, policies, and care standards within the hospital, in accordance with the relevant statutes and provisions of

Oregon law. She also has "full charge and control of all the mental healthcare-related business of the hospital," including advising the hospital's departments, staff, and related entities of their obligations under the United States Constitution and Oregon law. Dr. Walker is a person within the meaning of 42 U.S.C. § 1983 and was acting under color of state law at all times relevant to this complaint.

7. Defendant Dr. Sejal Hathi is sued in her official capacity as the Director of the Oregon Health Authority. As the chief executive officer of the Oregon Health Authority, one of her duties is to enforce and oversee the health regulations and policies within the state of Oregon, in accordance with the relevant statutes and provisions. She also has "full charge and control of all the healthcare-related business of all departments, commissions, and bureaus of the State," including advising these departments, commissions, and bureaus of their obligations under the United States Constitution and Oregon law. Dr. Hathi is a person within the meaning of 42 U.S.C. § 1983 and was acting under color of state law at all times relevant to this complaint.

## **FACTUAL BACKGROUND**

8. Plaintiff Preston Berman has been under the jurisdiction of the PSRB since 2010, following a finding of "Guilty Except for Insanity" (GEI) related to a severe mental health crisis and suicide attempt involving fire in an unoccupied building. Throughout this time, Mr. Berman has been closely monitored and treated with mental health care. He has resided at Oregon State Hospital (OSH) since 2021, with prior residencies from 2010 to 2015 and from 2019 to 2020.

9. Mr. Berman previously demonstrated his capacity to function in less restrictive, community-like environments through his successful participation in the OSH Salem

Cottage program, an unlocked, on-grounds residence designed as a step-down process from hospital-level care. Having spent four and a half years in the hospital level of care, transitioning to the Salem Cottages helped prepare Mr. Berman for living in a group home. In this setting, he engaged in therapeutic activities and developed independence and personal responsibility through everyday tasks. Mr. Berman did his own laundry without staff assistance, performed household chores similar to those in a residential treatment home, and prepared daily meals with minimal staff support, including communal meals for holidays. He also enjoyed the freedom to move between cottages, often walking to visit peers, with staff providing only minimal oversight, such as verifying his arrival by phone. These experiences were critical in fostering his independence and readiness for community living.

10. However, the termination of the Salem Cottage program has since led OSH to confine Mr. Berman and similarly situated individuals to a highly structured, institutionalized setting that significantly restricts their autonomy. Within the secure perimeter of OSH, daily activities are dictated by institutional protocols, and Mr. Berman, along with others in similar circumstances, is isolated in a facility where their interactions are largely limited to individuals with mental disabilities.

11. Restrictions at OSH extend to nearly all aspects of daily life. Mr. Berman's living conditions are under constant monitoring, and his access to personal items and basic amenities is highly restricted. For instance, he is limited to a single small snack box for personal food storage and is no longer permitted to store additional food or beverages as he once was. OSH also imposes strict limitations on his use of technology, prohibiting him

from having a TV, DVD player, or internet-enabled computer in his room. This isolation is further compounded by limitations on community engagement activities.

12. Furthermore, recent institutional changes at OSH have continued to diminish patient autonomy, including the phase-out of patient cash access, which restricts transactions to a point-of-sale system. This adjustment further limits residents' access to essential items available only through vending machines, reducing their ability to make independent choices.

13. The decision to close the Salem Cottage program and place Mr. Berman and similarly situated individuals in increasingly restrictive institutional settings has heightened the risk of further institutionalization. Prolonged confinement in such an environment fosters dependency on institutional care, undermining the principles of the Americans with Disabilities Act (ADA) and its goal of rehabilitation. OSH's failure to offer Mr. Berman and others access to less restrictive, community-like treatment not only stifles personal growth but also results in unnecessary segregation, isolating them from a more integrated and supportive environment.

## **INTRODUCTION**

14. Plaintiff Preston Berman does not take filing this action lightly; however, only the federal courts have the authority to address the increasingly restrictive practices implemented by OSH and OHA that continue to erode residents' civil rights and autonomy.

15. Plaintiff is not seeking compensation or monetary damages from the Defendants. Instead, he is solely requesting that the State of Oregon, Oregon Health Authority (OHA), and Oregon State Hospital (OSH) fulfill their legal duty to provide care in the least restrictive setting, as mandated by both state and federal law. This request is grounded in the statutory

and constitutional obligations that guarantee disabled individuals the right to treatment in an environment that fosters autonomy, community integration, and personal dignity, rather than imposing unnecessarily restrictive confinement.

16. Since his adjudication as Guilty Except for Insanity (GEI) in 2010, Mr. Berman has been under the jurisdiction of the Psychiatric Security Review Board (PSRB) and has experienced various levels of restrictive settings. During his prior residency at OSH, Mr. Berman was permitted to live in the Salem Cottage program, an unlocked, on-grounds residence that allowed him to participate in community-like activities and exercise independence. The Salem Cottage program enabled Mr. Berman to engage in therapeutic activities and interact with peers, while also granting him privileges such as unaccompanied grounds access with a peer, which encouraged his development of personal responsibility. However, OSH's termination of the Salem Cottage program, among other supportive measures, has led to increasingly restrictive and isolating conditions that severely limit Mr. Berman's autonomy and opportunities for community integration.

17. The policies implemented at OSH not only contradict the rehabilitative purpose of commitment but also violate Mr. Berman's rights under the Americans with Disabilities Act (ADA) and the Due Process Clause of the Fourteenth Amendment. OSH has enforced a series of restrictive measures that deny residents meaningful rehabilitative resources and limit their access to services that foster personal growth and independence. Among the most detrimental changes, OSH previously permitted residents to attend 12-step and recovery groups in the community, allowing them to integrate with members of the public. This is no longer permitted. OSH has severely restricted visitation rights, allowing only one-hour daily contact visits in the Secure Residential Treatment Facility (SRTF) level of

care, which fails to account for the long distances that many families, including Mr. Berman's, must travel to reach OSH. Previously OSH allowed families an exception to book multiple hours for visits on a single day to make their travel worthwhile. Additionally, visits in the Hospital Level of Care (HLOC) are conducted behind glass in a county jail like setting, far from the vision of the least restrictive environment, further limiting meaningful interaction between residents and their loved ones. OSH has also revoked sealed mail privileges, stifling confidential communication with family members, and restricted personal cash access by eliminating cash in favor of Avro cash cards, which further curtails residents' autonomy in daily life.

18. Further exacerbating the restrictive environment at OSH, the on-grounds Empowerment Center has recently been placed on indefinite hold. This space had provided residents with a much-needed reprieve from the institutional setting, offering a relaxing environment where they could practice real-life skills and enjoy a break from their highly restrictive surroundings. At the Empowerment Center, residents could drink quality coffee, eat snacks, play guitar, read books, sit on the back porch, talk with the Empowerment Center host, and play cards—all in a calming and supportive atmosphere. Its closure has removed a vital resource that was instrumental to residents' recovery and overall well-being. Additionally, while OSH continues to allow community outings, they have restricted visits with family in the community and the opportunity to go to a church of the residents choosing, 12 step meetings and other community settings where someone who doesn't qualify for Hospital Level of Care could actually interact with the community.

19. Moreover, OSH has implemented restrictive protocols at its licensed Secure Residential Treatment Facility (SRTF), which OSH claims is not HLOC, imposing the same

high-security protocols applied in its acute psychiatric units. This approach erases the critical distinction between care levels, contrary to the ADA's mandate that services for individuals with disabilities be provided in "the most integrated setting appropriate" to their needs. The shift toward increased restrictions has also affected basic personal freedoms, including cash access, which prevents residents from making independent purchases and contributes to dependency on institutional resources rather than fostering autonomy.

20. The ADA requires that services for individuals with disabilities be administered in the least restrictive, most integrated settings possible (42 U.S.C. § 12132; *Olmstead v. L.C.*, 527 U.S. 581). OSH's practices stand in direct violation of these requirements, as they effectively prevent residents from building connections with the community and participating in activities that support their independence and social integration. By maintaining residents in an overly restrictive and isolated environment, OSH's policies disregard the ADA's integration mandate and the Due Process protections intended to safeguard disabled individuals' rights to autonomy and meaningful rehabilitation.

21. This continued deprivation of autonomy and access to community-based treatment compounds ADA and Due Process violations. Disabled individuals like Mr. Berman possess a constitutional liberty interest in treatment that supports eventual community reintegration. OSH's policies contravene this principle, substituting unnecessary confinement for the individualized care needed to facilitate growth and recovery (Mink, 322 F.3d at 1121; Ohlinger, 652 F.2d at 778).

22. Through these restrictive practices, OSH has created a cycle of dependency and institutionalization, blocking residents from the pathway to independent living that the ADA and Fourteenth Amendment protections are designed to secure. The absence of a

rehabilitative setting and the erosion of residents' autonomy underscore an urgent need for corrective action to align OSH's practices with its legal obligations and to promote the dignity and rights of disabled individuals.

23. The September 2024 Mink-Bowman OSH Forensic Admission and Discharge Dashboard https://www.oregon.gov/oha/osh/pages/mink-bowman.aspx (Exhibit 1) indicates that numerous individuals under the jurisdiction of the Psychiatric Security Review Board (PSRB) no longer require a hospital level of care (HLOC) yet remain at Oregon State Hospital (OSH). Specifically, **53 PSRB individuals have been assessed as no longer needing HLOC**, averaging a wait time of **209.9 days** before discharge or conditional release, highlighting the lack of access to less restrictive environments. This prolonged institutionalization reflects a significant issue, as these individuals could benefit from integration into settings aligned with their actual support needs. OSH's current approach disregards the ADA's integration mandate, effectively holding individuals in restrictive conditions without just cause, limiting their growth, autonomy, and reintegration potential.

24. Plaintiff's background check (Exhibit 2) shows that the information presents individuals with a "Guilty Except for Insanity" (GEI) status under the PSRB as if they have criminal convictions. This representation creates a misconception, suggesting that GEI adjudications are equivalent to criminal convictions, which can lead to significant barriers in housing and employment opportunities for these individuals. The label "Guilty Except for Insanity" is a civil adjudication, not a criminal conviction, and should be reflected as such in background checks to avoid unwarranted stigma and discrimination. However, Exhibit 2's layout and terminology fail to make this critical distinction, reinforcing a punitive view of PSRB individuals rather than one based on treatment and rehabilitation. This misrepresentation

perpetuates mental health stigma and denies individuals fair access to resources necessary for their reintegration into society.

25. OSH has historically operated with a balance between safety, comfort, and reasonable risk tolerance, creating an environment conducive to rehabilitation by combining necessary safety protocols with humane and practical standards. This approach allowed for a rehabilitative setting that aligned with the realities residents would encounter upon community reentry, promoting skill-building and autonomy.

26. In recent years, however, OSH's administration has prioritized safety at an extreme level, implementing restrictive measures that seek to eliminate all perceived risks without considering the detrimental effects on residents' rehabilitative potential. This fixation on achieving a "zero-risk" environment results in excessive and unreasonable limitations that, rather than protecting residents, undermine their ability to rehabilitate effectively. By eliminating opportunities for autonomy and practicing essential life skills within the facility, OSH is creating conditions where residents are isolated from community-based realities, increasing the risk of adverse outcomes upon release due to the absence of a step-down process.

27. Historically, OSH operated under a structured care model with distinct levels of Minimum, Medium, and Maximum supervision. However, in 2022, the administration imposed a blanket policy applying restrictive "ligature" and "sharps" regulations across all levels of care, including the Secure Residential Treatment Facility (SRTF), which is intended to provide minimum-level care. This "flattening" of care levels has disproportionately impacted the least restrictive settings and has further impeded the rehabilitation of residents

in SRTF, where higher autonomy was previously provided to prepare residents for community reentry.

28. The administration's reactionary policies are evident in recent incidents that underscore the excessive nature of OSH's current approach. In June 2023, the Oregon State Hospital (OSH) implemented a significant policy change, referred to as the "Pause to Co-Mingling" (Exhibit 6), which effectively suspended all co-mingling and group-based therapeutic activities on its Salem campus following the discovery of contraband within the secure perimeter. The restrictions halted critical rehabilitative services, including group therapy, treatment mall activities, on-campus shopping, and religious gatherings, confining patients to their units and disrupting established treatment protocols designed to foster recovery and community integration. Peer advocacy and patient-led groups, such as the Peer Advocacy Council (PAC) and Native Services groups, as well as vocational training and culturally significant events like the Pride Festival, were also indefinitely postponed, further isolating residents and reducing access to rehabilitative opportunities. These measures violated the Americans with Disabilities Act (ADA), which mandates treatment in the least restrictive, most integrated setting appropriate to the needs of individuals with disabilities. By broadly applying restrictions indiscriminately and cutting off critical rehabilitative and social services, OSH undermined patients' rights to access therapeutic programs and essential interactions necessary for recovery, compounding the harm by failing to provide a clear timeline or plan for resuming normal operations.

29. In addition, on September 19, 2024, several residents under .370 commitment inhaled cocoa butter soap, mistakenly believing it had psychoactive effects. OSH staff responded by conducting on-site drug tests on the soap, which initially showed a false positive result

for cocaine. Without confirming the presence of illegal substances, the administration immediately halted all resident outings and implemented comprehensive searches across the facility. Once the soap was confirmed to contain no narcotics by having negative urinalysis from all 25 residents on the unit, the restrictions were lifted. This reaction exemplifies OSH's current approach of prioritizing extreme risk elimination over proportionate response, despite the absence of verified threats to safety. The soap in question was provided by OSH through their vendor.

30. Another incident occurred on October 23, 2024, when a pottery tool categorized as a "sharp" was misplaced. OSH has adopted an overly broad definition of "sharps," encompassing items such as pens, plastic knives, pottery tools, coffee pots, metal utensils, ceramics, paint brushes, and keys. In response to the misplaced pottery tool, OSH initiated comprehensive searches and a full lockdown across its Salem campus, suspending almost all off-unit activities, including the café, in-person visitation, group activities, outings, and access to the Kirkbride Bridges Treatment Mall facilities, such as the chapel, educational classrooms, computer lab, hair salon, and gym. The following day, the tool was found within the pottery room itself, where it was supposed to be, confirming that no actual security breach had occurred. Nevertheless, OSH administration maintained these severe restrictions, closing treatment malls and suspending patient jobs and therapeutic activities involving "sharps," including pens, pencils, and cooking tools, under the guise of completing a "sharps inventory." OSH also removed mitigation plans for belts and normal writing pens.

31. This pattern of extreme overreaction and the imposition of broad, generalized restrictions underscore the detrimental impact of OSH's current policies. Rather than implementing

targeted, evidence-based responses, OSH's indiscriminate lockdowns and restrictions

hinder residents' rehabilitation and violate the Americans with Disabilities Act (ADA) by

failing to provide treatment in the least restrictive environment appropriate to their needs.

The ADA mandates that facilities like OSH must allow residents with disabilities to receive

services in the "most integrated setting appropriate" for them, supporting their dignity and

autonomy. OSH's failure to uphold this standard by subjecting residents to blanket

restrictions that limit their engagement in necessary rehabilitative activities not only

undermines their constitutional rights under the Due Process Clause but also erodes the

foundation for their successful reintegration into the community. The administration's

current policies prioritize risk elimination over rehabilitation, effectively institutionalizing

residents in an environment that denies them the skills and autonomy they need to

transition safely and successfully to less restrictive settings.

32. The former Oregon State Hospital (OSH) administration, led by Superintendent Greg

Roberts and Chief Medical Officer Rupert Goetz, established the *Culture of Safety* system

transformation project. This initiative aimed to create an environment where necessary

safety protocols served the broader purpose of facilitating rehabilitation opportunities for

residents. Building on this foundation, OSH began Phase II, *Culture of Recovery,* which

shifted the institution's focus toward providing recovery-oriented, person-centered,

trauma-informed, and evidence-based treatment. This approach reinforced that safety

measures should support—not inhibit—the therapeutic work necessary for residents'

growth and reintegration.

33. Under Superintendent Roberts, OSH deliberately moved away from correctional language,

replacing terms like *minimum, medium,* and *maximum security* with treatment-centered

terminology such as *Transition, Recovery,* and *Admissions/Stabilization.* This non-carceral framework reflected a commitment to mental health care distinct from punitive detention. However, recent administrative actions have signaled a return to more restrictive practices without maintaining the essential focus on rehabilitation. For example, in response to a recent "sharps" incident, staff work areas **(non-patient zones)** were searched, and personal items classified as "sharps" were removed, reflecting a shift from risk mitigation to risk elimination. This shift disregards the prior framework, which balanced safety needs with therapeutic opportunities, fostering a recovery-oriented environment.

34. As OSH reverts to a risk-averse, highly restrictive environment that lacks a coherent path forward, its foundational commitment to recovery-based principles has become increasingly unclear. Returning to a system that emphasizes person-centered, trauma-informed care will align OSH's operations with its rehabilitative mission and statutory obligations. Reinstating a balanced risk-awareness model rather than a zero-risk approach is essential to foster an environment that enables residents' progress toward recovery, aligning with the ADA's mandate for integrated, humane care in the least restrictive setting possible.

## STATUTORY AND REGULATORY BACKGROUND

### JUSTICE DEPARTMENT'S ADA INVESTIGATION IN MICHIGAN PROVIDES RELEVANT PRECEDENT

35. On November 13, 2024, the U.S. Department of Justice (DOJ) announced an investigation under the Americans with Disabilities Act (ADA) into whether the State of Michigan unnecessarily institutionalizes adults with serious mental illness in state psychiatric

hospitals. The DOJ is assessing whether Michigan fails to provide necessary

community-based mental health services that enable individuals to transition from

psychiatric hospitals and remain stable in the community.

36. This investigation underscores the ADA's mandate that people with disabilities be served in

the most integrated setting appropriate to their needs. Assistant Attorney General Kristen

Clarke of the DOJ's Civil Rights Division emphasized, "The Americans with Disabilities

Act protects people's right to receive mental health services in the community, rather than

remaining in hospitals when they are ready to go home."

37. The Michigan case is directly relevant to the issues raised in this complaint. Oregon State

Hospital (OSH), like Michigan's psychiatric hospitals, subjects individuals to prolonged

institutionalization without appropriate steps or step downs to ensure their successful

transition to community-based care. OSH's policies violate the ADA's integration mandate,

which guarantees disabled individuals access to rehabilitative services in the least

restrictive setting. The DOJ's action in Michigan demonstrates federal recognition of these

systemic issues and provides a compelling framework for addressing similar violations in

Oregon.

## LEGAL DISTINCTION OF GEI ADJUDICATION UNDER OREGON LAW

38. It is essential to understand that under Oregon law, a Guilty Except for Insanity (GEI)

adjudication is fundamentally different from a criminal conviction. According to ORS §

161.325, when an individual is found GEI, the resulting dispositional order is not

equivalent to a criminal judgment. Rather than imposing a penal sentence, this statute

directs the court to issue a civil commitment, where individuals are placed under the

jurisdiction of the Psychiatric Security Review Board (PSRB) in the care of the Oregon

Health Authority (OHA), for treatment rather than punishment. ORS § 161.325(1) outlines

this framework, which underscores the state's intent to prioritize mental health treatment

and rehabilitation over penal consequences for individuals who committed offenses while

affected by a qualifying mental disorder.

39. Individuals under the jurisdiction of the PSRB, following a GEI adjudication, are therefore

considered civilly committed rather than criminally convicted. This civil commitment

status is intended to provide a therapeutic pathway toward recovery, guided by the principle

that GEI individuals should be given rehabilitative treatment with the goal of reintegration

into the community rather than lengthy restrictive institutionalization. By distinguishing

GEI adjudications from criminal convictions, Oregon law seeks to align with the

Americans with Disabilities Act (ADA) and the Due Process Clause, which protect

individuals with mental disabilities from undue confinement in settings more restrictive

than necessary.

40. However, current practices at OSH, as well as under the oversight of OHA, often fail to

honor the rehabilitative intent of civil commitment. By treating civilly committed GEI

individuals as though they were criminally convicted, OSH imposes overly restrictive

measures—such as revoking privileges, restricting community access, unreasonable

restrictions on visitation, and limiting rehabilitative resources—that contradict both state

law and constitutional protections. These restrictive practices disregard the GEI

designation's civil commitment framework, effectively blurring the line between

therapeutic care and punitive detention.

41. Through these protections, Oregon law recognizes that individuals under GEI adjudications, as civilly committed persons, should not face the social and legal burdens associated with criminal convictions. Unlike individuals with criminal convictions, those found GEI are meant to be in a rehabilitative framework rather than a punitive one. This distinction is crucial in areas like background checks, employment opportunities, housing eligibility, and social reintegration, where labeling GEI individuals as criminally convicted can lead to unjust discrimination and stigma. For example, traditional background checks flag criminal convictions but fail to distinguish GEI civil commitments, which can cause employers, housing authorities, and licensing boards to misinterpret the nature of a GEI adjudication as a conviction, leading to unnecessary barriers for those seeking reintegration.

42. The consequences of this mislabeling are significant: individuals under GEI adjudications often face barriers to securing stable housing, gaining employment, and participating in community life. Without clarity in these records, many potential employers and landlords view GEI adjudications as violent or dangerous offenses, even if the individual's offense was non-violent and directly linked to a mental health crisis. This misinterpretation perpetuates social exclusion, compounding the challenge of reentry and diminishing the rehabilitative intent of Oregon's GEI framework.

**ELEVENTH AMENDMENT**

43. The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."U.S. Const. amend. XI. Although the text of the Eleventh Amendment preserves a

state's sovereign immunity only when it faces suits by citizens of a different state, the

Supreme Court has "extended the Amendment's applicability to suits by citizens against

their own States." *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001) (citations

omitted); *see also Holz v. Nenana City Pub. Sch. Dist.*, 347 F.3d 1176, 1180 (9th Cir. 2003)

(noting that the Eleventh Amendment also applies to "certain actions against state agencies

and state instrumentalities")

(citation and quotation marks omitted).

44. Plaintiffs may overcome the Eleventh Amendment bar if Congress abrogates a state's

sovereign immunity. *See Garrett*, 531 U.S. at 364 ("Congress may subject nonconsenting

States to suit in federal court when it does so pursuant to a valid exercise of its § 5 power.")

(citing *Fitzpatrick v. Bitzer*, 427 U.S. 445, 456 (1976)). Congress abrogates a state's

sovereign immunity if it (1) "makes its intention to abrogate unmistakably clear in the

language of the statute" and (2) "acts pursuant to a valid exercise of its power under § 5 of

the Fourteenth Amendment." *Nev. Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 726 (2003).

In 1999, the Ninth Circuit held that Title II of the ADA meets both requirements. See *Dare*

*v. California*, 191 F.3d 1167, 1175 (9th Cir. 1999) (holding that Title II abrogated state

sovereign immunity because it "was a congruent and proportional exercise of Congress'

enforcement powers under § 5 of the Fourteenth Amendment").

45. After *Dare*, the Supreme Court in *Garrett* held that the Eleventh Amendment bars claims

under Title I of the ADA, but "left open . . . the question whether the Eleventh Amendment

permits suits for money damages under Title II." *Tennessee v. Lane*, 541 U.S. 509, 514

(2004) (citing *Garrett*, 531 U.S. at 360 n.1). In *Lane*, the Supreme Court held that Title II

abrogated state sovereign immunity but limited its holding to cases implicating the

fundamental right of access to the courts. See *id.* at 531 ("Because we find that Title II unquestionably is valid § 5 legislation as it applies to the class of cases implicating the accessibility of judicial services, we need go no further.") (citation omitted). The Court then extended *Lane's* holding to all Title II claims that are based on conduct that violates the Fourteenth Amendment. See *United States v. Georgia*, 546 U.S. 151, 159 (2006) ("[I]nsofar as Title II creates a private cause of action for damages against the States for conduct that *actually violates the Fourteenth Amendment*, Title II validly abrogates state sovereign immunity.") (emphasis in original). *Georgia* set forth a three-part test to determine whether a Title II claim may proceed against a nonconsenting state: (1) does a state's alleged conduct violate Title II; (2) does the state's alleged conduct also violate the Fourteenth Amendment; and (3) is Congress' abrogation of sovereign immunity valid even if the state's alleged conduct does not violate the Fourteenth Amendment. *Id.*

46. In *Phiffer*, the state of Oregon appealed the district court's denial of its motion for judgment on the pleadings on the plaintiff's Title II claim based on Eleventh Amendment immunity, arguing that *Garrett* upset prior circuit precedent. The Ninth Circuit disagreed. *Id.* at 793. The Supreme Court then granted certiorari, vacated the prior panel decision, and remanded for further consideration in light of *Lane*. Id. at 792. On remand, the *Phiffer* court declined to engage in a case-by-case analysis as to whether the plaintiff's Title II claim implicated a fundamental right, concluding that its "initial resolution of th[e] case is consistent with *Lane's* holding[.]" *Id.*

47. Following both *Lane* and *Georgia*, the Ninth Circuit continues to reaffirm its decision in *Phiffer*. See *Okwu v. McKim*, 682 F.3d 841, 845 (9th Cir. 2012) ("Title II abrogates a state's Eleventh Amendment immunity.") (citing *Phiffer*, 384 F.3d at 792); *Daniel v. Levin*, 172 F.

App'x 147, 149 (9th Cir. 2006) ("[T]he Eleventh Amendment does not bar ADA or [Rehabilitation Act] suits against state officials in their official capacities for injunctive relief or damages.") (citing *Phiffer*). So do a majority of district courts within the Ninth Circuit. *See, e.g., Karam v. Univ. of Ariz.*, No. 18-cv-00455-RCC, 2019 WL 588151, at *4 (D. Ariz. Feb. 13, 2019) (finding that "[t]he Ninth Circuit has clearly determined that Congress validly abrogated state's immunity under Title II of the ADA") (citing *Phiffer*); *Fernandez v. Rice*, No. 15-cv-00487- LEK, 2017 WL 988103, at *4 (D. Haw. Mar. 14, 2017) (citing *Phiffer* to hold that "Congress has abrogated states' Eleventh Amendment immunity with respect to claims under Title II of the ADA"); *Miller v. Ceres Unified Sch. Dist.*, 141 F. Supp. 3d 1038, 1043 (E.D. Cal. 2015) (declining to determine whether the plaintiff's Title II claim implicated a fundamental right because "the Ninth Circuit has not expressly called for this 'nuanced, case-by-case analysis' to occur") (citing *Phiffer*)

48. The Eleventh Amendment generally provides states with immunity from being sued in federal court by private parties for state law violations. However, this immunity does not extend to cases involving federal law where Congress has expressly abrogated state immunity, such as under Title II of the Americans with Disabilities Act (ADA). Congress specifically authorized individuals to bring claims against states under the ADA when constitutional rights are involved, including violations of the Due Process Clause of the Fourteenth Amendment. Therefore, in this case, Eleventh Amendment immunity does not apply, as the action is based on federal claims involving ongoing violations of both Title II of the ADA and the Fourteenth Amendment, qualifying as recognized exceptions to state immunity.

**The Americans with Disabilities Act and Olmstead v. L.C., 527 U.S. 581 (1999)**

49. The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

50. Congress enacted the ADA in 1990 "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities[.]" 42 U.S.C. § 12101(b)(1). Among the specific issues the ADA addresses are "segregation" and actions that prevent persons with disabilities from "fully participat[ing] in all aspects of society[.]" Id. §§ 12101(a)(1), (5).

51. In enacting the ADA, Congress found that "people with disabilities, as a group, occupy an inferior status in our society, and are severely disadvantaged socially, vocationally, economically, and educationally; [and] the Nation's proper goals regarding individuals with disabilities are to assure equality of opportunity, full participation, independent living, and economic self-sufficiency for such individuals[.]" Id. §§ 12101(a)(6)-(7). Congress explicitly recognized that "the continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities the opportunity to compete on an equal basis and to pursue those opportunities for which our free society is justifiably famous[,]" therefore resulting in "dependency and nonproductivity." Id. § 12101(a)(8)

52. The ADA was also intended to enable individuals with disabilities to gain economic independence and to "move proudly into the economic mainstream of American life." President George H.W. Bush, Remarks at the Signing of the Americans with Disabilities

Act (July 26, 1990), available at

http://www.eeoc.gov/eeoc/history/35th/videos/ada_signing_text.html.

53. Title II of the ADA prohibits discrimination on the basis of disability by public entities. 42

U.S.C. § 12132. A "public entity" is any state or local government and any department,

agency, or other instrumentality of a state or local government, and covers all services,

programs, and activities provided or made available by public entities, including through

contractual, licensing, or other arrangements. See 42 U.S.C. §§ 12131(1), 12132; 28 C.F.R.

§ 35.130. Accordingly, Title II's coverage extends to the State of Oregon and its respective

agencies, departments, and programs.

54. Congress directed the Attorney General to issue regulations implementing Title II of the

ADA. 42 U.S.C. § 12134(a).

55. The Title II regulations require public entities to "administer services, programs, and

activities in the most integrated setting appropriate to the needs of qualified individuals

with disabilities." 28 C.F.R. § 35.130(d). "The most integrated setting" is one that "enables

individuals with disabilities to interact with nondisabled persons to the fullest extent

possible." Id. pt. 35 app. B.

56. Title II's regulations further prohibit public entities from utilizing "criteria or methods of

administration" that have the effect of subjecting qualified individuals with disabilities to

discrimination, including unnecessary segregation, or "that have the purpose or effect of

defeating or substantially impairing accomplishment of the objectives of the public entity's

program with respect to individuals with disabilities[.]" Id. § 35.130(b)(3).

57. The Supreme Court has held that Title II prohibits the unjustified segregation of individuals

with disabilities. Olmstead v. L.C., 527 U.S. 581, 597-600 (1999).

58. The Supreme Court's holding in Olmstead "reflects two evident judgments." Id. at 600.
"First, institutional placement of persons who can handle and benefit from community
settings perpetuates unwarranted assumptions that persons so isolated are incapable or
unworthy of participating in community life." Id. "Second, confinement in an institution
severely diminishes the everyday life activities of individuals, including family relations,
social contacts, work options, economic independence, educational advancement, and
cultural enrichment." Id. at 601.

59. Under Olmstead, public entities are required to provide community-based services, rather
than segregated services, when such services (a) are appropriate, (b) are not opposed by the
affected persons, and (c) can be reasonably accommodated, taking into account the
resources available to the entity and the needs of other persons with disabilities. Id. at 607.

**Application of the ADA and Olmstead to Day Activity Services**

60. The ADA's integration mandate applies broadly to all programs, services, and activities
provided by a public entity, including day treatment services. According to 28 C.F.R. §
35.130(d), "A public entity shall administer services, programs, and activities in the most
integrated setting appropriate to the needs of qualified individuals with disabilities." The
ADA intends for services to support individuals' dignity and autonomy, yet the structure
and progression of day activities at Oregon State Hospital (OSH) move in the opposite
direction—toward greater restriction and control.

61. Day activities at OSH, including Anger Management, Process Groups, leisure activities
like cards and dice, outside time, and other structured programs, are exclusively for
individuals with mental disabilities and are conducted within OSH's secure perimeter. In
the past, residents were permitted to use video game consoles as part of the treatment mall,

but this option has been removed due to the hospital's increasingly restrictive sharps policy. Although these activities have potential therapeutic value, they are delivered in an environment with progressively restrictive rules that limit resident autonomy. Individuals are kept in highly supervised, rigidly structured settings, with OSH regularly imposing additional restrictions that further reduce their independence and opportunities for self-direction in daily activities.

62. For example, OSH eliminated the Salem Cottage program, a less restrictive setting that allowed residents more freedom within an unlocked, on-grounds facility. This decision not only intensified restrictions on residents' movement but also imposed more limits on their day-to-day activities, requiring them to engage solely in institutionally controlled, highly supervised programs. Moreover, residents have experienced restrictions on personal items and technology usage, with limitations on basic amenities such as personal snack storage, warm water access, and even the ability to change the television channel or access filtered water without staff permission.

63. These ongoing changes at OSH—eliminating less restrictive settings like the Salem Cottages, reducing personal freedoms, and further confining individuals to institutional control—make day activities overly restrictive. The progression toward greater limitations undermines residents' autonomy, forces reliance on rigid institutional structures, and contradicts the ADA's mandate to deliver services that respect the dignity and independence of individuals with disabilities. This approach fosters a dependency on institutional care rather than promoting the skills and autonomy necessary for self-sufficiency, thereby contravening the fundamental purpose of the ADA and unnecessarily restricting the personal agency of those it is meant to support.

## FACTUAL ALLEGATIONS

### A. Elimination of Less Restrictive Settings.

64. Historically, Oregon State Hospital (OSH) offered less restrictive settings, such as the Salem Cottage program, where individuals could reside in an unlocked environment with increased autonomy. These settings provided a therapeutic, community-like atmosphere that allowed residents to engage in activities outside the main facility's highly controlled environment. Residents in these programs could participate in therapeutic activities and interact more freely with peers, fostering a sense of independence, personal responsibility, and self-sufficiency.

65. At the SRTF (Secure Residential Treatment Facility) level of care, residents used to enjoy even greater autonomy. They were permitted to have modern amenities such as personal game consoles, televisions, and computers with internet access through Wi-Fi hotspots. Residents could go on outings to stores like Walmart to purchase clothing, food, and other personal items, including canned goods. Additionally, they had the freedom to buy coffee brands of their choice, unlike the current restriction to hospital-provided coffee. Over time, these opportunities have been significantly reduced, with residents no longer allowed personal computers, game consoles, or televisions in their rooms, resulting in a more restrictive and less empowering environment.

66. However, OSH has since eliminated these less restrictive options, confining residents to highly controlled, secure environments with significantly limited freedoms. The closure of programs like the Salem Cottages has forced residents who once thrived in less restrictive settings back into more institutionalized conditions. As a result, residents who could safely

function with a higher level of autonomy and reduced supervision now face increased

restrictions and decreased opportunities for self-directed activities.

67. This shift has significantly impacted the daily lives of residents, limiting their ability to

participate in less supervised and more varied therapeutic options. The removal of these

settings has increased residents' dependency on OSH's highly structured institutional

controls, reinforcing a reliance on constant supervision and reducing opportunities to

practice skills necessary for greater independence.

68. Additionally, the current restrictions have left residents with almost no opportunities to

engage in solo activities in their rooms, further diminishing their ability to develop and

practice coping skills independently. Personal time spent on constructive solo

activities—such as gaming, streaming media, or using a personal computer for educational

purposes—can be essential for building self-sufficiency and fostering emotional regulation.

The absence of such opportunities not only limits residents' personal growth but also

contributes to a sense of monotony and powerlessness in their daily lives.

69. The elimination of less restrictive options not only removes a critical step toward

rehabilitation and autonomy for residents but also intensifies the institutionalization

process, which can hinder long-term reintegration goals. By denying access to settings that

support gradual transitions to more independent living, OSH has constrained residents to

environments that restrict personal growth and choice, which contradicts rehabilitative best

practices and the ADA's mandate for integration in the least restrictive setting appropriate

to each individual's needs.

B. **Overly Restrictive Supervision of Basic Needs**.

70. At OSH, residents experience a high level of institutional control over basic daily activities, limiting their independence and autonomy in fundamental ways. Routine self-care tasks, which could provide opportunities for personal responsibility and self-management, are instead heavily supervised and controlled. Residents must seek permission from staff to complete basic activities such as accessing filtered water, changing television channels, or doing their laundry, which reinforces dependency on institutional oversight and reduces opportunities for personal agency.

71. This restrictive supervision extends to the management of personal items, with residents often limited to small, designated storage spaces for personal snacks. Previously, residents enjoyed more flexibility, including access to larger storage options for food and beverages, such as canned goods. Recent restrictions now confine them to a single, shoe box-sized snack container, removing a key element of personal comfort and self-determination within their living spaces. Furthermore, limitations on amenities, like access to warm water and other basic utilities, exacerbate the restrictive environment. Residents face strict regulations and constraints on personal hygiene resources, including timed water access in sinks and showers, which limit their ability to care for themselves independently and adds an element of frustration to basic tasks. In the Salem Cottages there were no timers on sinks and showers.

72. In the past, residents were also allowed to shop in the community for clothing that fit their needs and preferences, as well as food items that aligned with their dietary or cultural requirements. However, recent changes to Oregon Administrative Rule 309-102-0120,

Patient Rights Related to Mail and Packages, have severely restricted this ability. According to subsection (5), for safety and security reasons, patients, family members, or friends who are visitors as defined in chapter 309, division 106 may only purchase items through the OSH Market, except the patient may purchase printer paper at cost from OSH. OSH will not profit from the sales from the OSH Market. If the OSH Market does not have the desired item, the patient may request authorization from OSH to purchase an item through OSH's ordering system. OSH must only grant authorization for requests to purchase items if it is not contraband, including but not limited to prohibited items; it is patient clothing, personal bedding, reading material, cultural food/items, or religious items; and it can be stored in the designated storage areas in the patient's room or patient property room.

73. These changes have further eroded the autonomy of residents, forcing them to rely on the limited selection of the OSH Market and lengthy approval processes for basic necessities. The inability to choose and purchase items independently not only diminishes personal agency but also disrupts the therapeutic benefits of self-determination and the dignity of exercising choice.

74. Such restrictive oversight in daily life imposes a level of control that undermines residents' dignity, reinforcing reliance on staff for even the most basic tasks. The restrictive policies do not account for individual capabilities and, instead, apply blanket restrictions that undermine self-efficacy and personal growth. This level of supervision contradicts the principles of the ADA and rehabilitative best practices, which prioritize autonomy and empowerment for individuals with disabilities. The constant monitoring of basic needs within OSH ultimately promotes dependency rather than encouraging the skills necessary

for self-sufficiency and independent living, which are essential for meaningful

rehabilitation and personal development.

**C. Strict Limitations on Personal Items and Technology.**

75. OSH enforces strict restrictions on residents' access to personal items and technology,

isolating them from essential comforts, digital resources, and connections to the outside

world. These limitations impact the ability of residents to access basic personal items and

technology that could otherwise support autonomy, such as social media and wikipedia or

reasonable access to streaming services such as Netflix, to provide comfort, communication

with the outside world, and enable self-directed learning. In recent years, OSH has also

restricted access to technology. Personal computers and internet hotspots were removed

from residents' rooms and replaced with state issued computers, then those were removed,

leaving them only limited access to computers in the treatment mall's supported education

room. This restricted access confines residents to brief 45 minute sessions, scheduled

sessions without the flexibility to engage with technology on their own terms. Additionally,

OSH prohibits residents from having personal cell phones, despite the feasibility of

disabling cameras with simple epoxy applications. Access to a personal phone could

provide vital social connections, improve access to information, and enhance daily

autonomy, yet this broad restriction leaves residents further isolated.

76. Currently residents are forced to use public phones in the hallway with no privacy, they are

also answered by other residents which can lead to problems such as not getting the person

who has a call or simply hanging up or leaving the phone off the hook.

77. Instead of implementing individualized restrictions for residents who may not be able to use a smartphone safely, OSH enforces a blanket ban on smartphones for everyone, effectively leaving residents in the "stone age" in terms of technology access. This policy prevents residents from learning essential skills needed to function in today's technology-focused world.

78. Despite federal initiatives like InternetforAll.gov , championed by President Biden and Governor Kotek, which aim to provide every American, including Oregonians, with internet access, OSH continues to discriminate against its disabled residents by only allowing extremely limited access to internet resources. This restriction not only isolates residents but also deprives them of the opportunity to engage with technology, undermining their ability to reintegrate into a society that increasingly depends on digital skills and internet connectivity.

79. In addition to limiting personal items and technology, OSH has prohibited residents from receiving care packages containing clothing, food, and other essentials from family and friends. OSH rules allow clothes, blankets, and pillows, but everything has to be ordered from a mail order catalog making clothing and bedding choices severely limited if even able to be ordered at all. Previously, care packages allowed residents to receive basic comforts from home—clothes that fit their needs and personal food items that accommodated preferences. The ban on care packages reduces these simple comforts, restricting residents' ability to maintain a connection to their loved ones and removing a vital source of personal comfort and individuality.

80. These cumulative restrictions on personal items, technology, and care packages intensify residents' dependency on institutional controls, reduce personal agency, and restrict basic comforts that are essential to mental and emotional well-being. By imposing such sweeping limitations without accounting for individual capabilities or needs, OSH promotes institutional dependency and isolation, contrary to the rehabilitative and individualized care principles set forth by the ADA.

## D. **Stigmatizing Labeling on Background Checks.**

81. Oregon perpetuates mental health stigma by designating individuals found "Guilty Except for Insanity" (GEI) on background checks. Although GEI is an adjudication rather than a criminal conviction, this label is often treated as a conviction by potential employers and landlords, undermining the rehabilitative purpose of the adjudication. This stigmatizing classification effectively excludes individuals from integrated employment and housing opportunities, severely impacting their chances for meaningful community reintegration, stable housing, and financial independence.

82. For example, in 2020, Mr. Berman was conditionally hired for a work-from-home call center position with Harry and David, but the employer ceased communication after receiving his background check, which included the GEI designation. Similarly, Mr. Berman's housing application was initially denied based on the GEI label. Only after a letter of accommodation was provided, explaining that the GEI designation was not a criminal conviction, was his application reconsidered and approved. This systemic issue restricts access to employment and housing for individuals with GEI status, further

perpetuating isolation, dependency on institutional settings, and barriers to community

reintegration.

**E.   Progressive Restriction of Resident Autonomy and Resources at OSH**

83. OSH has systematically removed or restricted various resources and privileges previously

available to residents, further isolating them and limiting their opportunities for autonomy

and self-care:

     a.  **Elimination of Cash and Use of Avro Cash Cards** effective (11/19/24) –

        Replacing cash with Avro cash cards restrict residents' autonomy and

        flexibility in managing their own purchases.

     b.  **Restricted Visitation and Closing of the Cottages** – The Salem Cottages

        were closed down, they provided a less restrictive environment. The

        decision also severely limits opportunities for family interactions, with no

        family visits allowed in community settings or in on-grounds homes.

     c.  **Alignment of SRTF with HLOC Rules** (2022) – Standardizing Secure

        Residential Treatment Facility (SRTF) rules to Hospital Level of Care

        (HLOC) standards has further restricted autonomy, reducing the distinctions

        between different care levels.

     d.  **Removal of Technology and Media Access** (2022-2023) – OSH has

        progressively removed access to technology and media, including

        computers, TVs, standalone DVD players in rooms, personal cell phones,

        and portable DVD players (August 28, 2023). These actions severely limit

residents' engagement with technology and coping skills or things to do in their rooms, leaving them without skills essential in today's society.

e. **Reduction of Storage Options for Food and Personal Items** (2022) – The removal of larger storage bins for food in SRTF restricts residents' capacity for self-care and personal autonomy within their living spaces.

f. **Restrictions on Peer and Individual Movement** – Previously allowed freedoms, such as 1:1 on-grounds visits, peer-to-peer activities, and authorized interactions, have been restricted or eliminated.

g. **Increased Security Measures** – Security screenings have become more invasive and uniformly applied without considering individual risk level, now including pat-downs both upon entering and exiting the secure perimeter, intensifying residents' sense of confinement.

h. **Restricted Use of Sally Ports (SP)** – Sally port access, which facilitates resident movement, has been limited to SP2, with an onerous exception process required for rare SP5 use.

i. **Decreased Collaboration Across Programs and Units** – Reduced collaboration between programs, treatment stacks, units, and treatment malls has limited residents' options for treatment and support, further isolating them.

j. **Increased Staffing Requirements in Cottages** – The empowerment center (SEC) and Cottage 7, once venues for a home-like therapeutic setting on grounds, resident cooking and gardening activities, now have an increased minimum staffing requirement (3 staff members per cottage), reducing

residents' access and independence. But due to the new restrictions from

10/25/24 its unknown if the Empowerment Center or Cottage 7 will ever be

reopened without the courts intervention.

k. **Large Removal of Items in 2017/2018**: Due to The Joint Commision focus

on ligature risk, items such as belts, shoelaces, clothing hangers, personal

TVs, clocks/radios with cords, and other personal belongings were removed

to eliminate risk.

l. **Transfer of GEI Patients to Junction City (2022)**: Many GEI patients in

Bridges were transferred to Junction City despite no clinical indication,

solely to make room for .370 patients in need of a "community restoration"

placement, rather than an actual community setting.

m. **Loss of Privileges Following .370 Patient Elopements**: The summer when

a couple of .370 patients eloped led to a blanket restriction of privileges for

GEI and Civil patients. This restriction coincided with severe wildfires,

which prevented outdoor access due to poor air quality. Privileges were not

restored until the installation of anti-elopement structures, including within

the Plaza, where escape would be near-impossible.

n. **Repeated Halts in In-Person Visitation**: In-person visitation has been

halted on multiple occasions facility wide, impacting critical family

interactions. Community visitation with families is on indefinite hold.

o. **Reduction in Patient Pay Jobs**: Significant reduction in patient pay jobs,

including the elimination of all jobs outside the secure perimeter.

(As of 11/18/23 all jobs except Peer Advocacy Council are on hold)

p.  **Removal of Condoms in 2024**: Condoms were removed based on assumptions they promote non consensual sexual activity, further limiting hygienic options for personal privacy.

q.  **Removal of Furniture from Unit Common Areas**: Furniture has been removed from many unit common areas, reducing comfort and functionality within living spaces.

r.  **Increased Staffing Requirement for Bathing**: Bathing now requires two staff members for supervision, with many units having their tub rooms closed and inaccessible, even to staff.

s.  **Suspension of Haircuts**: Haircuts were suspended until a comprehensive safety plan is implemented (10/25/24). (As of 11/18/24 Haircuts are still suspended)

t.  **Suspension of Painting and Pottery Groups**: Painting and pottery groups have been suspended, further limiting creative outlets and therapeutic activities available to residents, Paintbrushes and pottery tools removed.

u.  **Prohibition of Normal Pen and Belts Despite Risk Mitigation Plans**: Pens, and Belts are currently prohibited, despite the established individualized risk mitigation plan process. This policy poses both physical and psychological risks to patients whose pants cannot stay up without a belt.

v.  **Loss of Tables and Chairs in Quads and Plazas**: Tables and chairs have been banned from quads and plazas, further reducing comfortable

communal spaces for residents. Numerous requests for bolted down picnic tables have been denied.

w. **Refusal to Approve Clinically Indicated Tablets**: Despite being identified as the recommended alternative to DVD players, tablets have consistently been denied approval, limiting therapeutic and recreational resources for residents.

x. **Expansion of Contraband List and Definition of "Sharps"**: There has been a significant increase in items classified as contraband, including an expanded definition of what constitutes a "sharp," limiting residents' access to various personal and therapeutic items.

y. **Limitations on Staff for Patient Outings**: Only IDT members and select Treatment Mall staff are permitted to accompany patients on outings, even on campus, significantly reducing available resources, restricting access to familiar staff with established rapport, and impacting overall staff job satisfaction.

z. **Approval of Security Search Modifications**: Special accommodations and considerations for security searches at sally ports are now authorized by Risk Review rather than treatment teams who work directly with the resident, with frequent reports indicating inconsistent adherence to these modifications, either partially or entirely.

84. These cumulative restrictions limit residents' personal agency, social connections, and access to essential skills needed for reintegration into society.

## COUNT I

## VIOLATION OF TITLE II OF AMERICANS WITH DISABILITIES ACT (42 U.S.C. § 12131 et seq.)

85. Paragraphs 1 through 84 of this Complaint are hereby re-alleged and incorporated by reference.

86. Defendants, the State of Oregon, Oregon State Hospital (OSH), Sara Walker in her official capacity as Interim Superintendent of OSH, and Sejal Hathi in her official capacity as Director of the Oregon Health Authority (OHA), are public entities within the meaning of Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12131(1).

87. Title II of the ADA prohibits public entities from discriminating against qualified individuals with disabilities by denying them the benefits of services, programs, or activities, or otherwise subjecting them to discrimination. 42 U.S.C. § 12132.

88. The implementing regulations under Title II require public entities to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). The "most integrated setting" is defined as one that "enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible." 28 C.F.R. pt. 35, app. B.

89. Defendants have violated Title II of the ADA by failing to provide services and treatment in the least restrictive setting appropriate to the needs of Plaintiff and similarly situated residents of OSH.

90. Defendants have restricted Plaintiff and other residents to highly institutionalized environments, including secure perimeter settings within OSH, that limit autonomy and

reduce opportunities for independence, community engagement, and meaningful integration.

91. Defendants enforce policies that impose overly restrictive controls on daily activities and basic rights, including:

    a. **Imposing broad limitations on personal items, amenities, and technology use**: Defendants restrict access to personal storage, technology, and communication devices, depriving residents of reasonable comfort, autonomy, vital effective coping skills, and social connections.

    b. **Eliminating less restrictive housing options and activities**: The termination of the OSH Salem Cottage program and restrictions on other settings with increased autonomy have removed important opportunities for residents to exercise independence, resulting in unnecessary institutional dependency.

    c. **Imposing stigmatizing classifications on background checks**: The "Guilty Except for Insanity" designation on background checks, often treated as a conviction by prospective landlords and employers, restricts access to employment and housing for residents, despite being an adjudication rather than a criminal record.

92. These restrictions and policies limit residents' opportunities for self-sufficiency, community integration, and rehabilitation, violating the ADA's mandate that services be provided in the most integrated and least restrictive setting appropriate to individuals' needs.

93. As a result of Defendants' policies and practices, Plaintiff and similarly situated residents of OSH are denied the benefits of services, programs, and activities in the most integrated

setting appropriate to their needs, resulting in discrimination based on disability in violation of Title II of the ADA.

## COUNT II

## VIOLATION OF THE DUE PROCESS CLAUSE OF THE 14TH AMENDMENT TO THE UNITED STATES CONSTITUTION

94. Paragraphs 1 through 93 of this Complaint are hereby re-alleged and incorporated by reference.

95. The Due Process Clause of the 14th Amendment to the United States Constitution guarantees that no state shall "deprive any person of life, liberty, or property, without due process of law." This protection extends to individuals in state custody, including those in the Oregon State Hospital (OSH).

96. Defendants, including Sara Walker in her official capacity as Interim Superintendent of OSH, and Sejal Hathi in her official capacity as Director of the Oregon Health Authority (OHA), are acting under color of state law and are subject to the protections and requirements of the Due Process Clause.

97. Plaintiff and similarly situated residents of OSH possess a constitutionally protected liberty interest in receiving treatment in the least restrictive environment appropriate to their needs. This liberty interest is rooted in the principles of autonomy and rehabilitation, as recognized by the Supreme Court and reinforced by state and federal laws.

98. Defendants Dr. Walker and Dr. Hathi have violated the Due Process rights of Plaintiff and similarly situated residents by subjecting them to conditions of confinement that are overly restrictive and do not correspond to their therapeutic needs or level of risk.

99. Defendants have further violated Due Process by:

   a. **Enforcing excessive limitations on autonomy and personal agency**: By restricting access to basic amenities, personal items, and technology, Defendants impose blanket restrictions that deprive residents of opportunities to exercise autonomy and maintain social connections, without a sufficient justification tied to safety or therapeutic needs.

   b. **Utilizing stigmatizing labels that impact future employment and housing opportunities**: Defendants perpetuate stigma by labeling individuals with "Guilty Except for Insanity" (GEI) on background checks, leading to discrimination in housing and employment, which compounds the difficulty of reintegrating into society.

100.    The elimination of less restrictive options, such as the Salem Cottage program, and the continuous imposition of additional restrictions on daily life, have intensified Plaintiff's and other residents' dependency on institutional controls, which risks prolonged institutionalization and diminishes the possibility of successful community reintegration.

101.    As a direct result of Defendants' policies and practices, Plaintiff and similarly situated individuals have suffered and continue to suffer harm. Courts have consistently held that the denial of constitutional rights cannot be compensated through monetary damages. See *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (holding that the loss of constitutional rights constitutes irreparable harm).

102.    The actions of OSH and OHA contribute to the erosion of autonomy, denial of rehabilitative opportunities, and prolonged institutionalization without adequate procedural safeguards.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Preston Berman respectfully requests that this Court enter judgment in his favor and grant the following relief:

A. **Appointment of a Neutral Expert**: Appoint a neutral expert, qualified in forensic mental health and disability rights, to advise the Court on effective methods for reducing unnecessary institutionalization at Oregon State Hospital (OSH) and ensuring compliance with the Americans with Disabilities Act (ADA) and the Due Process Clause of the 14th Amendment. This expert shall work with OSH and the Oregon Health Authority (OHA) to develop and implement strategies for providing care in the least restrictive setting appropriate to the needs of OSH residents at all 3 care levels, Minimum, Medium, and Maximum.

B. **Injunction on Background Check Policies for GEI**: Issue a permanent injunction requiring the State of Oregon to amend its background check policies for individuals adjudicated "Guilty Except for Insanity" (GEI), ensuring that background checks clearly state that GEI is an adjudication, not a criminal conviction. The amended policy should explicitly clarify that GEI is a civil commitment status intended for treatment, not punishment, to prevent unnecessary barriers to employment and housing.

C. **Injunction for Least Restrictive Care**: Issue an injunction requiring OSH and OHA to provide treatment in the least restrictive setting appropriate for Plaintiff and similarly situated residents, including restoring or developing community-like settings such as the on ground salem Cottages and the Empowerment Center which was just closed October 25, 2024, where residents can exercise autonomy and interact in integrated environments.

D. **Review and Adjustment of Institutional Policies**: Order OSH to review and modify institutional policies that impose overly restrictive limitations on residents' access to personal items, amenities, technology, smartphones, tablets, and other basic necessities, to ensure that any restrictions are narrowly tailored, based on individualized needs, and support the goals of rehabilitation and integration.

E. **Training and Oversight**: Order OSH and OHA to conduct staff training and implement oversight mechanisms to ensure compliance with the ADA and Due Process requirements, particularly regarding individual assessments for less restrictive placements and the reduction of blanket restrictions that limit resident autonomy.

F. **Other Relief**: Grant such further relief as the Court deems necessary and appropriate to ensure the rights of Plaintiff and similarly situated individuals are upheld and that OSH's practices align with state and federal law, the ADA, and constitutional protections.

DATED: November 18, 2024.

Respectfully submitted,

_s/ Preston Berman_
PRESTON BERMAN
2600 Center St. NE
Salem, OR 97301-2669
Telephone: (503) 947-2704

Plaintiff, appearing Pro Se

# EXHIBIT 1

**OSH Forensic Admission and Discharge Dashboard**
September 2024

### Aid & Assist Admission List

| | Count | Avg Days |
|---|---|---|
| On the Admission List as of the last day of the month | 85 | 17.0 |
| Admitted During the Month | 84 | 26.1 |



### PSRB / GEI Admission List

| | Count | Avg Days |
|---|---|---|
| On the Admission List as of the last day of the month | 3 | 12.7 |
| Admitted During the Month | 1 | 22.0 |



### Aid & Assist No Longer Needing HLOC

| | Count | Avg Days |
|---|---|---|
| No Longer Needs Hospital Level of Care (as of the last day of the month) | 89 | 44.1 |
| Discharged for Community Restoration After Having Been Assessed to No Longer Need HLOC | 14 | 59.0 |
| Total Discharged During the Month | 86 | |



### PSRB / GEI No Longer Needing HLOC

| | Count | Avg Days |
|---|---|---|
| No Longer Needs Hospital Level of Care (as of the last day of the month) | 53 | 209.9 |
| Conditionally Released to the PSRB After Having Been Assessed to No Longer Need HLOC | 5 | 120.2 |
| Total Discharged During the Month | 8 | |



## Aid & Assist Orders & Readmission Rates







| County | Aid & Assist Orders per Month | | | | | |
|---|---|---|---|---|---|---|
| | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 YTD |
| Baker | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.0 |
| Benton | 0.3 | 0.8 | 1.1 | 1.9 | 1.8 | 2.8 |
| Clackamas | 2.4 | 1.8 | 4.1 | 4.6 | 6.5 | 3.8 |
| Clatsop | 0.8 | 1.3 | 1.3 | 1.7 | 1.4 | 1.4 |
| Columbia | 0.7 | 0.5 | 1.3 | 1.2 | 1.3 | 0.9 |
| Coos | 2.2 | 2.4 | 2.7 | 1.1 | 2.5 | 2.1 |
| Crook | 0.3 | 0.1 | 0.0 | 0.2 | 0.2 | 0.2 |
| Curry | 0.7 | 1.3 | 1.7 | 1.3 | 1.0 | 1.2 |
| Deschutes | 1.5 | 1.7 | 3.2 | 2.6 | 3.0 | 2.6 |
| Douglas | 1.9 | 1.8 | 3.8 | 3.3 | 3.7 | 4.4 |
| Gilliam | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Grant | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 | 0.2 |
| Harney | 0.0 | 0.1 | 0.0 | 0.1 | 0.0 | 0.1 |
| Hood River | 0.4 | 0.1 | 0.3 | 0.1 | 0.6 | 0.4 |
| Jackson | 4.4 | 3.0 | 4.8 | 4.3 | 5.9 | 6.3 |
| Jefferson | 0.4 | 0.1 | 0.0 | 0.3 | 0.1 | 0.4 |
| Josephine | 1.7 | 0.8 | 1.0 | 1.5 | 1.5 | 1.3 |
| Klamath | 0.4 | 0.6 | 1.4 | 1.3 | 2.1 | 2.3 |
| Lake | 0.0 | 0.2 | 0.2 | 0.0 | 0.0 | 0.1 |
| Lane | 7.2 | 5.8 | 9.3 | 11.3 | 15.4 | 16.0 |
| Lincoln | 2.2 | 1.9 | 2.2 | 1.9 | 0.9 | 1.4 |
| Linn | 2.3 | 2.3 | 2.2 | 2.8 | 3.0 | 2.9 |
| Malheur | 0.6 | 0.5 | 0.3 | 0.6 | 0.8 | 1.0 |
| Marion | 5.8 | 7.1 | 8.2 | 9.3 | 8.9 | 8.4 |
| Morrow | 0.1 | 0.2 | 0.2 | 0.4 | 0.1 | 0.0 |
| Multnomah | 9.7 | 9.1 | 9.9 | 10.4 | 15.7 | 18.3 |
| Polk | 1.6 | 1.1 | 1.1 | 2.3 | 2.8 | 1.7 |
| Sherman | 0.0 | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 |
| Tillamook | 1.0 | 0.7 | 0.6 | 1.3 | 0.8 | 0.8 |
| Umatilla | 0.5 | 0.9 | 1.0 | 1.4 | 1.9 | 1.9 |
| Union | 0.1 | 0.1 | 0.2 | 0.3 | 0.1 | 0.0 |
| Wallowa | 0.0 | 0.1 | 0.0 | 0.1 | 0.0 | 0.0 |
| Wasco | 0.3 | 0.3 | 0.3 | 0.3 | 0.5 | 0.6 |
| Washington | 5.8 | 7.5 | 8.9 | 10.8 | 10.8 | 12.3 |
| Wheeler | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Yamhill | 1.3 | 0.4 | 0.9 | 1.1 | 1.5 | 1.3 |
| **Total** | **56.8** | **54.4** | **72.0** | **79.3** | **94.9** | **97.4** |

## Aid & Assist

| County | Admission List (as of last day of month) | | | | Patients Admitted During Month | | | | No Longer Needing HLOC (as of last day of month) | | | | | | | | Patients Discharged for Community Restoration | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | Recommended LOCUS | | | | | | | | Recommended LOCUS | | | | | | |
| | Count | Avg Days | Low | High | Count | Avg Days | Low | High | Count | 1 | 2 | 3 | 4 | 5 | 6 | Avg Days | Count | 1 | 2 | 3 | 4 | 5 | 6 | Avg Days |
| Baker | | | | | | | | | | | | | | | | | | | | | | | | |
| Benton | 2 | 20.0 | 18 | 22 | 2 | 17.0 | 7 | 27 | 3 | | | 1 | 2 | | | 37.7 | | | | | | | | |
| Clackamas | 3 | 5.7 | 1 | 8 | 2 | 25.0 | 25 | 25 | 5 | | | | 2 | 3 | | 20.8 | 1 | | | | 1 | | | 33.0 |
| Clatsop | 2 | 22.0 | 22 | 22 | 2 | 18.0 | 11 | 25 | 1 | | | | 1 | | | 25.0 | | | | | | | | |
| Columbia | | | | | 2 | 29.0 | 29 | 29 | | | | | | | | | | | | | | | | |
| Coos | 1 | 11.0 | 11 | 11 | 2 | 29.0 | 28 | 30 | 3 | | | | 3 | | | 44.0 | | | | | | | | |
| Crook | 1 | 19.0 | 19 | 19 | | | | | | | | | | | | | | | | | | | | |
| Curry | 2 | 7.5 | 7 | 8 | 1 | 28.0 | 28 | 28 | 2 | | | | 1 | 1 | | 42.0 | | | | | | | | |
| Deschutes | 2 | 19.5 | 13 | 26 | | | | | 2 | | | | 1 | 1 | | 52.5 | | | | | | | | |
| Douglas | 6 | 17.2 | 5 | 25 | 5 | 24.2 | 6 | 29 | 1 | | | | | 1 | | 83.0 | 1 | | | | 1 | | | 35.0 |
| Gilliam | | | | | | | | | | | | | | | | | | | | | | | | |
| Grant | 1 | 19.0 | 19 | 19 | | | | | | | | | | | | | | | | | | | | |
| Harney | | | | | | | | | | | | | | | | | | | | | | | | |
| Hood River | | | | | 1 | 31.0 | 31 | 31 | 3 | | | 1 | 1 | 1 | | 35.7 | | | | | | | | |
| Jackson | 4 | 20.5 | 14 | 27 | 5 | 27.2 | 27 | 28 | 3 | | | | 2 | 1 | | 36.0 | | | | | | | | |
| Jefferson | | | | | | | | | | | | | | | | | | | | | | | | |
| Josephine | | | | | 3 | 27.3 | 25 | 29 | 1 | | | | | 1 | | 11.0 | | | | | | | | |
| Klamath | 3 | 22.0 | 12 | 27 | 6 | 27.3 | 26 | 30 | 4 | | | | | 4 | | 36.8 | | | | | | | | |
| Lake | | | | | 1 | 23.0 | 23 | 23 | | | | | | | | | | | | | | | | |
| Lane | 17 | 16.3 | 1 | 28 | 12 | 27.3 | 22 | 31 | 20 | | | 2 | 6 | 9 | 3 | 41.0 | 5 | | | | 1 | 4 | | 64.6 |
| Lincoln | 1 | 25.0 | 25 | 25 | 3 | 28.3 | 27 | 29 | 1 | | | | | 1 | | 97.0 | 1 | | | | | 1 | | 28.0 |
| Linn | | | | | 1 | 23.0 | 23 | 23 | 2 | | | | 1 | 1 | | 16.5 | | | | | | | | |
| Malheur | | | | | 1 | 30.0 | 30 | 30 | | | | | | | | | | | | | | | | |
| Marion | 6 | 21.8 | 4 | 82 | 6 | 26.7 | 23 | 29 | 9 | | | 2 | 1 | 6 | | 93.7 | 1 | | | | | 1 | | 110.0 |
| Morrow | | | | | | | | | | | | | | | | | | | | | | | | |
| Multnomah | 15 | 15.7 | 7 | 25 | 14 | 25.1 | 22 | 29 | 15 | | | 1 | 4 | 10 | | 43.0 | 3 | | | | 1 | 2 | | 60.0 |
| Polk | | | | | 2 | 27.0 | 27 | 27 | 1 | | | | | 1 | | 61.0 | | | | | | | | |
| Sherman | | | | | | | | | | | | | | | | | | | | | | | | |
| Tillamook | | | | | | | | | | | | | | | | | | | | | | | | |
| Umatilla | 1 | 13.0 | 13 | 13 | 4 | 27.3 | 26 | 28 | | | | | | | | | | | | | | | | |
| Union | | | | | | | | | | | | | | | | | | | | | | | | |
| Wallowa | | | | | | | | | | | | | | | | | | | | | | | | |
| Wasco | | | | | | | | | | | | | | | | | | | | | | | | |
| Washington | 16 | 16.6 | 3 | 28 | 9 | 25.6 | 23 | 29 | 11 | | | | 3 | 8 | | 32.8 | 2 | | | | | 2 | | 58.5 |
| Wheeler | | | | | | | | | | | | | | | | | | | | | | | | |
| Yamhill | 2 | 23.0 | 21 | 25 | | | | | 2 | | | | 1 | 1 | | 21.0 | | | | | | | | |
| **Total** | **85** | **17.0** | **1** | **82** | **84** | **26.1** | **6** | **31** | **89** | **0** | **0** | **7** | **29** | **50** | **3** | **44.1** | **14** | **0** | **0** | **0** | **6** | **8** | **0** | **59.0** |

## PSRB / GEI

| County | Admission List (as of last day of month) | | | | Patients Admitted During Month | | | | Patients Conditionally Released to PSRB | | | | | | | |
| | | | | | | | | | | Level of Care Needed | | | | | | |
| | Count | Avg Days | Low | High | Count | Avg Days | Low | High | Count | SRTF | RTF | AFH | DOC | Ind. | Other | Avg Days |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Baker | | | | | | | | | | | | | | | | |
| Benton | | | | | | | | | | | | | | | | |
| Clackamas | | | | | | | | | 1 | 1 | | | | | | 154.0 |
| Clatsop | | | | | | | | | | | | | | | | |
| Columbia | | | | | | | | | 2 | | 2 | | | | | 94.5 |
| Coos | | | | | | | | | | | | | | | | |
| Crook | | | | | | | | | | | | | | | | |
| Curry | | | | | | | | | | | | | | | | |
| Deschutes | | | | | | | | | | | | | | | | |
| Douglas | | | | | | | | | | | | | | | | |
| Gilliam | | | | | | | | | | | | | | | | |
| Grant | | | | | | | | | | | | | | | | |
| Harney | | | | | | | | | | | | | | | | |
| Hood River | | | | | | | | | | | | | | | | |
| Jackson | 2 | 6.0 | 6 | 6 | 1 | 22.0 | 22 | 22 | | | | | | | | |
| Jefferson | | | | | | | | | | | | | | | | |
| Josephine | | | | | | | | | | | | | | | | |
| Klamath | | | | | | | | | 1 | | 1 | | | | | 126.0 |
| Lake | | | | | | | | | | | | | | | | |
| Lane | | | | | | | | | | | | | | | | |
| Lincoln | | | | | | | | | | | | | | | | |
| Linn | | | | | | | | | | | | | | | | |
| Malheur | | | | | | | | | | | | | | | | |
| Marion | | | | | | | | | | | | | | | | |
| Morrow | | | | | | | | | | | | | | | | |
| Multnomah | 1 | 26.0 | 26 | 26 | | | | | 1 | 1 | | | | | | 132.0 |
| Polk | | | | | | | | | | | | | | | | |
| Sherman | | | | | | | | | | | | | | | | |
| Tillamook | | | | | | | | | | | | | | | | |
| Umatilla | | | | | | | | | | | | | | | | |
| Union | | | | | | | | | | | | | | | | |
| Wallowa | | | | | | | | | | | | | | | | |
| Wasco | | | | | | | | | | | | | | | | |
| Washington | | | | | | | | | | | | | | | | |
| Wheeler | | | | | | | | | | | | | | | | |
| Yamhill | | | | | | | | | | | | | | | | |
| Total | 3 | 12.7 | 6 | 26 | 1 | 22.0 | 22 | 22 | 5 | 2 | 3 | 0 | 0 | 0 | 0 | 120.2 |

*Data related to PSRB / GEI patients who no longer need hospital level of care are not listed until they discharge since the county and level of care is not known until placement.

**Definition Guide**

**Aid & Assist** – Includes patients under an ORS 161.370 court order needing competency restoration.

**PSRB / GEI** – Includes patients under a GEI court order (ORS 161.327 and ORS 161.336) or a PSRB court order (ORS 419C.530, ORS 426.220, ORS 426.701, and ORS 426.702).

**Currently on the Admission List** – Includes patients awaiting admission to OSH for whom OSH has received the court order.
    **Avg Days** – The average days a patient currently on the admission list has been waiting for admission to OSH, measured from the date the court order was signed.

**Admitted During the Month** – Includes patients who were admitted to OSH during the month.
    **Avg Days** – The average days a patient admitted to OSH had been waiting for admission, measured from the date the court order was signed.

**No Longer Needs Hospital Level of Care** – Includes patients who have been assessed to no longer need Hospital Level of Care (HLOC) and are ready to be discharged from OSH. Aid & Assist patients are added to the Ready to Place (RTP) list and PSRB/GEI patients are added to the Conditional Release Ready (CRR) list.
    **Avg Days** – The average days a patient assessed to no longer need HLOC has been waiting for discharge, measured from the date the assessment was made.

**Discharged After Having Been Assessed to No Longer Need Hospital Level of Care** – Includes patients who had been assessed to no longer need HLOC and were discharged from OSH during the month. For Aid & Assist patients, only those discharged to community restoration are included.
    **Avg Days** – The average days a patient discharged from OSH had been waiting for discharge, measured from the date the assessment was made.

**LOCUS Score** – The Level of Care Utilization System (LOCUS) is a dynamic instrument that is used to determine and recommend a continuum of service needs, e.g. the environment of care, hours of contact and types of services.
    **1** – Independent Living - Patients who are living either independently or with minimal support in the community and who have achieved significant recovery from past episodes of illness.
    **2** – Independent Living - Patients who need ongoing treatment, but who are living either independently or with minimal support in the community.
    **3** – Independent Living – Patients who need intensive support and treatment, but who are living either independently or with minimal support in the community.
    **4** – Supportive/Supported Housing and ACT Services - Patients can live in the community either in supportive or independent settings, but treatment needs require intensive management by a multi-disciplinary treatment team.
    **5** – RTF/RTH - This level of care has traditionally been provided in non-hospital; free standing residential facilities based in the community.
    **6** – Class 1 SRTF or Psychiatric Hospital - Traditionally provided in a hospital setting, but could, in some cases, can be provided in a free-standing non-hospital setting.

**Level of Care Needed** – All levels of supervision under the PSRB are assessed not just by clinical stability but also by dangerousness. The PSRB mission is community and public safety therefore the driver for placement is safety to the community.
    **SRTF** – Patients who need placement in a locked Secure Residential Treatment Facility (SRTF) that provides support for daily living, medication monitoring, and crisis intervention.
    **RTF** – Patients who need placement in an unlocked Residential Treatment Facility (RTF) that provides support for daily living, medication monitoring, and crisis intervention.
    **AFH** – Patients with specific needs who require Adult Foster Home (AFH) placements that provide support for training or assistance with personal care and activities of daily living, supervision of medications and/or behavior, crisis prevention, and management of diet and health care.
    **DOC** – Patients that have been dually sentenced to both PSRB and DOC at the same time and are ready to be released to DOC care.
    **Ind.** – Patients who may still require treatment but who are appropriate for either an independent living (Ind.) arrangement or with minimal support in the community.
    **Other** – Patients who have a more uncommon level of need not identified in the other categories.

# EXHIBIT 2

# Checkr

Report completed on Feb 2, 2018 1:11 PM

| Consumer Report for | Requestor Company | Status |
|---|---|---|
| **Preston Berman** | **Postmates** |  |

**California Applicants/Employees Only: The report does not guarantee the accuracy or truthfulness of the information as to the subject of the investigation, but only that it is accurately copied from public records, and information generated as a result of identity theft, including evidence of criminal activity, may be inaccurately associated with the consumer who is the subject of the report. An investigative consumer reporting agency shall provide a consumer seeking to obtain a copy of a report or making a request to review a file, a written notice in simple, plain English and Spanish setting forth the terms and conditions of his or her right to receive all disclosures, as provided in Section 1786.26.**

**Sólo para los Solicitantes/Empleados de California: En el informe no se garantiza la exactitud o veracidad de la información en cuanto al tema de la investigación, sino sólo que se ha copiado exactamente de los registros públicos, y la información generada como resultado del robo de identidad, incluyendo las pruebas de una actividad delictiva, podría estar incorrectamente asociada con el consumidor que sea el sujeto del informe. Una agencia investigadora de informes de crédito deberá suministrarle a un consumidor que trate de obtener una copia de un informe o solicite revisar un archivo una notificación por escrito en inglés y español lisos y llanos, en la que se establezcan los términos y las condiciones de su derecho a recibir toda la información, como se dispone en la Sección 1786.26.**

**Report Summary**

| | | |
|---|---|---|
| SSN Trace | Feb 1, 2018 | Clear |
| Sex Offender Search | Feb 1, 2018 | Clear |
| Global Watchlist Search | Feb 1, 2018 | Clear |
| National Criminal Search | Feb 2, 2018 | Consider |
| County Criminal Searches | | Consider |
| Motor Vehicle Report | Feb 1, 2018 | Clear |



## Report information

Report status  `Consider`

| | | | |
|---|---|---|---|
| **First name** | **Middle name** | **Last name** | **Date of birth** |
| Preston | - | Berman | ▓▓▓▓▓ |
| **Phone** | **Zipcode** | **Email** | **Social Security #** |
| +▓▓▓▓▓▓ | 97202 | ▓▓▓▓▓▓▓▓▓ | ▓▓▓▓▓▓ |
| **Driver license** | **Previous driver license** | | |
| ▓▓▓▓(OR) | - | | |
| **Created at** | **Completed at** | | |
| Feb 1, 2018 8:28 PM | Feb 2, 2018 1:11 PM | | |



**SSN Trace**  `Clear`

**Sex Offender Search**  `Clear`

**Global Watchlist Search**  `Clear`

**National Criminal Search**  `Consider`

See County Criminal Search(es).

**County Criminal Searches**    `Consider`

**Deschutes, OR**    `Consider`

ARSON IN THE FIRST DEGREE                                    Feb 15, 2010

| | |
|---|---|
| Case Number | 10FE0206SF |
| File Date | Feb 19, 2010 |
| Court Jurisdiction | DESCHUTES CIRCUIT COURT |
| County | DESCHUTES |
| State | OR |
| Full Name | PRESTON JACOB BERMAN |
| DOB |  |

| | |
|---|---|
| Charge | ARSON IN THE FIRST DEGREE |
| Charge Type | FELONY |
| Offense Date | Feb 15, 2010 |
| Disposition | FINDING - GUILTY EXCEPT FOR INSANITY |
| Disposition Date | Dec 8, 2010 |
| Sentence | other: 20 YEARS MENTAL STATE HOSPITAL , $1500.00 TOTAL FINES/COST |

| | |
|---|---|
| Charge | RECKLESS BURNING |
| Charge Type | MISDEMEANOR |
| Offense Date | Feb 15, 2010 |
| Disposition | FINDING - GUILTY EXCEPT FOR INSANITY |
| Disposition Date | Dec 8, 2010 |
| Sentence | other: 20 YEARS MENTAL STATE HOSPITAL , SEE COUNT 1 FINES/COST |

| | |
|---|---|
| Charge | RECKLESS BURNING |
| Charge Type | MISDEMEANOR |
| Offense Date | Feb 15, 2010 |
| Disposition | FINDING - GUILTY EXCEPT FOR INSANITY |
| Disposition Date | Dec 8, 2010 |
| Sentence | other: 20 YEARS MENTAL STATE HOSPITAL , SEE COUNT 1 FINES/COST |

| | |
|---|---|
| Charge | RECKLESS BURNING |
| Charge Type | MISDEMEANOR |
| Offense Date | Feb 15, 2010 |

| | |
|---|---|
| Disposition | FINDING - GUILTY EXCEPT FOR INSANITY |
| Disposition Date | Dec 8, 2010 |
| Sentence | other: 20 YEARS MENTAL STATE HOSPITAL , SEE COUNT 1 FINES/COST |

| | |
|---|---|
| Charge | Reckless Burning |
| Charge Type | MISDEMEANOR |
| Offense Date | Feb 15, 2010 |
| Disposition | FINDING - GUILTY EXCEPT FOR INSANITY |
| Disposition Date | Dec 8, 2010 |

| | |
|---|---|
| Charge | RECKLESS BURNING |
| Charge Type | MISDEMEANOR |
| Offense Date | Feb 15, 2010 |
| Disposition | FINDING - GUILTY EXCEPT FOR INSANITY |
| Disposition Date | Dec 8, 2010 |
| Sentence | other: 20 YEARS MENTAL STATE HOSPITAL , SEE COUNT 1 FINES/COST |

| | |
|---|---|
| Charge | RECKLESS BURNING |
| Charge Type | MISDEMEANOR |
| Offense Date | Feb 15, 2010 |
| Disposition | FINDING - GUILTY EXCEPT FOR INSANITY |
| Disposition Date | Dec 8, 2010 |
| Sentence | other: 20 YEARS MENTAL STATE HOSPITAL , SEE COUNT 1 FINES/COST |

| | |
|---|---|
| Charge | RECKLESS BURNING |
| Charge Type | MISDEMEANOR |
| Offense Date | Feb 15, 2010 |
| Disposition | FINDING - GUILTY EXCEPT FOR INSANITY |
| Disposition Date | Dec 8, 2010 |
| Sentence | other: 20 YEARS MENTAL STATE HOSPITAL , SEE COUNT 1 FINES/COST |

| | |
|---|---|
| Charge | RECKLESS BURNING |
| Charge Type | MISDEMEANOR |
| Offense Date | Feb 15, 2010 |
| Disposition | FINDING - GUILTY EXCEPT FOR INSANITY |
| Disposition Date | Dec 8, 2010 |
| Sentence | other: 20 YEARS MENTAL STATE HOSPITAL , SEE COUNT 1 FINES/COST |

| | |
|---|---|
| Charge | RECKLESS BURNING |
| Charge Type | MISDEMEANOR |
| Offense Date | Feb 15, 2010 |
| Disposition | FINDING - GUILTY EXCEPT FOR INSANITY |
| Disposition Date | Dec 8, 2010 |
| Sentence | other: 20 YEARS MENTAL STATE HOSPITAL , SEE COUNT 1 FINES/COST |

| | |
|---|---|
| Charge | RECKLESS BURNING |
| Charge Type | MISDEMEANOR |
| Offense Date | Feb 15, 2010 |
| Disposition | FINDING - GUILTY EXCEPT FOR INSANITY |
| Disposition Date | Dec 8, 2010 |
| Sentence | other: 20 YEARS MENTAL STATE HOSPITAL , SEE COUNT 1 FINES/COST |

| | |
|---|---|
| Charge | RECKLESS BURNING |
| Charge Type | MISDEMEANOR |
| Offense Date | Feb 15, 2010 |
| Disposition | FINDING - GUILTY EXCEPT FOR INSANITY |
| Disposition Date | Dec 8, 2010 |
| Sentence | other: 20 YEARS MENTAL STATE HOSPITAL , SEE COUNT 1 FINES/COST |

| | |
|---|---|
| Charge | RECKLESS BURNING |
| Charge Type | MISDEMEANOR |
| Offense Date | Feb 15, 2010 |
| Disposition | FINDING - GUILTY EXCEPT FOR INSANITY |
| Disposition Date | Dec 8, 2010 |
| Sentence | other: 20 YEARS MENTAL STATE HOSPITAL , SEE COUNT 1 FINES/COST |

| | |
|---|---|
| Charge | RECKLESS BURNING |
| Charge Type | MISDEMEANOR |
| Offense Date | Feb 15, 2010 |
| Disposition | FINDING - GUILTY EXCEPT FOR INSANITY |
| Disposition Date | Dec 8, 2010 |
| Sentence | other: 20 YEARS MENTAL STATE HOSPITAL , SEE COUNT 1 FINES/COST |

| | |
|---|---|
| Charge | RECKLESS BURNING |
| Charge Type | MISDEMEANOR |
| Offense Date | Feb 15, 2010 |
| Disposition | FINDING - GUILTY EXCEPT FOR INSANITY |

| | |
|---|---|
| Disposition Date | Dec 8, 2010 |
| Sentence | other: 20 YEARS MENTAL STATE HOSPITAL , SEE COUNT 1 FINES/COST |

| | |
|---|---|
| Charge | RECKLESS BURNING |
| Charge Type | MISDEMEANOR |
| Offense Date | Feb 15, 2010 |
| Disposition | FINDING - GUILTY EXCEPT FOR INSANITY |
| Disposition Date | Dec 8, 2010 |
| Sentence | other: 20 YEARS MENTAL STATE HOSPITAL , SEE COUNT 1 FINES/COST |

| | |
|---|---|
| Charge | RECKLESS BURNING |
| Charge Type | MISDEMEANOR |
| Offense Date | Feb 15, 2010 |
| Disposition | FINDING - GUILTY EXCEPT FOR INSANITY |
| Disposition Date | Dec 8, 2010 |
| Sentence | other: 20 YEARS MENTAL STATE HOSPITAL , SEE COUNT 1 FINES/COST |

| | |
|---|---|
| Charge | RECKLESS BURNING |
| Charge Type | MISDEMEANOR |
| Offense Date | Feb 15, 2010 |
| Disposition | FINDING - GUILTY EXCEPT FOR INSANITY |
| Disposition Date | Dec 8, 2010 |
| Sentence | other: 20 YEARS MENTAL STATE HOSPITAL , SEE COUNT 1 FINES/COST |

| | |
|---|---|
| Charge | RECKLESS BURNING |
| Charge Type | MISDEMEANOR |
| Offense Date | Feb 15, 2010 |
| Disposition | FINDING - GUILTY EXCEPT FOR INSANITY |
| Disposition Date | Dec 8, 2010 |
| Sentence | other: 20 YEARS MENTAL STATE HOSPITAL , SEE COUNT 1 FINES/COST |

| | |
|---|---|
| Charge | BURGLARY 2 |
| Charge Type | FELONY |
| Offense Date | Feb 15, 2010 |
| Disposition | FINDING - GUILTY EXCEPT FOR INSANITY |
| Disposition Date | Dec 8, 2010 |
| Sentence | other: 20 YEARS MENTAL STATE HOSPITAL , SEE COUNT 1 FINES/COST |

**Motor Vehicle Report**

Clear

Full Name                          -

Current License Status            VALID

Current License Type              PERSONAL

Current License Class             C

Current License                   
Expiration Date

Current License
Issued Date

Current License First
Issued Date

# Checkr

One Montgomery Street, Suite 2000, San Francisco, CA 94104
applicants.checkr.com - (844) 824-3257

# EXHIBIT 3

The recent OSH visitation policy introduces restrictions that impose undue burdens on both patients and their visitors, and it conflicts with the Americans with Disabilities Act (ADA) by failing to provide reasonable, individualized accommodations that respect the rights of patients with disabilities to maintain connections with their communities. The ADA mandates that individuals with disabilities receive services in the "most integrated setting appropriate" to their needs, a standard that prioritizes autonomy and community interaction, essential components of rehabilitation.

This policy, requiring all non-contact visitors to undergo invasive screening procedures—including removing personal items, using lockers, submitting to metal detector wands, and, if necessary, undergoing pat-downs—does not tailor restrictions based on individual risk assessments. Such blanket requirements are overly broad and treat all visitors, regardless of risk, as if they may introduce contraband into the facility. This approach lacks the individualized assessment mandated by the ADA, which calls for reasonable accommodations that do not impose unnecessary barriers.

The policy imposes the following burdens:

1. **Unreasonable Burden on Visitors**: Visitors, including family members offering crucial emotional support, are subject to searches that resemble those at high-security facilities. Such treatment can be invasive and may deter family and friends from visiting altogether, especially if they feel uncomfortable or humiliated by the screening process. This disproportionate burden on visitors restricts

patients' access to their support networks, which are crucial for mental and emotional well-being.

2. **Overly Broad Approach to Contraband Prevention**: While facilities may have legitimate concerns regarding contraband, policies that presume all visitors pose such a risk do not comply with ADA requirements for reasonable modifications tailored to the needs of individuals. The ADA promotes individualized accommodations rather than one-size-fits-all policies, meaning safety procedures should be tailored based on a resident's needs and risks rather than broadly applied. This policy unjustly restricts both patients and visitors who do not present security risks.

3. **Negative Impact on Patient Rehabilitation**: Contact with family and friends is fundamental to mental health recovery, helping individuals with disabilities retain a sense of normalcy and connectedness. By subjecting patients to restrictive visitation protocols, OSH not only isolates them but undermines their opportunities for personal growth and reintegration. Such restrictions can create a sense of mistrust and stigma toward patients, as they are effectively treated as complicit in any contraband activities. The ADA emphasizes integrating individuals with disabilities into the community, which includes facilitating positive relationships that promote independence and recovery.

4. **ADA Requirement for Reasonable Modifications**: The ADA prohibits unnecessary restrictions that deny individuals with disabilities full participation in public services and benefits. By failing to make reasonable modifications for

patients who rely on community and family connections for their recovery, OSH is in violation of the ADA. The policy appears to ignore the therapeutic and rehabilitative importance of family visits, disproportionately impacting residents who are, by law, entitled to the least restrictive environment appropriate to their needs.

5. **Failure to Foster Integrated Treatment**: The ADA's integration mandate requires services to be provided in the most inclusive setting. Imposing these restrictions without individualized assessments isolates patients and infringes upon their rights to maintain social ties crucial to recovery and rehabilitation. These visitation restrictions prevent patients from participating in integrated, community-like interactions with family and friends, essential for their emotional and psychological health.

In summary, OSH's visitation policy, by failing to differentiate between residents based on risk and need, imposes excessive and unreasonable burdens on both patients and visitors. It is against the ADA's principles of individualization and integration, which advocate for tailored accommodations and the facilitation of community interactions to support the recovery of individuals with disabilities. For compliance with the ADA, OSH must re-evaluate this policy to ensure that visitation procedures are appropriately balanced with safety needs, while respecting patients' rights to a supportive, inclusive, and rehabilitative environment.

PAGE 3 - EXHIBIT 3 SUMMARY

# Visitation resumes for all patients Monday, Sept. 9.

- Only Bridge 1, 2, and 3 will have contact visiting.
- All other units will have **non-contact** visiting only.
- Space is limited! Only five visits can happen at one time.
- You may only have one visitor per visiting session.
- You and your visitor will talk through a clear partition using a phone.

- Only adult visitors will be allowed at this time.
- All non-contact visits will be held outside Harbors.
- All visit appointments must be made at least 24 hours in advance.
- Reception will begin scheduling visitors **Monday, Sept. 2.**

Need help understanding this? You can ask for:
· A version in your language.
· The form to be read out loud.
· A different format, like bigger text

¿Necesita ayuda para entender esto? Puede pedir:
· Una versión en su lenguaje.
· Que alguien lea esto en voz alta
· Un formato diferente, como texto más grande.


OREGON STATE
HOSPITAL
HOPE · SAFETY · RECOVERY

Staff: To request this information in another format or language on behalf of a patient, contact the OSH interpreter services coordinator by calling 503-756-7889 or emailing osh.interpreterservices@oha.oregon.

# Visitation FAQ
# OSH Staff

**July 16, 2024**

**When does visitation resume?**
Visitation resumes on July 22 for patients on Secure Residential Treatment Facility (SRTF) level of care units. This includes Bridge 1, 2 and 3 in Salem and Forest 1, 2 and 3 in Junction City. Approved visitors of patients on SRTF units are encouraged to schedule visits in advance.

**Why is visitation only open to patients who are on SRTF level of care units?**
During the assessment of visitation protocols, the decision was made to reopen visitation to patients in phases starting with patients on the SRTF units because they no longer require a hospital level of care, and safety and security risks are lower for this patient population.

**When will visitation resume for other patients?**
At this time, other patients may continue video visits. Meanwhile, security staff continue to work on a plan to resume visitation for other patients.

**How does this change affect unit staff?**
Unit nursing staff will still accompany patients to visitation staging area, which is the mail room in Junction City and now in the Bridgeways Mall in Salem.

Program nurse managers, unit managers and nurse administrators now have access to a live visitation scheduler to coordinate patient transportation to the visitation staging area so that patients arrive at least 10 minutes prior to the patient's scheduled visitation.

Nursing staff must now also stay with the patient until the screening process is complete.

Unit staff must now complete the same training required for Security staff before being permitted to supervise visitation.

# Visitation FAQ
# OSH Staff

Unit staff may also experience an increase in video visit requests. Video visitors must also follow OSH visitor guidelines. Access the Patient-Video and Telehealth OWL page for more resources on video visits.

### Will minors be allowed to visit?
Yes, approved minors may visit with an approved adult visitor.

### What other changes were made to the visitation process?
There were several changes made following the review of our visitation processes.

- Screening process – Security will more carefully screen both patients and visitors before and after visits. For patients, the screening process includes a pat-down and search. Visitors will be screened with a handheld metal detection device and may be asked to turn out pockets if the detection device alerts. Visitors are also no longer allowed to wear or bring coats or outerwear into the visitation area.

- Schedule changes – Our review of current visitation processes showed that security staff needed more time to screen approved visitors for contraband. To accommodate an additional 15 minutes for visitor processing times, the number of visitation sessions was reduced on each campus:
  - Salem: move from four to three weekday sessions and from three to two weekend sessions
  - Junction City: weekday and weekend afternoon sessions remain the same. But there will be one less available for weekend mornings.

  Access the new visitation times.

- Cameras – Older cameras were replaced in the Kirkbride Café, and additional overhead cameras were added to the visitation area in both Salem and Junction City to provide more coverage.

# Visitation FAQ
# OSH Staff

- [Visitor guidelines](#) were updated with additional requirements about visitor attire and video visits. It was also decided that food and games are not allowed during visits at this time. Video visitors must also follow visitor guidelines.

**What is the screening process like for patients?**
- Nursing staff will bring patients to the staging area (Bridgeway Mall in Salem and outside mail room in Junction City) at least 10 minutes before their scheduled visitation.
- Nursing Staff will have access to view the visitation scheduler.
- Patients must wear their badge.
- Patients must wear a base layer of clothing to visitation. They may not bring hats, coats, gloves, extra layers of clothing etc.
  - If they do bring coats due to weather on the Salem campus, the items will be checked by security and left in the coat check on the Bridgeway Mall.
- Patients will be patted down and screened with a metal detector wand before entering and leaving the visitation area. They will be asked to take off their shoes and turn out their pockets during the screening process.
- Patients may not bring any items with them into visitation.
- Nursing staff should remain with their patient until the screening process is finished. If the patient refuses to be screened, staff will need to bring the patient back to the unit.

**What can patients and visitors expect during the visit?**

- Patients will be escorted by security to the visitation area (Salem: Kirkbride Café, Junction City: Lakeside Dining).
- Visits last one hour.
- Patients may greet their visitors with a brief embrace at the beginning and at the end of the visit. Visitors and patients may not have other physical contact.

# Visitation FAQ
# OSH Staff

- Visitors will sit on one side of the table and the patient on the other. They may not sit next to each other.
- Food and/or drinks are not allowed in visitation.
- Patients and visitors must stay at their tables and may not roam the visiting area.
- Small children are allowed to sit in the lap of the patient.
- Patients may not hold or have access to any items the visitor may have brought with them through the secure perimeter. This includes baby bottles, blankets etc.
- Visitors and patients must follow the direction of security throughout visitation.
- Patients and visitors must follow all visitation guidelines during a visit, or the visit may end early and lead to additional restrictions on the ability to visit in the future.
- At the end of one-hour patients will be escorted back to the staging area to be picked up by the Nursing staff.
- Patients may not follow visitors out of the visiting area.

**Will approved visitors notice a difference in the screening process?**

Possibly. The screening process will take more time. Security will conduct a search with a handheld metal detection device. Visitors will be asked to turn out the pockets of their clothing. The amount of additional time is minimal for the benefit of a safer, more secure environment for patients, staff and visitors. Another change that might be noticed by visitors is that security staff will also be inside the visitation area. Because of safety concerns, visitors and patients may embrace each other once at the beginning and end of each visit.

**What does the screening process for visitors look like now?**

- When visitors arrive, they will be asked to put all personal items, hats, scarves, over-coats and excessive layers of clothing, etc. inside a locker.

## Visitation FAQ
## OSH Staff

- Visitors will be asked to take off their shoes, which will be searched and scanned through the X-ray machine.
- Visitors will be asked to turn out their pockets.
- Visitors will then be scanned by Security with a metal detector wand.
- If the metal detector wand alerts Security of the presence of metal, the visitor may be asked to comply with a pat down search. The visitor cannot be forced to be patted down, but refusal will result in the visit being cancelled.
- If Security has a reasonable concern that the visitor is harboring contraband, they may ask the visitor to comply with a pat down. The visitor cannot be forced to be patted down, but refusal will result in the visit bring cancelled.

**Are there any visitation exceptions for patients who are not on SRTF units?**
No. At this time, in-person visitation is for patients who are on SRTF units only. Other patients may schedule video visits.

**What about end-of-life visits or other special circumstances for off-grounds visits?**
In rare circumstances, off-site visitation may be considered with the approval of the OSH Executive team or designee.

**What if I don't have an answer to a patient's question or a patient requests more information?**
Patients and approved visitors may contact Family Services by email or phone:
- OSH.OmbudsandFamilyServices@odhsoha.oregon.gov
- 503-947-8109 (voicemail only)

# Non-Contact Visitation
# Frequently Asked Questions

August 29, 2024

This FAQ resource is to help answer questions visitors may have about non-contact visitation. It also includes information about our updated screening process and contact information for Ombuds and Family Services.

## When does visitation for patients on Hospital Level of Care (HLOC) units resume?
Non-contact visitation for patients on HLOC units restarts on Sept. 9. HLOC units are all other units besides the Bridges stack in Salem and the Forest stack in Junction City.

## When can approved visitors schedule visits?
Approved visitors may make a scheduling request starting Monday, Sept. 2. Space is limited for non-contact visits and visitation appointments must be made at least 24 hours in advance.

## How do I schedule a visit?
Approved visitors can schedule their visit by calling 503-945-2800 in Salem and 541-465-2554 in Junction City.

## What can I expect from my non-contact visit?
Visitors will be escorted to the non-contact visitation area where there are visitation bays set up with a clear partition separating visitors and patients. The visitor and patient will communicate through a phone.
OSH has also made changes to our visitation screening process:

- When visitors arrive, they will be asked to put all personal items, hats, scarves, over-coats and excessive layers of clothing, etc. inside a locker.
- Visitors will be asked to take off their belt and shoes, which will be searched and scanned through the X-ray machine.
- Visitors will be asked to turn out their pockets.
- Visitors will then be scanned by Security with a metal detector wand.
- If the metal detector wand alerts Security of the presence of metal, the visitor may be asked to comply with a pat down search. The visitor cannot

be forced to be patted down, but refusal will result in the visit being cancelled.

- If Security has a reasonable concern that the visitor is harboring contraband, they may ask the visitor to comply with a pat down. The visitor cannot be forced to be patted down, but refusal will result in the visit being cancelled.

**Why is non-contact visitation necessary?**
Due to the high risk of contraband entering the secure perimeter during contact visitation, OSH is reopening visitation in phases. In the first phase, contact visitation resumed July 22 for patients who do not need a hospital level of care.

**When is visitation?**
Visitation times and dates can be found on the <u>Friends and Family Services</u> webpage.

**How early should I arrive for my visit?**
Visitors should arrive at least 20 to 30 minutes before the scheduled visit to allow for screening time.

**Will minors be allowed to visit?**
Currently, non-contact visitation is for adults. Moving forward, our goal is to allow minor visitors in the non-contact areas.

**Is Friends and Family Day still happening?**
Is Friends and Family Day has been postponed until April 2025. This was a difficult decision made in the interest of the safety of our patients and staff.

**Can more than one person visit?**
Because space is limited in the non-contact visitation area, each patient may only have one adult visitor per visitation session. For each visitation session, there are only five spots available in Salem and four in Junction City.

**What if I have other questions?**
Visitors may contact Ombuds and Family Services by email or phone:

- OSH.OmbudsandFamilyServices@odhsoha.oregon.gov
- 503-947-8109 (voicemail only)

# EXHIBIT 4

In August 2023, Oregon State Hospital (OSH) not only restricted residents from taking portable DVD players to their rooms—limiting their use to shared common areas (or milieus) without access to private spaces—but also promised to install entertainment centers in the quiet rooms at the end of the halls on all units to offset the impact of this restriction. As of November 2024, these promised entertainment centers have yet to be installed. Additionally, OSH initially provided portable DVD players for residents to use in lieu of the entertainment centers in the milieu, but these devices were of such poor quality that many have since broken due to daily, communal use. Unit administrators have consistently pushed back against replacing these broken devices, leaving residents with minimal options for recreational activities.

This situation imposes a double burden on residents: they never gained access to the promised entertainment centers, and their remaining resources for therapeutic entertainment, like the portable DVD players, are scarce or nonfunctional. The restriction also removed a critical coping mechanism by prohibiting the use of DVD players in private or quiet areas, such as end-of-hallway quiet rooms, stripping residents of an essential tool for relaxation and decompression. This shift not only undermines residents' autonomy but also deprives them of a necessary means for self-care in a calm, private setting—a key resource in an overstimulating institutional environment.

This restriction, coupled with unfulfilled promises of alternative resources, imposes an unreasonable burden on residents' quality of life and violates the Americans with

Disabilities Act (ADA). Under ADA regulations, individuals in institutional settings are entitled to support and accommodations in the least restrictive environment that meet their needs. Access to private, therapeutic space is crucial for mental health, allowing residents a necessary reprieve from communal settings. By failing to install the promised entertainment centers and restricting DVD player use to shared areas, OSH has neglected its duty to provide reasonable accommodations that support resident autonomy, privacy, and therapeutic needs.

Additionally, OSH's refusal to expand a successful tablet pilot project, which allowed highly symptomatic patients supervised access to tablets, only worsens the restrictive impact of this policy. The demonstrated success of this program, which showed both safety and therapeutic benefits for residents at higher acuity levels, supports the argument that tablet access could provide a viable and less restrictive alternative for residents at lower acuity levels as well. This refusal to implement proven, less invasive solutions suggests an unreasonably restrictive approach, denying residents the opportunity to engage with meaningful coping tools in a controlled, therapeutic environment.

In summary, OSH's actions—including restricting DVD players to common areas, failing to install promised entertainment centers, and refusing to provide alternative tools like tablets—deprive residents of essential coping resources, undermining ADA principles by failing to offer access to personal, therapeutic activities in a reasonably integrated and least restrictive setting.

PAGE 2 - EXHIBIT 4 SUMMARY

# Use of media discs and players
## (DVDs, CDs and video games)

**The OSH safety and leadership teams identified media discs — like DVDs, CDs and video games — as high-risk items that need to be handled differently to maintain a safe environment. Beginning Aug. 28, 2023:**



- OSH will continue to allow personal media discs that can be used with unit DVD players and unit video game systems. These discs will continue to be stored in personal property boxes (and not in patient rooms).
- Patient-owned disc players will be mailed to friends and family or stored in long-term storage. (OSH will pay shipping cost.)
- In the short-term, units in Springs, Crossroads, Archways, Pathways and Mountain will maintain two hospital-owned, portable DVD players, and Bridges and Forest will maintain four hospital-owned portable DVD players. These players may be checked out with a single disc at a time and used in unit activity rooms or air courts - not in patient rooms, quiet rooms or sensory rooms.
- OSH Market will no longer sell DVD players.
- OSH is working toward no portable DVD players in the future and plans to add more entertainment systems in common areas.

## Common questions:

**Will I still be able to purchase and access my own DVDs and video games?**
Yes.

**Where will my DVDs and video games be stored?**
In your on-unit property box in the locked unit property room.

**How will I watch movies now?**
Every unit has multiple TV/DVD setups in common areas that patients can use with staff support. In the short-term, all units outside of Harbors will maintain hospital-owned, portable DVD players until additional entertainment centers are added to the units.

Need help understanding this?
You can ask for:

- A version in your language.
- The form to be read out loud.
- A different format, like bigger text.

¿Necesita ayuda para entender esto?
Puede pedir:

- Una versión en su lenguaje.
- Que alguien lea esto en voz alta
- Un formato diferente, como formato más grande.

# EXHIBIT 5

https://www.oregon.gov/oha/OSH/Pages/Rulemaking-Hearings.aspx

The proposed emergency modifications to the Oregon Administrative Rules (OARs) by Oregon State Hospital (OSH) constitute clear violations of the Americans with Disabilities Act (ADA) by transforming the hospital into a correctional-style environment, impeding residents' rights to treatment in the least restrictive, most integrated setting appropriate to their needs. These changes prioritize punitive security measures over therapeutic care, directly contradicting the ADA's mandate for integration and autonomy for individuals with disabilities.

1. **Security Screening and Contraband Control as Barriers to Integration**:
   - The extensive security screenings for visitors, such as metal detectors, physical pat-downs, and restrictive policies on personal items, directly mirrors correctional practices and disregards the hospital's responsibility to provide a supportive, community-like environment. By prioritizing security to this extreme, OSH undermines residents' access to essential personal connections and social interactions, a crucial element of ADA-compliant treatment that facilitates meaningful integration and rehabilitative progress. These measures unlawfully deny residents their ADA rights to community interaction and reinforce isolation.

2. **Violation of Communication Rights Through Mail Monitoring**:
   - OSH's new mail-handling policies, which permit inspection, photocopying, and retention of original mail items based on vague security concerns, constitute an unwarranted intrusion into residents' rights to private and unmonitored communication. These practices infringe on the ADA's integration mandate by creating a stifling environment that is overly restrictive, effectively treating residents as though they are incarcerated rather than receiving therapeutic care. The level of surveillance and control is in direct violation of ADA standards, which

mandate reasonable accommodations for communication, autonomy, and privacy to enable meaningful engagement with the outside world.

3. **Unnecessary Visitor Barriers Contradict ADA Requirements for Family Integration**:

    ○ Requiring visitors to submit to invasive searches, including the removal of personal items and disclosure of medical devices or medications, constitutes a violation of the ADA's requirement to facilitate integration and accessible support systems for individuals with disabilities. These visitor restrictions hinder essential family and support network access, critical for rehabilitation and social connection. The ADA mandates that restrictions must be tailored to individual needs, yet OSH's blanket approach here severely limits resident autonomy and contravenes federal law by curtailing residents' ADA-protected rights to a support network.

4. **Correctional-Style Surveillance in Violation of ADA's Least Restrictive Requirement**:

    ○ OSH's implementation of heightened surveillance and strict monitoring practices disregards ADA requirements for the least restrictive treatment environment. Instead of fostering a rehabilitative setting that promotes independence, OSH has adopted measures that more closely resemble correctional confinement, stripping residents of necessary autonomy and undermining their dignity. Such overreaching control and monitoring violate ADA principles by depriving individuals of their right to therapeutic, person-centered care that enables community integration.

5. **Failure to Provide Individualized, ADA-Compliant Care**:

    ○ By applying uniform restrictions and security protocols indiscriminately, OSH is in direct violation of the ADA's requirement for individualized care that respects each resident's needs, capabilities, and rehabilitative potential. The ADA

mandates that restrictions be no more restrictive than necessary to meet each individual's needs, yet OSH's broad, punitive approach disregards this requirement and treats all residents as high-risk, thereby intensifying unnecessary institutionalization and isolation.

These modifications fundamentally alter OSH's environment, imposing correctional conditions that are incompatible with the ADA's requirements for the least restrictive, most integrated setting appropriate to the needs of individuals with disabilities. This shift in policy represents a clear and ongoing violation of the ADA by unlawfully institutionalizing residents in a highly controlled, punitive environment that obstructs their path to autonomy, integration, and meaningful rehabilitation.

**OFFICE OF THE SECRETARY OF STATE**
LAVONNE GRIFFIN-VALADE
SECRETARY OF STATE

CHERYL MYERS
DEPUTY SECRETARY OF STATE
AND TRIBAL LIAISON



**ARCHIVES DIVISION**
STEPHANIE CLARK
DIRECTOR

800 SUMMER STREET NE
SALEM, OR 97310
503-373-0701

# NOTICE OF PROPOSED RULEMAKING
INCLUDING STATEMENT OF NEED & FISCAL IMPACT

CHAPTER 309
OREGON HEALTH AUTHORITY
HEALTH SYSTEMS DIVISION: BEHAVIORAL HEALTH SERVICES

FILING CAPTION: PATIENT MAIL, VISITATION AND PROPERTY RULES

LAST DAY AND TIME TO OFFER COMMENT TO AGENCY: 10/29/2024  3:00 PM

*The Agency requests public comment on whether other options should be considered for achieving the rule's substantive goals while reducing negative economic impact of the rule on business.*

| | | |
|---|---|---|
| CONTACT: Adina Jennings-Bradshaw | Oregon State Hospital | Filed By: |
| 503-421-4788 | 2600 Cetner St NE | Adina Canales |
| OSH.Rules@dhsoha.state.or.us | Salem, OR 97301 | Rules Coordinator |

HEARING(S)

*Auxiliary aids for persons with disabilities are available upon advance request. Notify the contact listed above.*

DATE: 10/22/2024
TIME: 3:00 PM - 4:00 PM
OFFICER: ADINA JENNINGS-BRADSHAW

REMOTE HEARING DETAILS
MEETING URL: Click here to join the meeting
PHONE NUMBER: 1-971-277-2343
SPECIAL INSTRUCTIONS:
TEAMS
Meeting ID: 284 791 824 57
Passcode: bgX6MN

CALL-IN NUMBER
+1 971-277-2343
Phone conference ID: 587 831 489#

NEED FOR THE RULE(S)

102- The Oregon State Hospital (OSH) is modifying its rules concerning patient mail to ensure the safety and security of Oregon State Hospital, patients and staff with rules that mitigate against the introduction of contraband into the hospital.

OSH has recently experienced contraband (i.e., illicit controlled substances) entering OSH attached to patient mail in ways not previously known or attempted. These controlled substances pose an immediate risk to patient and staff safety at OSH. In addition to the general risks posed by consuming controlled substances, the medications routinely prescribed to patients to treat mental illness carry a heightened risk to the health and safety of a patient who consumes controlled substances due to adverse side effects known to occur when controlled substances and anti-psychotic

FILED
09/19/2024 9:17 AM
ARCHIVES DIVISION
SECRETARY OF STATE

medications commingle. Current rules for handling mail at OSH are insufficient to catch newer forms or methods of introducing contraband and contraband substances into OSH.

106; Contraband property, including and specifically controlled substances, poses an immediate risk to patient and staff safety at the Oregon State Hospital (OSH). In addition to the general risks posed by consuming controlled substances, the medications routinely prescribed to patients to treat mental illness carry a heightened risk to the health and safety of a patient who consumes controlled substances due to adverse side effects known to occur when controlled substances and anti-psychotic medications commingle. Current rules for visitation are inadequate to prevent contraband and contraband substances from entering OSH.

Further, the Centers for Medicare and Medicaid (CMS) have identified that the rules and processes are non-compliant with federal regulations and that termination from Medicaid enrollment is warranted if changes do not occur. Because, the current rules and processes are in violation of federal rules, amendment is necessary to comply with federal regulations and to protect patients. Without immediate changes, OSH's Medicare enrollment will terminate on August 10, 2024, which is an immediate risk of serious prejudice to the public interest because Oregon taxpayers will pay for patient healthcare in lieu of federal entitlement programs, and patients will continue to be exposed to known risks.

108; Contraband property, including and specifically controlled substances, poses an immediate risk to patient and staff safety at the Oregon State Hospital (OSH). In addition to the general risks posed by consuming controlled substances, the medications routinely prescribed to patients to treat mental illness carry a heightened risk to the health and safety of a patient who consumes controlled substances due to adverse side effects known to occur when controlled substances and anti-psychotic medications commingle. Current rules and the procedures based on the rules have proven ineffective at protecting patients from contraband, including controlled substances.

Further, the Centers for Medicare and Medicaid (CMS) have identified that the rules and processes are non-compliant with federal regulations and that termination from Medicaid enrollment is warranted if changes do not occur. Because, the current rules and processes are in violation of federal rules, and amendment is necessary to comply with federal regulations and to protect patients. Without immediate changes, OSH's Medicare enrollment will terminate on August 10, 2024, which is an immediate risk of serious prejudice to the public interest because Oregon taxpayers will pay for patient healthcare in lieu of federal entitlement programs, and patients will continue to be exposed to known risks.

Rule amendment will allow OSH to comply with CMS regulations and to effectively screen for contraband and contraband substances that pose an immediate risk to the health and safety of patient and staff.

DOCUMENTS RELIED UPON, AND WHERE THEY ARE AVAILABLE

https://www.oregonlegislature.gov/bills_laws/ors/ors162.html

STATEMENT IDENTIFYING HOW ADOPTION OF RULE(S) WILL AFFECT RACIAL EQUITY IN THIS STATE

These rule changes will not have any effect on racially/ethnically specific communities. This rule applies equally to OSH patients, visitors and staff at OSH.

FISCAL AND ECONOMIC IMPACT:

a.   OSH has determined that there will be a fiscal impact. Program start-up costs would include a monthly expense to make copies of patient mail of no more than $241 per campus until such time as a technology solution to scan mail is implemented. This would then involve an initial expense of $136,172 for that equipment, one machine per campus at $68,086 each, and remove the recurring copying expenses. Personnel expenses would be within existing resources as employee tasks are re-assigned. Recurring maintenance and training access is expected to be $27,576 annually, or $55,152 biennially.

COST OF COMPLIANCE:

*(1) Identify any state agencies, units of local government, and members of the public likely to be economically affected by the rule(s). (2) Effect on Small Businesses: (a) Estimate the number and type of small businesses subject to the rule(s); (b) Describe the expected reporting, recordkeeping and administrative activities and cost required to comply with the rule(s); (c) Estimate the cost of professional services, equipment supplies, labor and increased administration required to comply with the rule(s).*

a.   OSH has determined that there will be a fiscal impact. Program start-up costs would include a monthly expense to make copies of patient mail of no more than $241 per campus until such time as a technology solution to scan mail is implemented. This would then involve an initial expense of $136,172 for that equipment, one machine per campus at $68,086 each, and remove the recurring copying expenses. Personnel expenses would be within existing resources as employee tasks are re-assigned. Recurring maintenance and training access is expected to be $27,576 annually, or $55,152 biennially.

DESCRIBE HOW SMALL BUSINESSES WERE INVOLVED IN THE DEVELOPMENT OF THESE RULE(S):

SM were not involved in development of these rules, these rules only apply to OSH patients, visitors and staff.

WAS AN ADMINISTRATIVE RULE ADVISORY COMMITTEE CONSULTED? YES

RULES PROPOSED:

309-102-0110, 309-102-0120, 309-102-0130, 309-102-0140, 309-102-0150, 309-106-0005, 309-106-0010, 309-106-0015, 309-106-0020, 309-106-0025, 309-106-0030, 309-106-0035, 309-108-0000, 309-108-0005, 309-108-0010, 309-108-0015, 309-108-0020, 309-108-0025

AMEND: 309-102-0110

RULE SUMMARY: 309-102-0110 adds definitions to allow for extra security, screening and searches of incoming mail

CHANGES TO RULE:

309-102-0110
Definitions ¶

(1) "Contraband" means any controlled substance, drugs not prescribed to the patient, drugs not prescribed or authorized by OSH, drug paraphernalia, weapons, unauthorized currency or prohibited items.¶
(2) "Controlled Substance" means a drug or its immediate precursor classified in Schedules I through V under the federal Controlled Substances Act, 21 USC 811 to 812, as modified under ORS 475.005 and ORS 475.035.¶
(3) "Court" means a tribunal where legal matters are resolved, including but not limited to state circuit courts, federal courts, bankruptcy courts, tribal courts, administrative courts, and municipal courts."¶
(4) "Court official" means a person employed by a court to conduct court business, and includes a federal, county, tribal, and municipal judge, magistrate, administrative judge, and hearings officer and any other person who is tasked by a court to conduct the court's business."¶
(5) "Cultural Food/Items" means an item that relates to a patient's cultural or ethnic identity.¶
(6) "Division" means the ~~Health Systems~~<u>Oregon State Hospital</u> Division of the Oregon Health Authority.¶
(7) "Drug" means:¶
(a) Substances recognized as drugs in the official United States Pharmacopoeia, official Homeopathic Pharmacopoeia of the United States or official National Formulary, or any supplement to any of them;¶
(b) Substances intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in humans or animals;¶
(c) Substances (other than food) intended to affect the structure or any function of the body of humans or animals, including but not limited to vitamins, supplements, dietary powders, synthetic cathinones, synthetic cannabinoids; or¶
(d) Substances intended for use as a component of any article specified in paragraph (a), (b) or (c) of this subsection; however, the term does not include devices or their components, parts or accessories.¶
(8) "Drug Paraphernalia" means all equipment, products and materials of any kind that are marketed for use or

designed for use in planting, propagating, cultivating, growing, harvesting, manufacturing, compounding, converting, producing, processing, preparing, testing, analyzing, packaging, repackaging, storing, containing, concealing, injecting, ingesting, inhaling or otherwise introducing into the human body a controlled substance in violation of ORS 475.752 to 475.980.¶

(9) "Electronic Mail" means digital messages transmitted electronically.¶

(10) "Excess Personal Property" means property which cannot be stored in the designated storage in the patient's room or personal storage space on the unit.¶

(11) "Good Faith Belief" means an honest or sincere belief in something.¶

(12) "Harassment" means a patient who is communicating or attempting to communicate with an individual or entity that they are prohibited from contacting by a court order, treatment care plan, or other legal requirement.¶

(13) "Journalist Mail" means any mail sent by a patient to a news media organization such as, but not limited to a newspaper, a magazine and a television station's news department, or sent to a patient from a news media organization, and which is clearly labeled "journalist mail" on the addressee side of the envelope, set apart from the return and mailing addresses for ease of recognition, and where the news media organization is verifiable.¶

(14) "Legal Mail" means any mail received from or addressed to an attorney, court, disability rights organizations or the protection and advocacy system identified in ORS 192.517,or court official which is clearly labeled as "legal mail" on the addressee side of the envelope, set apart from the return and mailing addresses for ease of recognition, where the sender or receiver is verifiable as a licensed attorney, court, or court official.¶

(15) "Limited Access Item" means an item that could pose a safety or security risk in the possession of a patient but is permitted for a set duration of time with the prior authorization of OSH staff and, if applicable, with the direct supervision of OSH staff. A limited access item becomes a prohibited item if the patient possesses or uses the item outside of the scope of the authorization or without OSH staff supervision if required.¶

(16) "Mail" means any paper documents sent by or received by a patient in a standard sized, legal sized, or special handling envelope with a weight of 16 ounces or less, and thickness of no more than ⬜ inch. Mail does not include any item other than paper. Legal, Official and journalist mail are not subject to the envelope and weight restrictions.¶

(17) "Official Mail" means any mail sent by a patient or sent to a patient from an elected official, appointed official, employee or agent of a federal, state, or tribal government, where the designation of the government official, employee or agent is clearly labeled on the addressee side of the envelope, set apart from the return and mailing addresses for ease of recognition, and whose status is verifiable.·¶

(18) "Oregon State Hospital" or "OSH" or "hospital" means any campus of the Oregon State Hospital system.¶

(19) "OSH Market" means an on-site retail establishment where patients, family members or friends who are visitors as defined in chapter 309 division 106 may purchase unrestricted items or authorized limited access items for the patient.¶

(20) "OSH Staff" means OSH employees, contractors, interns, and volunteers who have direct or indirect contact with patients.¶

(21) "Package" means any item sent by or received by a patient that does not meet the definition of mail, journalist mail, legal mail, or official mail.¶

(a) "Authorized Package" means a package received by OSH for a patient that OSH has provided prior authorization for under these rules.¶

(b) "Unauthorized Package" any package that is not an authorized package.¶

(22) "Patient" means an individual who is 18 years of age or older and receiving care and/or treatment at OSH, whether the program where the individual is receiving care and/or treatment is licensed as hospital level of care or other licensed level of care.¶

(23) "Patient Clothing" means an item worn to cover the patient's body.¶

(24) "Patient Property Room" means a designated area where patients may store personal property in a designated bin that cannot be stored in their room.¶

(25) "Personal Bedding" means two pillows, one blanket or comforter, and one sheet set.¶

(26) "Personal Property" means unrestricted items that belong to the patient that can be kept in the designated storage of the patient's room or patient property room.¶

(27) "Photocopy" means the copied image of incoming mail, including envelope, that replicates the content and the mail in in a format that accurately conveys the words or images on the original mail received.¶

(28) "Prohibited Item" means:¶

(a) Alcohol;¶

(b) Possession of drugs in the patient's room without authorization by OSH;¶

(c) Any item that reasonably could be used to escape or leave the hospital without authorization;·¶

(d) Food stored in the patient room or in the patient's storage in the patient property room;¶

(e) Any item in the possession of a patient who is prohibited from possessing or using that item in their treatment care plan because it is considered detrimental to their treatment;·¶

(f) Excess personal property;¶

(g) Any limited access item in the possession of a patient that exceeds the scope of the authorization or is not being supervised by OSH staff as required; or¶

(h) Any item that could pose a safety or security risk for the hospital.¶

(28<u>9</u>) "Reading Materials" means a written or printed work consisting of pages glued or sewn together along one side and bound in covers, such as books, magazines, or periodicals.¶

(29<u>30</u>) "Reasonable Cause" means an OSH staff member has knowledge or notice of facts or circumstances and the rational inferences drawn therefrom that would lead a reasonable and experienced OSH staff member to come to a conclusion.¶

(30<u>1</u>) "Religious Item" means an item that is associated with the patient's particular system of faith and worship.¶

(31<u>2</u>) "Safety" means protecting the patient and others from potential harm or preventing the patient from escaping or leaving without authorization, damaging state property, damaging the patient's or another patient's personal property, or committing or attempting to commit a crime.¶

(32<u>3) "Scan" means to cause an object to be examined by an x-ray or electromagnetic device for the purpose of detecting contraband.</u>¶

(<u>34</u>) "Security Reason" means protecting the patient from serious and immediate harm and protecting others from threats or harassment.¶

(33<u>5) "Security Risk" means conditions that would pose a risk of harm to the patient, others, or to the hospital.</u>¶

(<u>36</u>) "Superintendent" means the executive head of the Oregon State Hospital or the Superintendent's designee.¶

(34<u>7</u>) "Threat" means the patient's expression of an intent to harm, cause alarm to, or intimidate another individual.¶

(35<u>8</u>) "Treatment Care Plan" means an individualized and comprehensive written plan of therapeutic interventions designed, in collaboration between the patient and their treatment team, to facilitate rehabilitation of psychiatric symptoms.¶

(36<u>9</u>) "Unauthorized Currency" means paper money and coins in the possession of a patient in an amount or in a location not authorized by OSH.¶

(37<u>40</u>) "Unrestricted Items" means any item that is not contraband and has been authorized by OSH for the patient's use or possession.¶

(38<u>41</u>) "Weapon" means any item that can be used or modified to be used to harm the patient or others, including but not limited to guns, knives, improvised pointed or bladed instrument, and pepper spray.

Statutory/Other Authority: ORS 179.040, 413.042, ORS 179.360

Statutes/Other Implemented: ORS 179.360, 426.385

AMEND: 309-102-0120

RULE SUMMARY: 309-102-0120 adds minor changes to clean up language regarding reading and opening protected mail

CHANGES TO RULE:

309-102-0120
Patient Rights Related to Mail and Packages ¶

(1) Except as limited in these rules, all patients at OSH must have the right to communicate freely by sending and receiving sealed mail.¶
(2) All journalist mail, legal mail, official mail, or other mail may be sent or delivered by hand or via any parcel delivery service.¶
(3) To aid OSH in identifying the type of patient mail, incoming and outgoing legal, journalist, or official mail must be clearly labeled on the outside of the envelope as legal, journalist, or official mail, and set apart from the return and mailing addresses for ease of recognition, and must be verifiable as legal, journalist, or official mail.¶
(4) Patients may not receive unauthorized packages.¶
(5) For safety and security reasons, patients, family members or friends who are visitors as defined in chapter 309, division 106 may only purchase items through the OSH Market, except the patient may purchase printer paper at cost from OSH. OSH will not profit from the sales from the OSH Market. If the OSH Market does not have the desired item, the patient may request authorization from OSH to purchase an item through OSH's ordering system. OSH must only grant authorization for requests to purchase items if:¶
(a) It is not contraband, including but not limited to prohibited items;¶
(b) It is patient clothing, personal bedding, reading material, cultural food/items, or religious items; and¶
(c) It can be stored in the designated storage areas in the patient's room or patient property room.¶
(6) Except as otherwise provided in these rules, ~~no OSH~~ staff must:¶
~~(a) Open, read, censor, inspect or otherwise examine~~must not:¶
(a) Read or censor any patient's incoming or outgoing journalist mail, legal mail or official mail.¶
(b) Prevent, obstruct or delay a patient's outgoing journalist mail, legal mail, official mail, mail or packages from being promptly mailed; or¶
(c) Prevent, obstruct or delay a patient's incoming journalist mail, legal mail, official mail or mail from being promptly delivered to the patient.¶
(7) Except as required for treatment reasons, safety, or security reasons, or when mail is addressed to OSH, OSH staff having read or examined a patient's journalist, legal, official or other mail must protect the patient's confidentiality by refraining from discussions regarding it.¶
(8) OSH may place a limit on the patient's right to send or receive journalist mail, mail, or authorized packages if the limitation and the reasons for the limitation are stated in the patient's written treatment care plan. OSH must inform the patient of that limitation.¶
(9) At a patient's request, OSH staff may assist the patient in reading their incoming or sending their outgoing mail, journalist, legal or official mail. The patient's need for this assistance must first be documented in the patient's treatment care plan.¶
(10) OSH must provide patients with a reasonable amount of writing material. OSH must make stamps available for purchase by patients with funds. OSH will provide a reasonable number of stamps to patients without funds.¶
(11) The exchange of electronic mail is an earned privilege and is related to the patient's recent behaviors, current level of care and other privileges.
Statutory/Other Authority: ORS 179.040, 413.042, ORS 179.360
Statutes/Other Implemented: ORS 179.360, 426.385

AMEND: 309-102-0130

RULE SUMMARY: 309-102-0130 updates and adds processes to allow OSH to process, search, photocopy, scan and store incoming mail

CHANGES TO RULE:

309-102-0130
Handling of Patients Journalist Mail, Legal Mail, Official Mail, Mail & Packages ¶

(1) When a patient receives an authorized package, OSH may open and search it for contraband, including but not limited to prohibited items, even if there is no reasonable cause to believe that it may contain such an item. Authorized packages may be opened outside of the patient's presence.¶
(2) Unauthorized packages will not be accepted by OSH. OSH may return the package to sender, conduct a search of the package for safety or security reasons, request that it be accepted by law enforcement, or dispose of it in the presence of two OSH staff members. OSH must document the action taken.¶
(3) OSH may ~~open and search~~scan any incoming and outgoing sealed mail, journalist, legal, and official mail, or packages with non-invasive technology (e.g., metal detector, x-ray) for contraband. ¶
(4) OSH may open, search, and photocopy patient mail other than legal, journalist, and official mail, outside the patient's presence, even where there is no reasonable cause to believe that it may contain contraband. ¶
(~~4~~a) ~~OSH may open and search legal, journalist and official mail, with reasonable cause to believe that it~~When OSH photocopies patient mail, it must provide a photocopy of the original mail to the patient and retain the original mail in a locked and secured room. ¶
(b) If the original ma~~il~~y contains contraband, ~~including but not limited to prohibited items, where such search must occur in the patient's presence.~~¶
(~~5) OSH may scan any incoming and outgoing sealed mai~~OSH will follow the procedures in sections (7) and (8) of this rule.¶
(c) Upon a patient's discharge, OSH must return any original mail except mail that has been identified and disposed of as contraband pursuant to the procedures in section (7) of this rule. ¶
(5) OSH may open and search legal, journalist, ~~legal,~~ and official mail, ~~or packages with non-invasive technology (e.g., metal detector, x-ray).~~in the presence of the patient even when there is no reasonable cause to believe it may contain contraband, for the purpose of assuring it does not contain contraband. ¶
(~~6~~a) ~~After searching a~~If the legal, journalist, or official mail does not contain contraband, the patient~~'s~~ ma~~i~~y retain the original.¶
(b) If the legal, journalist, ~~legal,~~ or official mail ~~or package under this rule an~~contains any item that poses a safety or security risk, including but not limited ~~n~~to contra~~band or prohibited item is f~~olled substances, drug paraphernalia, weapons, or any item that cou~~n~~ld ~~inside, OSH may give any unrestricted items to the patient~~be used as an instrumentality of escape, OSH will follow the procedures in section (7) of this rule. ¶
(~~7~~6) After searching a patient's mail, journalist, legal, or official mail, or package under this rule and a prohibited item is found inside, then OSH may:¶
(a) Store the item as excess personal property;¶
(b) Provide the item to a designated person pursuant to OAR 309-108-0010(3);¶
(c) Dispose of any prohibited items that may pose a safety or security risk. Disposal must be documented and must be witnessed by two OSH staff members; and/or¶
(d) Give the patient any unrestricted item.¶
(~~8~~7) After searching a patient's mail, journalist, legal, or official mail, or package under this rule and controlled substances, drug paraphernalia, ~~or weapons are found inside~~weapons, or any item that could be used as an instrumentality of escape are found inside or there is reasonable cause to believe that one of those items has been found, then OSH must:¶
(a) Create a chain of custody and hold the mail, journalist, legal, or official mail, or package mail from a protection and advocacy group under ORS 192.517 or package in a secure area;¶
(b) Contact law enforcement and turn over the controlled substances, drug paraphernalia, or weapons if law enforcement is willing to accept the item(s), and document the action taken;¶
(i~~i~~A) If law enforcement declines to investigate further or accept the controlled substances, drug paraphernalia, or weapons, then dispose of the controlled substances, drug paraphernalia, or weapons in the presence of at least two OSH staff and document the action taken.¶
(ii~~i~~B) If law enforcement declines to investigate further or accept the rest of the contents of the mail, journalist, legal or official mail, or package, give the patient any unrestricted items, and dispose of any prohibited item as set out in paragraph (7) of this rule.¶
(~~9~~8) After searching a patient's mail, journalist, legal, or official mail, or package under this rule and drugs not

prescribed to the patient, drugs not prescribed or authorized by OSH, or unauthorized currency are found inside, OSH must:¶

(a) Follow the process in section (~~7~~6) of this rule, if OSH does not have good faith belief that the drugs not prescribed to the patient, drugs not prescribed or authorized by OSH, or the unauthorized currency are evidence of a crime or attempted crime; or¶

(b) Follow the process in section (~~8~~7) of this rule if OSH has a good faith belief that the drugs not prescribed to the patient, drugs not prescribed or authorized by OSH, or the unauthorized currency are evidence of a crime or attempted crime.¶

(~~10~~9) OSH must inform the patient of any incoming or outgoing mail, journalist, legal, or official mail, or package found to contain contraband (including prohibited items) was opened unless OSH has a good faith belief that the notification may:¶

(a) Increase the risk to the safety or security of OSH; or¶

(b) Impact an ongoing criminal investigation or proceeding.

Statutory/Other Authority: ORS 179.040, 413.042, ORS 179.360

Statutes/Other Implemented: ORS 179.360, 426.385

AMEND: 309-102-0140

RULE SUMMARY: 309-102-0140 adds language to allow for opening and photocopying mail

CHANGES TO RULE:

309-102-0140
Disposition of Mail Retained or Delivered To Patient ¶

(1) If mail, journalist, legal or official mail, or a package is opened, OSH staff must not read or further inspect any unrestricted items, except if patient's treatment plan contains a restriction for certain mail. ¶
(2) Any item retained from a patient's mail, journalist, legal, or official mail, or package must be clearly marked to identify, at minimum, the date of the inspection and retention, the patient's name, the name and address of the sender, a description of the held or disposed items, and both the printed name and the signature of the OSH staff member conducting the process. The item must then be handled as provided in these rules and OAR chapter 309, division 108.¶
(3) When any item is confiscated by a law enforcement agency, each part of the process must be documented in the patient's chart with, at minimum, the date of inspection and confiscation, the patient's name, the name and address of the sender, a description of the confiscated item or items, and both the printed name and the signature of the OSH staff member who witnessed the law enforcement's confiscation.¶
(4) All documentation related to any held item must be in writing and kept in the patient's chart. The~~OSH security staff must also retain written documentation related to any held item.~~ patient must receive a legible copy of each document, unless OSH has good cause to believe that providing a copy of the documentation would:¶
(a) Increase the risk to the safety or security of OSH; or¶
(b) Impact an ongoing criminal investigation or proceeding.
Statutory/Other Authority: ORS 179.040, 413.042, ORS 179.360
Statutes/Other Implemented: ORS 179.360, 426.385

REPEAL: 309-102-0150

RULE SUMMARY: 309-102-0150 removes redundant info

CHANGES TO RULE:

~~309-102-0150~~
~~Notice to Patients and OSH Staff ¶~~

~~(1) Upon admission to OSH, patients must be informed of their rights under these rules, both verbally and in writing, and will be provided instructions on how to obtain a copy of these rules. Information about these rules must also be prominently displayed in areas frequented by patients.¶~~
~~(2) OSH staff must be notified in writing at the commencement of their employment, or for existing OSH staff, within a reasonable time of the effective date of these rules, of the rights, policies, and procedures set forth in these rules. OSH staff must review the rules, policies, procedures, and updates annually.¶~~
~~(3) Violation of these rules and any related OSH policies or procedures by OSH staff may constitute cause for disciplinary action.¶~~
~~(4) The patient may contest the application of these rules under OSH's grievance and review process in OAR chapter 309, division 118.~~
~~Statutory/Other Authority: ORS 179.040, 413.042, ORS 179.360~~
~~Statutes/Other Implemented: ORS 179.360, 426.385~~

AMEND: 309-106-0005

RULE SUMMARY: OAR 309-106-0005 provides definitions for: attorney; contact visit; clergy; direct care staff; forensic patient; gender identity; hospital level of care patient; in-person visit; metal detection screening; minor; OSH property; pat-down; personal search; physical aggression; search; secure perimeter; secure residential treatment facility; security inspection; security reason; security risk; security staff; service animal; virtual visit; visit; and wanding.

CHANGES TO RULE:

309-106-0005
Definitions ¶

As used in these rules:¶
(1) "~~Contraband" means any controlled substance, drugs not prescribed to the patient, drugs not prescribed or authorized by OSH, drug paraphernalia, weapons, unauthorized currency or prohibited items.~~¶
(2~~)~~Attorney" means any lawyer actively licensed by the Oregon State Bar or other state bar.¶
(2) "Contact Visit" means that the meeting between the patient and the approved visitor occurs in person without a barrier. There may be limited approved physical contact between the patient and the approved visitor, such as a hug at the beginning or ending of the visit.¶
(3) "Contraband" means any controlled substance, drugs not prescribed to the patient, drugs not prescribed or authorized by OSH, drug paraphernalia, weapons, unauthorized currency or prohibited items.¶
(4) "Clergy" means any member of the community who is recognized by a religious authority and who has been accepted, oriented, trained, and approved by the Oregon State Hospital Spiritual Care Department.¶
(5) "Controlled Substance" means a drug or its immediate precursor classified in Schedules I through V under the federal Controlled Substances Act, 21 USC 811 to 812, as modified under ORS 475.005 and ORS 475.035.¶
(3~~6~~) "Cultural Food/Items" means an item that relates to a patient's cultural or ethnic identity.¶
(4~~7~~) "D~~ivision" means the Health Systems~~rect Care Staff" means any health care workers, either employed directly or contracted with OSH, who work directly with patients in the hospital, including but not limited to physicians, nurse practitioner, registered nurse, nursing assistants, therapists, and technicians.¶
(8) "Division" means the Oregon State Hospital Division of the Oregon Health Authority.¶
(5~~9~~) "Drug" means:¶
(a) Substances recognized as drugs in the official United States Pharmacopoeia, official Homeopathic Pharmacopoeia of the United States or official National Formulary, or any supplement to any of them;¶
(b) Substances intended for use in the diagnosis, cure, mitigation, treatment or prevention of disease in humans or animals;¶
(c) Substances (other than food) intended to affect the structure or any function of the body of humans or animals, including but not limited to vitamins, supplements, dietary powders, synthetic cathinones, synthetic cannabinoids; or¶
(d) Substances intended for use as a component of any article specified in paragraph (a), (b) or (c) of this subsection; however, the term does not include devices or their components, parts or accessories.¶
(6~~10~~) "Drug Paraphernalia" means all equipment, products and materials of any kind that are marketed for use or designed for use in planting, propagating, cultivating, growing, harvesting, manufacturing, compounding, converting, producing, processing, preparing, testing, analyzing, packaging, repackaging, storing, containing, concealing, injecting, ingesting, inhaling or otherwise introducing into the human body a controlled substance in violation of ORS 475.752 to 475.980.¶
(7~~11~~) "Excess Personal Property" means property which cannot be stored in the designated storage in the patient's room or personal storage space on the unit.¶
(8~~12~~) "Forensic Patient" means a patient who is 18 years of age or older admitted to OSH as an Guilty Except for Insanity (GEI) patient pursuant to ORS 161.327 or ORS 161.328, Aid and Assist Patient under ORS 161.365 or ORS 161.371, an Extremely Dangerous Person pursuant to ORS 426.701 or ORS 426.702, an administrative transfer under ORS 179.473, a transfer from Oregon Youth Authority (OYA) or DOC pursuant to ORS 179.173 or as a misdemeanor GEI pursuant to ORS 161.328.¶
(13) "Gender Identity" means an individual's gender-related identity, which may be different from the identity that is traditionally associated with the individual's sex assigned at birth.¶
(14) "Good Faith Belief" means an honest or sincere belief in something.¶
(9~~15~~) "Harassment" means a patient who is communicating or attempting to communicate with an individual or entity that they are prohibited from contacting by a court order, treatment care plan, or other legal requirement.¶
(10~~6~~) "Health Care Representative" means a competent adult appointed by a court to make health care decisions for a patient under ORS Chapter 127.¶

(147) "Hospital Level of Care (HLOC) Patient" means a patient who is 18 years of age or older and is admitted to one of OSH's licensed hospital units.¶

(18) "In-Person Visit" means a meeting at the hospital between a patient and an approved visitor who are permitted to see and talk with each other on a scheduled basis for a reasonable period of time.¶

(19) "Journalist Mail" means any mail sent by a patient to a news media organization such as, but not limited to a newspaper, a magazine and a television station's news department, or sent to a patient from a news media organization.¶

(120) "Legal Guardian" mean an individual appointed by a court to act as guardian of an adult under ORS Chapter 125.¶

(213) "Legal Mail" means any mail received from or addressed to an attorney, court, tribal official, governmental official, disability rights organizations or the protection and advocacy system identified in ORS 192.517.¶

(1422) "Limited Access Item" means an item that could pose a safety or security risk in the possession of a patient but is permitted for a set duration of time with the prior authorization of OSH staff and, if applicable, with the direct supervision of OSH staff. A limited access item becomes a prohibited item if the patient possesses or uses the item outside of the scope of the authorization or without OSH staff supervision if required.¶

(1523) "Mail" means any paper documents sent by or received by a patient in a standard sized, legal sized, or special handling envelope with a weight of 16 ounces or less, and thickness of no more than ⬚ inch. Mail does not include any item other than paper. Legal mail and journalist mail are not subject to the envelope and weight restrictions.¶

(124) "Metal Detection Screening" means a type of security inspection where an electronic or mechanical device, designed to detect the presence of metal or other substances, is used to scan an individual's body, extra clothing, items in the patient's possession and service animal for the purpose of detecting contraband. Examples include but are not limited to an x-ray machine or wand.¶

(25) "Minor" means any person less than 18 years of age.¶

(26) "Oregon State Hospital" or "OSH" or "hospital" means any campus of the Oregon State Hospital system.¶

(127) "OSH Market" means an on-site retail establishment where patients, family members or friends who are visitors as defined in chapter 309 division 106 may purchase unrestricted items or authorized limited access items for the patient.¶

(128) "OSH Property" means OSH buildings, surrounding grounds, and parking lots. Personally owned vehicles parked on OSH property are not considered part of OSH property.¶

(29) "OSH Staff" means OSH employees, contractors, interns, and volunteers who have direct or indirect contact with patients.¶

(1930) "Package" means any item sent by or received by a patient that does not meet the definition of mail, journalist mail, or legal mail.¶

(a) "Authorized Package" means a package received by OSH for the patient where OSH has provided prior authorization under these rules.¶

(b) "Unauthorized Package" any package that is not an authorized package.¶

(31) "Pat-down" means a search procedure in which security staff or direct care staff run their hands over a clothed individual's body and inspect their clothing (including but not limited to their pockets, cuffs, socks, and outerwear) for the purpose of detecting contraband. Pat-downs may include searching the patient's extra clothing, items in the patient's possession and service animal.¶

(320) "Patient" means an individual who is who is 18 years of age or older and receiving care and treatment at OSH, whether the program where the individual is receiving care and treatment is licensed at hospital level of care or other licensed level of care.¶

(2433) "Patient Clothing" means an item worn to cover the patient's body, including but not limited to shoes, head coverings, and outerwear.¶

(2234) "Patient Property Room" means a designated area where patients may store personal property in a designated bin that cannot be stored in their room.¶

(235) "Personal Bedding" means two pillows, one blanket or comforter, and one sheet set.¶

(2436) "Personal Property" means unrestricted items that belong to the patient that can be kept in the designated storage of the patient's room or patient property room.¶

(2537) "Personal Search" means search procedures where OSH staff physically search an individual's body and clothing for contraband that goes beyond a security screening, which includes a pat-down, skin search or internal search. Personal searches may include searching the person's extra clothing, items in the patient's possession and service animal. ¶

(38) "Physical aggression" means any physical behavior that results in, could result in or threatens physical unwelcome contact or injury, including but not limited to spitting, throwing bodily fluids, throwing objects, posturing, or taking a fighting stance. ¶

(39) "Prohibited Item" means:¶

(a) Alcohol;¶

(b) Possession of drugs in the patient's room without authorization by OSH;¶

(c) Any item that reasonably could be used to escape or leave the hospital without authorization;¶

(d) Food stored in the patient room or in the patient's storage in the patient property room;¶

(e) Any item in the possession of a patient who is prohibited from possessing or using that item in their treatment care plan because it is considered detrimental to their treatment;¶

(f) Excess personal property;¶

(g) Any limited access item in the possession of a patient that exceeds the scope of the authorization or is not being supervised by OSH staff as required; or¶

(h) Any item that could pose a safety or security risk for the hospital.¶

(26) ~~"Reading Materials" means a written or printed work consisting of pages glued or sewn together along one side and bound in covers, such as books or magazines.~~¶

(27~~40~~) "Reasonable Cause" means an OSH staff member has knowledge or notice of facts or circumstances and the rational inferences drawn therefrom that would lead a reasonable and experienced OSH staff member to come to a conclusion.¶

(28~~41~~) "Religious Item" means an item that is associated with the patient's particular system of faith and worship.¶

(42~~9~~) "Safety" means protecting the patient and others from potential physical, emotional, or medical harm or preventing the patient from escaping or leaving without authorization, damaging state property, damaging the patient's or another patient's ~~personal~~ property, or committing or attempting to commit a crime.¶

(43~~0~~) "Search" means a close inspection, including physical contact of ~~a patient, of a person's room or living area, or of the patient~~n individual, any items in the individual's possession, or individual's ~~p~~sersonal ~~property~~vice animal. Searches may require the removal and separate inspection of shoes, jackets, purses, bags and other accessories.¶

(31~~44~~) "Secur~~ity~~ie Perimeter" means restricted high-security buildings, areas, and quads within the sally port entrances and exits at the state hospital.¶

(45) "Secure Residential Treatment Facility (SRTF) Patient" means a patients who 18 years of age or older and admitted to one of OSH's licensed secure residential treatment facilities.¶

(46) "Security Inspection" means a visual inspection or a non-invasive inspection using an electronic or metal device (e.g., metal detect~~or, x-ray), without the element of a personal contact search~~ion screening or wanding) for the purpose of detecting contraband. A security inspection does not involve physical contact with the subject of the inspection.¶

(32~~47~~) "Security ~~r~~Reason" means protecting the patient from serious and immediate harm ~~and protecting others from threats or harassmen~~, protecting others from harm, threats or harassment, and ensuring the safety and security of the hospital.¶

(48) "Security Risk" means conditions that would pose a risk of harm to the patient, others, or to the hospital.¶

(49) "Security Staff" means OSH staff assigned to the Security Department at OSH.¶

(50) "Service Animal" means an animal that is individually trained to do work or perform tasks for the benefit of an individual with a disability, including a physical, sensory, psychiatric, intellectual, or other mental disability. Animals whose sole function is to provide comfort or emotional support do not qualify as service animals under the Americans with Disabilities Act.¶

(33~~51~~) "Superintendent" means the executive head of the Oregon State Hospital or the Superintendent's designee.¶

(34~~52~~) "Threat" means ~~the patient~~a person's expression of an intent to harm, cause alarm to, or intimidate another individual.¶

(53~~3~~) "Treatment Care Plan" means an individualized and comprehensive written plan of therapeutic interventions designed, in collaboration between the patient and their treatment team, to facilitate rehabilitation of psychiatric symptoms.¶

(36~~54~~) "Unauthorized Currency" means paper money and/or coins in the possession of a patient in any amount or in a location not authorized by OSH.¶

(37~~55~~) "Unrestricted Items" means any item that is not contraband and has been authorized by OSH for the patient's use or possession.¶

(38) ~~"Visitor" means an individual who is not an OSH staff member or another patient and who OSH has authorized to enter a designated visiting area in the hospital to meet with the patient.~~¶

(39~~56~~) "Virtual Visit" means a visit between a patient and an approved visitor using computerized or video monitors, or telephones.¶

(57) "Visit" or "visitation" means a meeting at the hospital between patient and an approved visitor who are permitted to see and talk with each other on a scheduled basis for a reasonable period of time.¶

(58) "Visitor" means an individual who is not an OSH staff member or another patient and who OSH has authorized to enter a designated visiting area in the hospital to meet with a patient.¶

<u>(59) "Wanding" means a type of security inspection where a portable electronic or mechanical device, designed to detect the presence of metal or other substances, is passed in close proximity of an individual's body or their property for the purpose of detecting contraband. ¶</u>

<u>(60)</u> "Weapon" means any item that can be used or modified to be used to harm the patient or others, including but not limited to guns, knives, improvised pointed or bladed instrument, and pepper spray.

Statutory/Other Authority: ORS 179.040, 413.042, ORS 179.360

Statutes/Other Implemented: ORS 179.321, 426.385

AMEND: 309-106-0010

RULE SUMMARY: OAR 309-106-0010 amends the processes for a patient to refuse a visitor; to establish a right to in-person visitation with an approved visitor; outlines the process for security staff to form reasonable cause that a visitor should be subject to a search; and what conduct will result in revoking visitation.

CHANGES TO RULE:

309-106-0010
Patients Rights to Visitation and Exceptions ¶

(1) The Division recognizes the needs of patients to have access to and maintain contact with family members and the community of which they are a part as well as the needs of family and community members to have access to patients. Except as otherwise provided in ~~section (6) of~~ this rule, patients have the right to receive visits from any~~one they wish~~ visitor who has submitted a visitor application and been approved for visitation.¶

(2) OSH shall provide designated places for in-person and virtual visitations to occur in as much comfort and privacy as possible.¶

(3) OSH may set reasonable limitations on visitation hours and days and type of visitation, and may also require supervision during a visit. OSH may grant exceptions upon visitor or patient requests to change days or hours of visitation. OSH may impose additional reasonable limitations on visitation under the following circumstances:¶

(a) The Governor has declared a public health emergency as set in ORS 433.441;¶

(b) The Governor has declared a state of emergency as set in ORS 401.165 that may impact hospital's operations, patients, or OSH staff;¶

(c) OSH has determined there are safety or security risks that may impact the hospital's operations, patients, or OSH staff.¶

(4) OSH shall post visitation rules and restrictions on every unit and in the visitation areas.¶

(5) A patient~~'s lawyer or clergy shall not be restricted to the limitations established by OSH under section (3) of this rule.~~ may refuse to see a visitor at any time. ¶

(6) OSH ~~shall~~patients have ~~the~~a right to ~~restrict visitation under the following circumstances:~~¶

~~(a) The patient refuses to see the visitor;~~¶

~~(b) R~~in-person visits for approved visitors except when:¶

(a) Security staff or direct care staff have r~~easonable cause~~ ~~exists~~ to believe that the ~~patient may~~visitor would pose a safety or security risk ~~to others~~, introduce contraband (including prohibited items), or assist in planning or executing a patient's escape or unauthorized leave from OSH;¶

(~~c~~b) ~~R~~Security staff or direct care staff have r~~easonable cause~~ ~~exists~~ to believe that the visitor would be harmful to the patient's physical or mental health or may pose a safety or security risk;¶

(~~d~~c) ~~T~~Security staff or direct care staff observe that the visitor's behavior is disruptive to the patient, others, or OSH, ~~and~~which may include consideration of the visitor's past conduct;¶

~~(e) Reasonable cause exists to believe that the visitor would pose a safety or security risk, introduce contraband (including prohibited items), or assist in planning or executing a patient's escape or unauthorized leave from OSH;~~¶

~~(f) The patient or visitor is prohibited by a court order from contacting or being in the same geographic area;~~¶

~~(g at OSH;~~¶

(d) The visitor refuses to comply with the requirements in this rule or has a history of violating these rules;¶

~~(h) The patient's legal guardian has requested a restriction on a visitor,~~ including but not limited to refusal to submit to security inspection and pat-downs deemed necessary to ensure the safety and security of patients, others, and OSH;¶

(i~~e~~) The unit is under current medical restriction because of a communicable disease, or the visitor may have a communicable disease or refuses to comply with required preventative protocols; or~~and~~¶

(j~~f~~) A visitor whose purpose is to solicit the patient to purchase an item the visitor is selling.¶

(7~~g~~) ~~V~~The visitor~~s~~ ~~may be required to wear personal protective equipment, including a mask, and adhere to other preventative protocols while a medical restriction is in effect.~~¶

~~(8) Visitors are prohibited from entering the hospital with or providing any item other than mail to the patient. Violation of this rule will be sufficient grounds to end the visit, require the visitor to leave the hospital grounds, confiscate the item(s), and impose restrictions on visitation in the future~~ is proselytizing regarding a religion to a patient who does not want that interaction;¶

(h) the circumstances in section 3 above exist.

Statutory/Other Authority: ORS 179.040, 413.042, ORS 179.360
Statutes/Other Implemented: ORS 179.321, 426.385

AMEND: 309-106-0015

RULE SUMMARY: ORS 309-106-0015 provides categories of visitors who are pre-approved for visitation; provides discretion for the Superintendent to place limitations on pre-approved visitors based on the visitor's violation of OSH rules or other disruptive conduct during visitation; amends processes for a visitor to apply for visitation; details the process for a visitor to inform OSH of medical devices and the search procedure for medical devices of a visitor; amends the process for a minor child accompanying a visitor to OSH; more clearly defines conduct that results in a mandatory denial of visitation; provides conduct that may result in termination or denial of visitation a application; amends the rules for when a visitation application must be denied and when an application may be denied on review.

CHANGES TO RULE:

309-106-0015
OSH Review of Visitor Applications ¶

(1) ~~All visitors are required to apply for visitation prior to visiting a patient as set out in OSH Policy, available at OSH's website for Policies and Procedures, except the following pers~~Except for provided in section (2) of this rule, the following individuals are automatically approved for visitation~~s~~:¶
(a) A patient's attorney recognized by the court as representing the patient, or an agent of the attorney, such as an investigator or paralegal~~;~~, provided each person provides evidence of their representation of the patient, including but not limited to state bar membership or a letter of representation from the law firm or engagement letter from the investigation firm.¶
(b) A court-appointed ~~or,~~ attorney, attorney or otherwise contracted licensed psychologist or psychiatrist ~~for th~~whose purpose of conducting an independent evaluation of the patient; and where legal authority to conduct the evaluation has been provided to OSH, such as but not limited to a court order or letter of engagement signed by the patient, guardian, judge or patient's attorney; or¶
(c) The patient's legal guardian who has provided proof of current guardianship~~; and/or~~¶
~~(d) A health care representative who has provided proof of representative statu.~~¶
(2) For those visitors automatically approved under section (1) of this rule, the Superintendent may place limitations on visitation by notifying the visitor and patient in writing based on a significant safety issue, security risk, or disruption to hospital operations. These circumstances may include but are not limited to:¶
(a) The visitor commits or attempts to commit a crime upon OSH premises or against the patient; and¶
(b) The visitor repeatedly violates or attempts to violate visitation rules.¶
(2~~3~~) ~~OSH must approve~~All other individuals, who want to visit a patient at OSH, are required to apply for and be approved for visitation by OSH prior to visiting a patient.¶
(4) As part of the visitor~~'~~s application~~for a,~~ all visitor~~to be allowed to visit with a patient. A visitor or patient may request review of OSH's decision pursua~~s must do the following:¶
(a) Complete the online visitor application, available on OSH's website;¶
(b) Submit to an annual background check;¶
(c) Disclose any medical device or equipment (e.g., pacemaker, inhaler, wheelchair, or walker) or necessary prescription medication that the visitor is bringing into ~~to OSH Policy 8.026.~~the secure perimeter of the hospital and provide a description of such equipment or medication.¶
~~(3) The patient's treatin~~g~~he~~¶
(A) Visitors with proper documentation from a physician ~~or,~~ nurse practitioner, ~~or treatment team may restrict a particular visitor from visiting a patient for their mental and physical health by docume~~medical clinic regarding a medical condition or disability requiring a medical device or equipment, shall present this information to OSH staff to help inform staff of the visitor's circumstances. This documentation will not exempt the visitor from the security screening process.¶
(B) Any prescription medication must be in its original cont~~ain it in the patient's treatment care plan. Specific reasons for the~~er with the original label that contains the visitor's name, name of medication, prescriber, and ~~r~~prescription number.¶
(C) If a visitor is prescri~~bed medica~~tion ~~or~~ must ~~be clearly stated with supporting documentation, as available~~rely on a new medical device or equipment after their application has been approved, the visitor must contact the OSH Reception Center at least 48-hours prior to their next visitation to provide satisfactory documentation of the new medication or medical device that they plan to bring with them to visitation.¶
(4~~D~~) ~~The patient's treating physician or n~~If the new prescribed medication or medical device or equipment was prescribed in fewer than 48-~~ho~~urs~~e~~ ~~pra~~ctitioner ~~or treatment team may restrict a particular visit where the visit may be detrimental to the mental or physical health of the patient or pose a safety or security risk to others by~~

documenting it ior to the visitation, the visitor must contact the OSH Reception Center as soon as practicable prior to the visit and provide satisfactory documentation of the new medication or medical device or equipment that they plan to bring with them to visitation.¶

(E) Disclose whether the visitor is bringing a service animal to the visit and complete any OSH-required pre-approval paperwork for the animal.¶

(d) Disclose if they are accompanying a minor child to the visitation, and provide documentation confirming that each child visiting a progress note. Specific reasons for the restrpatient is the visitor or patient's child or is in the visitor's legal custody or court-ordered physical custody at the time of the application must be clearly stated with supporting docume.¶

(5) OSH must deny an application for all types of visitation, in-person and virtual, for the following reasons:¶

(a) The patient or visitor is prohibited by a court order from contacting one as availablenother or being in the same geographic area.¶

(5b) OSH shall notifyThe visitor is a minor and the patient in whas a pending critming of a restriction under sections (2) or (3) of this rule within 24 hours of imposing the restriction, unless notifal charge or a conviction of a sex offense against a minor, unless the minor is the patient's biological or adopted child or grandchild who is not the victim of the pending criminal charge or a conviction of a sex offense against a minor.¶

(c) The visitor is accompanying a minor, and the visitor has a pending or prior convication within this time period would be detrimental to the patient's mental or physical health, which must be documented in the patient's chart. If notification is delayed under this section, notification will be provided as soon as is reasonable. The notification must state the reasons and duration of the restriction and explaof a sex offense involving a minor.¶

(d) The visitor is a former staff member and there are allegations or findings of abuse or neglect related to a patient.¶

(6) OSH must deny an application for in-person visitation for the following reasons but may approve an application for virtual visitation:¶

(a) The visitor has active warrants;¶

(b) The visitor was convicted of possession, control, or delivery of an explosive device;¶

(c) The visitor has a pending criminal charge or a conviction in the preceding 10 years of a violent felony as that term is defined in ORS 147.500; and¶

(d) The visitor has a pending criminal charge or a conviction for a drug-related crime in the preceding 5 years, except where the visitor confirms that they are the patient's 12-step program sponsor (e.g. Alcoholics Anonymous, Narcotics Anonymous, Cocaine Anonymous, Al-Anon, etc.) or peer recovery specialist, they have no pending drug-related charge, and the only drug-related conviction is in to the patient howreceding 3 years, they may challenge the decisionve in-person visitation with the patient.¶

(67) A physiciaOSH may deny an application for nurse practitioner shall review decisions to visitation if the security staff or direct care strict a visitor under section (2) of this rule and may renewaff believe that the visitor could pose a clinical, safety or security risk to the patient, others or the hospital. Specific reasons for the restriction at least monthly. Restrictions will expire in one month frommust be documented.¶

(8) OSH shall notify the patient in writing of a limitation on a visit or denial of a visitor application under these rules, unless notification would be detrimental to the dpate of the decision, unless renewedient's mental or physical health, which must be documented. The notification must state the reasons, duration and review process.¶

(79) OSH may set additional restricplace limitations ton a visitors as provided in OAR chapter 943, division 12.¶

(810) A patient or their representative may contest any restrictions placed onrequest review of OSH's decision to deny a visitor's or application ofby following these rules as provided grievance procedures set out in OAR chapter 309, division 118.

Statutory/Other Authority: ORS 179.040, 413.042, ORS 179.360
Statutes/Other Implemented: ORS 179.321, 426.385

REPEAL: 309-106-0020

RULE SUMMARY: removes redundant info

CHANGES TO RULE:

~~309-106-0020~~
~~Notice to Patients and OSH Staff ¶~~

~~(1) Upon admission to OSH, patients shall be informed of their rights under these rules, both verbally and in writing, and will be provided instructions on how to obtain a copy of these rules. Information about these rules shall also be prominently displayed in areas frequented by patients.¶~~
~~(2) OSH staff shall be notified in writing at the commencement of their employment, or for existing OSH staff, within a reasonable time of the effective date of these rules, of the rights, policies, and procedures set forth in these rules. OSH staff shall review the rules, policies, procedures and updates annually.¶~~
~~(3) Violation of these rules and any related OSH policies or procedures by OSH staff may constitute cause for disciplinary action.~~
~~Statutory/Other Authority: ORS 179.040, 413.042, ORS 179.360~~
~~Statutes/Other Implemented: ORS 179.321, 426.385~~

ADOPT: 309-106-0025

RULE SUMMARY: OAR 309-106-0025 amends the requirements and rules for visitation including: rules for appropriate clothing for visitors; prohibited clothing items within the security perimeter; prohibits words or logos on clothing that cannot be worn at OSH in the presence of patients; prohibits clothing that could be used as a weapon or to conceal contraband; indicates items that are prohibited from being allowed into visitation spaces; exempts certain classifications of visitors from prohibited property rules based on the nature of the visit; provides guidance to security staff to observe and identify prohibited conduct or property; prohibits certain conduct during visitations that may facilitate the dissemination of contraband.

CHANGES TO RULE:

309-106-0025
Visitation Requirements
(1) Visitors must abide by all requirements set out in these rules. Failure to do so may result in the termination of the visit and limitations on future visits.¶
(2) Visitors must abide by the following requirements for the safety and security of the patients, staff, visitors, and hospital: ¶
(a) Visitors must wear a base layer of clothing only, which may include a dress, skirt, shirt, pants, or shorts.¶
(b) Visitors must also wear appropriate footwear such as shoes or sandals.¶
(c) Visitors are prohibited from wearing into the secure perimeter:¶
(A) Camouflage or military-type clothing unless it has been approved in advance by the Security Director or designee;¶
(B) Clothing with words or logos related to alcohol, tobacco, products, drugs, vulgarity, violence, bigotry, sexual connotations, or those containing allusions to any of these items;¶
(C) Clothing that may be considered provocative, including, but not limited to, transparent, skin-tight, low-cut clothing, or clothing that exposes undergarments, bare back, buttocks, or midriff at any time (e.g., while sitting, standing, or bending over);¶
(D) Neckties, scarves, necklaces, or any other item that encircles the neck;¶
(E) Outerwear (e.g., jackets, gloves, hats). When wearing hats or other head coverings that obstruct the facial features unless it is a religious garment that has been disclosed to OSH in advance;¶
(F) Multiple layers of clothing;¶
(G) Shoes or accessories that might be a safety hazard, including any item that may be used as a weapon or ligature device; and¶
(d) Visitors must not bring into the secure perimeter computers, tablets, cellular phones, watches or any other electronic or battery-powered device.¶
(3) Visitors may only bring these items into the secure perimeter:¶
(a) Their locker keys;¶
(b) Their badge;¶
(c) Pre-disclosed prescription medication;¶
(d) Pre-disclosed medical device or equipment;¶
(e) Service animal; and¶
(f) When there is a minor visitor under the age of two, the following items are allowed into the secure perimeter:¶
(A) A clear baby bottle with fluids inside;¶
(B) A single baby blanket;¶
(C) Two diapers and diaper wipes; ¶
(D) One undamaged plastic toy; and¶
(E) Any additional items must be approved on a case-by-case basis by the Security Shift Supervisor. However, strollers, baby carriers, car seats, and stuffed animals are not allowed in the secure perimeter. ¶
(4) Notwithstanding section (3) of this rule, additional items (e.g., computers, papers, pens, books and phones) subject to the approval of security staff may be brought into the secure perimeter:¶
(a) By the following individuals:¶
(A) A patient's attorney recognized by the court as representing the patient, or an agent of the attorney, such as an investigator or paralegal, provided each person provides evidence of their representation of the patient, including but not limited to state bar membership or a letter of representation from the law firm or engagement letter from the investigation firm.¶
(B) A court-appointed, attorney-appointed or otherwise contracted licensed psychologist or psychiatrist whose purpose of conducting an independent evaluation of the patient and where legal authority to conduct the

evaluation has been provided to OSH, such as but not limited to a court order or letter of engagement signed by the patient, guardian, judge or patient's attorney; and¶

(C) Clergy.¶

(b) Under no circumstances may any of the individuals described in this section bring in weapons, prescription medications not in its original packaging and prescribed for the visitor, non-prescription medications, controlled substances, alcohol, food and beverages.¶

(5) Security staff or direct care staff may continuously observe visitors and patients to identify any unusual behavior or security concerns. Suspicious activity includes, but it not limited to:¶

(a) Passing contraband or engaging in conduct that appears to be passing contraband;¶

(b) Engaging in conflict with patients, other visitors, or staff;¶

(c) Inappropriate touching or lewd behavior; and¶

(d) Appearing to be intoxicated.¶

(6) For in-person contact visits, a brief hug at the beginning and at the conclusion of a visit is allowed. No further physical contact between a patient and a visitor is allowed. Security staff or direct care staff may interrupt any attempt to prolong the brief embrace . If the patient or visitor persists in engaging in physical contact during visitation, security staff or direct care staff may terminate the visit.¶

(7) Patients and visitors are not permitted to move about the visiting area or any other room outside of the visiting area including in the gardens.¶

(8) To limit the opportunity to pass contraband to patients, patients and visitors are not permitted to purchase or eat food during the visit, or to play games together.¶

(9) Patients are not permitted to approach or follow visitors outside of the designated visiting area.¶

(10) All minors must be accompanied by a pre-approved adult visitor who is a parent, legal guardian, or court-ordered escort to enter a visitation area. Visitors must provide documentation confirming that each child visiting is their child, in their legal custody or court-ordered physical custody at the time of the application.¶

(11) Visitors may be required to wear personal protective equipment, including a mask, and adhere to other preventative protocols while a medical restriction is in effect.¶

(12) Video visitation is available to all patients and their approved visitors.

Statutory/Other Authority: ORS 179.040, 413.042, 179.360

Statutes/Other Implemented: ORS 179.321, 426.385

ADOPT: 309-106-0030

RULE SUMMARY: OAR 309-106-0030 addresses visitor security inspections and provides for: when and where visitors will be subject to security and property screening; for storing visitor property during visitation; the process for searching a visitor's person; when search devices may be used on visitors; prohibits certain body piercings or jewelry; provides for the searching of medical devices; provides for the exemption from metal detector screenings; provides for the search process for pat downs; provides guidelines for service animals accompanying a visitor; provides procedures for confiscating contraband.

CHANGES TO RULE:

309-106-0030
Visitor Security Inspection and Screening
(1) Visitors must be processed through a security checkpoint to access the visitation area in the secure perimeter to protect the safety and security of the hospital. Security staff or direct care staff must screen all visitors, including visual inspection, metal detection screening, and pat-downs.¶
(2) Lockers may be provided for visitors' use to store purses, carrying cases, or other personal items until the visit is over.¶
(3) A visitor may be asked to submit to a security inspection or pat-down but may deny consent for the search. If the visitor denies or withdraws consent for the search at any time, visitation will be denied and any search must be immediately discontinued. .¶
(4) Prior to entering the secure perimeter and prior to visitation, all visitors, including attorneys, investigators, and psychologists or other professionals hired by the patient or attorney, must undergo security screening, including minors and service animals. For most visitors, successfully completing security screening and the related inspection of clothing and authorized items will alleviate the need for a pat-down.¶
(5) Visitors are subject to a security inspection (visual inspection, metal detection screening, and wanding) prior to entering the secure perimeter of the hospital. Security inspections are conducted as follows:¶
(a) Visitors must be in a single or base level of clothing. All additional items such as hats, gloves, coats, multiple layers of shirts, extra socks and shoes must be removed. Visitors must turn out their pockets, and their sleeves and cuffs must be unrolled.¶
(b) Visitors may be asked to remove body piercings or excessive jewelry to expedite the screening process. Excessive jewelry, areas of the body that have body piercings or undergarments with metal clasps or adjusters often alarm metal detectors and may delay or even prevent visiting.¶
(c) For wanding, visitors must stand with legs approximately shoulder-width apart and their arms outstretched. ¶
(d) Visitors are required to cooperate with the instructions of security staff or direct care staff in order to facilitate the security inspection process, such as requests to turn out pockets, unroll cuffs, or turn around. If visitors do not cooperate, the visit must terminate.¶
(6) Visitors with a medical device such as a pacemaker, defibrillator, device that operates under magnetic calibration, metal implants, wheelchair, bone growth stimulator, or other internal or external medical device) should check with their doctor prior to arriving at OSH to determine if it is safe to go through the metal detection screening. Depending on their doctor's recommendations, the visitor must include that information in their visitor application or provide an update to OSH if discovered after the application is submitted.¶
(7) Visitors who are exempt from metal detection screening include those persons who have provided OSH in their visitor application approved documentation of a metal condition or medical device or equipment in or upon their person. If a person is exempt from metal detection screening, a pat-down must be conducted prior to entry into the secure perimeter for visitation.¶
(a) All pre-disclosed and approved medication, medical devices and equipment, and service animals must be searched prior to visitation.¶
(b) A modified search will be used for visitors requiring wheelchairs or electric scooters as the reliability of hand-held metal detectors is limited by the structure of the chair or scooter. Visitors in wheelchairs or electric scooters must limit their accessories and personal possessions to only those items medically necessary and allowed within these rules during visitation.¶
(8) If metal detection screening alerts to the presence of metal, or security staff or direct care staff suspect the presence of contraband, security staff or direct care staff must investigate with a pat-down.¶
(9) Pat-downs must be conducted as follows:¶
(a) A minimum of two OSH staff members, comprised of either security staff or direct care staff, must conduct pat-downs.¶

(b) The security staff or direct care staff member making physical contact with the visitor to conduct the pat-down must be the same sex as the visitor. If visitor expresses a preference for a staff member of their same gender identity to conduct the pat-down, a security staff or direct care staff member of that gender identity must conduct the pat-down. However, if a security staff or direct care staff member of the visitor's preferred sex or gender identity is not immediately available to conduct the pat-down, then a security staff or direct care staff member, who is not the visitor's preferred sex or gender identity, may conduct the pat-down with the visitor's consent. If the visitor does not consent, the visit must terminate. Other security staff or direct care staff, who are involved in the pat-down but who are not making physical contact with the visitor, do not need to be the visitor's preferred sex or gender identity.¶

(c) Visitors must be wearing a single or base level of clothing. All additional items such as hats, gloves, coats, multiple layers of shirts, extra socks and shoes must be removed. Visitors must turn out their pockets, and sleeves and cuffs must be unrolled.¶

(d) Visitors must stand with legs approximately shoulder-width apart and their arms outstretched.¶

(e) Pat-downs must be conducted within view of the camera surveillance system.¶

(f) Visitors are required to cooperate with the instructions of security staff or direct care staff to facilitate the pat-down process, such as requests to turn out pockets, unroll cuffs, shake out their clothing, or turn around. If the visitors do not want to cooperate, then the visit must terminate.¶

(10) Visitors who bring in service animals will be subject to the following requirements: ¶

(a) Visitors must be responsible to ensure that the service animal is properly controlled and behaved at all times.¶

(b) Visitors may be asked the following in relation to the service animal:¶

(A) If the animal is required because of a disability; and¶

(B) What work or task the animal has been trained to perform.¶

(c) Visitors are required to remove any apparel or other item the service animal is wearing so that security staff or direct care staff may search the item prior to entry into the secure perimeter of the hospital;¶

(d) Patients are not allowed to touch service animals.¶

(e) A visitor will not be asked to remove the service animal from the premises unless:¶

(A) The animal is out of control and the visitor does not take effective action to control it; or¶

(B) The animal is not housebroken.¶

(f) Where there is a legitimate reason to ask that the service animal to be removed, staff shall offer the visitor the opportunity to visit without the animal's presence, if the visitor can arrange to have the animal removed and cared for and controlled outside of the secure perimeter. Under no circumstances may a staff person remove or care for the animal.¶

(11) If illicit contraband is found on a visitor or in their property at any time, including hidden in their prescription medication, or medical devices or equipment, security staff or direct care staff must confiscate the item and contact law enforcement. OSH must also:¶

(a) Create a chain of custody and hold the illicit contraband in a secure area; and¶

(b) Contact law enforcement and turn over the illicit contraband if law enforcement is willing to accept the item(s), and document the action taken. If law enforcement declines to investigate further or accept the illicit contraband, then dispose of the illicit contraband in the presence of at least two OSH staff and document the action taken.¶

(12) Any approved item entering visitation with a child or other visitor will be searched during the screening process by security staff. Security staff shall search the additional items approved for minor visits or other visitors who had been pre-approved to bring medications, medical devices or equipment into the secure perimeter upon exit to ensure they are exiting with the visitor.

Statutory/Other Authority: ORS 179.040, 413.042, 179.360

Statutes/Other Implemented: ORS 179.321, 426.385

ADOPT: 309-106-0035

RULE SUMMARY: OAR 309-106-0035 provides the process for administrative review of the denial of visitation applications.

CHANGES TO RULE:

309-106-0035
Administrative Review
(1) A prospective visitor may within 60 days of a decision denying an application for visitation by submitting a completed written request for Administrative Review to OSH Ombuds Office.¶
(a) The administrative review request must include information supporting reversal or modification of the decision and copies of any supporting documents or official records.¶
(b) Apon timely receipt of a completed Administrative Review Request and copies of any supporting documents or updated official records, the OSH Ombuds Office will review the decision and either affirm, reverse or modify the decision.¶
(c) The OSH Ombuds Office, may request additional information from the prospective visitor, law enforcement agency, or other reliable resource to complete the review.¶
(d) Reversal or Modification of a Decision Denying an Application for Visitation or Limitation on Visitation: A decision denying an application may be reversed or modified by the OSH Ombuds Office on in the following circumstances:¶
(A) The initial decision is determined by the OSH Ombuds Office to have been made in error based on incorrect information, or an incorrect application of these rules; or¶
(B) Circumstances impacting eligibility for visitation changed since the date of the decision denying the application for visitation or decision to limit visitation under review.¶
(e) The OSH Ombuds Office's decision shall be final and not subject to further review.¶
(2) Administrative Review by Superintendent for Extraordinary Circumstances:¶
(a) Notwithstanding any other provision of these rules, the Superintendent or their designee may, in their sole discretion, reverse or modify a decision denying an application for visitation between a patient and an immediate family member of the patient for extraordinary circumstances.¶
(b) The Superintendent or designee's decision will be final and subject to review only as provided for in ORS 183.484.
Statutory/Other Authority: ORS 179.040, 413.042, 179.360
Statutes/Other Implemented: ORS 179.321, 426.385

AMEND: 309-108-0000

RULE SUMMARY: OAR 309-108-0000 includes additional language that more clearly indicates the purpose and statutory authority for the rules relating to patient personal property and searches of that property.

CHANGES TO RULE:

309-108-0000
Purpose and Statutory Authority ¶

These rules prescribe the standards and procedures for the handling of ~~personal property of~~atient's personal, excess or storage property and the security inspection and search procedures for Oregon State Hospital patients.
Statutory/Other Authority: ORS 179.040, 413.042, ORS 179.360
Statutes/Other Implemented: ORS 179.321, 426.385

AMEND: 309-108-0005

RULE SUMMARY: OAR 309-108-0005 adds definitions for terms addressed in later rules. Specifically, for direct care staff, gender identity, internal searches, medical detection screening, no-contact searches, pat-down searches, personal searches, the scope of a search, security risks, and the tools used in searches.

CHANGES TO RULE:

309-108-0005
Definitions ¶

As used in these rules:¶
(1) "Chief Medical Officer" or "CMO" means the physician or designee who oversees all medical and other non-nursing clinical care and pharmacy and laboratory services provided at the Oregon State Hospital.¶
(2) "Contraband" means any controlled substance, drugs not prescribed to the patient, drugs not prescribed or authorized by OSH, drug paraphernalia, weapons, unauthorized currency or prohibited items.¶
(23) "Controlled Substance" means a drug or its immediate precursor classified in Schedules I through V under the federal Controlled Substances Act, 21 USC 811 to 812, as modified under ORS 475.005 and ORS 475.035.¶
(34) "Cultural Food/Items" means an item that relates to a patient's cultural or ethnic identity.¶
(45) "Division" means the Health Systemsrect Care Staff" means any health care workers, either employed directly or contracted with OSH, who work directly with patients in the hospital, including but not limited to physicians, nurse practitioners, registered nurses, nursing assistants, therapists, and technicians.¶
(6) "Division" means the Oregon State Hospital Division of the Oregon Health Authority.¶
(57) "Drug" means:¶
(a) Substances recognized as drugs in the official United States Pharmacopoeia, official Homeopathic Pharmacopoeia of the United States or official National Formulary, or any supplement to any of them;¶
(b) Substances intended for use in the diagnosis, cure, mitigation, treatment or prevention of disease in humans or animals;¶
(c) Substances (other than food) intended to affect the structure or any function of the body of humans or animals, including but not limited to vitamins, supplements, dietary powders, synthetic cathinones, synthetic cannabinoids; or¶
(d) Substances intended for use as a component of any article specified in paragraph (a), (b) or (c) of this subsection; however, the term does not include devices or their components, parts or accessories.¶
(68) "Drug Paraphernalia" means all equipment, products and materials of any kind that are marketed for use or designed for use in planting, propagating, cultivating, growing, harvesting, manufacturing, compounding, converting, producing, processing, preparing, testing, analyzing, packaging, repackaging, storing, containing, concealing, injecting, ingesting, inhaling or otherwise introducing into the human body a controlled substance in violation of ORS 475.752 to 475.980.¶
(79) "Excess Personal Property" means property which cannot be stored in the designated storage in the patient's room or personal storage space on the unit.¶
(810) "Gender Identity" means an individual's gender-related identity, which may be different from the identity that is traditionally associated with the individual's sex assigned at birth.¶
(11) "Good Faith Belief" means an honest or sincere belief in something.¶
(912) "Harassment" means a patient who is communicating or attempting to communicate with an individual or entity that they are prohibited from contacting by a court order, treatment care plan, or other legal requirement.¶
(103) "Internal Search" means a visual or digital inspection of body cavities for the purpose of detecting contraband. This does not include the visual, non-invasive inspection of an individual's nostrils, ears, or mouth.¶
(14) "Limited Access Item" means an item that could pose a safety or security risk in the possession of a patient but is permitted for a set duration of time with the prior authorization of OSH staff and, if applicable, with the direct supervision of OSH staff. A limited access item becomes a prohibited item if the patient possesses or uses the item outside of the scope of the authorization or without OSH staff supervision if required.¶
(145) "Metal Detection Screening" means a type of security inspection where an electronic or mechanical device, designed to detect the presence of metal or other substances, is used to scan an individual's body, extra clothing, items in the patient's possession and service animal for the purpose of detecting contraband. Examples include but are not limited to an x-ray machine or wand.¶
(16) "No-Contact Search" means a non-invasive search procedure, used in lieu of a traditional pat-down, where the patient will cooperate with OSH staff in searching their clothing and will undergo a metal detection or other scanning technology for screening purposes. No-contact searches may include searching the patient's extra clothing, items in the patient's possession and service animal.¶

(17) "Oregon State Hospital" or "OSH" or "hospital" means any campus of the Oregon State Hospital system.¶

(1~~8~~9) "OSH Market" means an on-site retail establishment where patients, family members or friends who are visitors as defined in chapter 309 division 106 may purchase unrestricted items or authorized limited access items for the patient.¶

(1~~3~~9) "OSH Staff" means OSH employees, contractors, interns, and volunteers who have direct or indirect contact with patients.¶

(1~~14~~20) "Package" means any item sent by or received by a patient that does not meet the definition of mail, journalist mail, or legal mail.¶

(a) "Authorized Package" means a package received by OSH for a patient that has been prior authorized under these rules.¶

(b) "Unauthorized Package" any package that is not an authorized package.¶

(1~~15~~21) "Pat-down" means a search procedure in which security staff or direct care staff run their hands over a clothed individual's body and inspect their clothing (including but not limited to their pockets, cuffs, socks, and outerwear) for the purpose of detecting contraband. Pat-downs may include searching the patient's extra clothing, items in the patient's possession and service animal.¶

(22) "Patient" means an individual who is 18 years or older and receiving care and /or treatment at OSH, whether the program where the individual is receiving care and/or treatment is licensed as hospital level of care or other licensed level of care.¶

(1~~6~~23) "Patient Clothing" means an item worn to cover the patient's body, including but not limited to shoes, head coverings, and outerwear.¶

(1~~7~~24) "Patient Property Room" means a designated area where patients may store personal property in a designated bin that cannot be stored in their room.¶

(1~~8~~25) "Personal Bedding" means two pillows, one blanket or comforter, and one sheet set.¶

(1~~9~~26) "Personal Property" means unrestricted items that belong to the patient that can be kept in the designated storage of the patient's room or patient property room.¶

(20~~7~~) "Personal Search" means search procedures where staff physically search an individual's body and clothing for contraband that goes beyond a security screening, which includes a pat-down, skin search or internal search. Personal searches may include searching the patient's extra clothing, items in the patient's possession and service animal.¶

(28) "Prohibited Item" means:¶

(a) Alcohol;¶

(b) Possession of drugs in the patient's room without authorization by OSH;¶

(c) Any item that reasonably could be used to escape or leave the hospital without authorization;¶

(d) Food stored in the patient room or in the patient's storage in the patient property room;¶

(e) Any item in the possession of a patient who is prohibited from possessing or using that item in their treatment care plan because it is considered detrimental to their treatment;¶

(f) Excess personal property;¶

(g) Any limited access item in the possession of a patient that exceeds the scope of the authorization or is not being supervised by OSH staff as required; or¶

(h) Any item that could pose a safety or security risk for the hospital.¶

(2~~1~~9) "Reading Materials" means a written or printed work consisting of pages glued or sewn together along one side and bound in covers, such as books or magazines.¶

(2~~2~~30) "Reasonable Cause" means an OSH staff member has knowledge or notice of facts or circumstances and the rational inferences drawn therefrom that would lead a reasonable and experienced OSH staff member to come to a conclusion.¶

(2~~3~~1) "Religious Item" means an item that is associated with the patient's particular system of faith and worship.¶

(3~~2~~4) "Safety" means protecting the patient and others from potential physical, emotional, or medical harm or preventing the patient from escaping or leaving without authorization, damaging state property, damaging the patient's or another patient's ~~personal~~property, or committing or attempting to commit a crime.¶

(2~~5~~33) "Search" means a close inspection, including physical contact of a patient, ~~of a person's room or living area, or of the patient's personal property~~a patient's personal property, a patient's excess property, a patient's storage property, any items in the patient's possession, or the patient's service animal. Searches may require the removal and separate inspection of shoes, jackets, purses, bags and other accessories.¶

(2~~6~~34) "Secur~~ity ie~~ Perimeter" means restricted high-security buildings, areas, and quads within the sally port entrances and exits at the state hospital.¶

(35) "Security Inspection" means a visual inspection or a non-invasive inspection using an electronic or metal device (e.g., metal detect~~or, x-ray), without the element of a personal contact search~~ion screening or wanding) for the purpose of detecting contraband. A security inspection does not involve physical contact with the subject of the inspection.¶

(2736) "Security Reason" means protecting the patient from serious and immediate harm ~~and protecting others from threats or harassment~~, protecting others from harm, threats or harassment, and ensuring the safety of the hospital.¶

(37) "Security Risk" means conditions that would pose a risk of harm to the patient, others, or to the hospital.¶

(38) "Security Staff" means OSH staff assigned to the Security Department at OSH.¶

(39) "Service Animal" means an animal that is individually trained to do work or perform tasks for the benefit of an individual with a disability, including a physical, sensory, psychiatric, intellectual, or other mental disability. Animals whose sole function is to provide comfort or emotional support do not qualify as service animals under the Americans with Disabilities Act.¶

(40) "Skin Search" means a personal search procedure where the patient being searched removes all of their clothing and is visually examined and the removed clothing is inspected for the purpose of contraband.¶

(2841) "Superintendent" means the executive head of the Oregon State Hospital or the Superintendent's designee.¶

(429) "Threat" means the patient expressing an intent to harm, cause alarm to, or intimidate another individual.¶

(430) "Treatment Care Plan" means an individualized and comprehensive written plan of therapeutic interventions designed, in collaboration between the patient and their treatment team, to facilitate rehabilitation of psychiatric symptoms.¶

(3144) "Unauthorized Currency" means paper money and coins in the possession of a patient in an amount or in a location not authorized by OSH.¶

(3245) "Unrestricted Items" means any item that is not contraband and has been authorized by OSH for the patient's use or possession.¶

(3346) "Wanding" means a type of security inspection where a portable electronic or mechanical device, designed to detect the presence of metal or other substances, is passed in close proximity of an individual's body, clothing, possessions or service animal for the purpose of detecting contraband.¶

(47) "Weapon" means any item that can be used or modified to be used to harm the patient or others, including but not limited to guns, knives, improvised pointed or bladed instrument, and pepper spray

Statutory/Other Authority: ORS 179.040, 413.042, ORS 179.360

Statutes/Other Implemented: ORS 179.321, 426.385

AMEND: 309-108-0010

RULE SUMMARY: OAR 309-108-0010 includes additional language relating to where OSH may conduct a search for contraband. Subsection (7) is amended to ensure that OSH staff return a patient's room or living area to the condition it was in before the occurrence of a search.

CHANGES TO RULE:

309-108-0010
Patient Personal Property ¶

(1) Patients shall have the right to possess and use on each unit reasonable amounts of personal property and unrestricted items. Patients shall not have the right to possess or use contraband or prohibited items. In addition to these rules, OSH maintains a list of items that it has determined pose a safety or security risk to OSH and qualify as contraband, a prohibited item or limited access item under these rules and OSH Policy 8.037, dated February 13, 2015, as modified by the Property/Item Access List, Attachment A to OSH Policy 8.037, dated July 6, 2022, available at OSH's website for Policies and Procedures. Patients may also request a paper copy which shall also be posted in areas frequented by patients.¶

(2) OSH shall provide each patient with accessible storage for reasonable amounts of personal property in the patient's room and in the patient property room. Patients who need specific assistance in exercising the right to retain and use personal property shall receive such assistance. This shall be documented in the treatment care plan.¶

(3) OSH shall designate one or more locations for storage of reasonable amounts of excess personal property, including but not limited to valuables. OSH staff shall work with patients to identify what excess property will be stored or will be given to the patient's guardian, legal representative, family member, or other individual designated by the patient. Valuables that are stored at the hospital shall be documented by OSH staff and retained in a secure location.¶

(4) Excess property and valuables shall be returned to the patient upon release or discharge, or upon the death of the patient to the patient's guardian or legal representative, next of kin, or as otherwise required by law.¶

(5) OSH may restrict the amount of currency allowed to be retained by patients on their unit or off of their unit. Unauthorized currency may be stored as excess property, given to an individual listed in section (2) of this rule, or deposited in the patient's trust account.¶

(6) OSH may conduct a security inspection or search of a patient, patient's room or living area, a patient's personal property, a patient's excess property, a patient's storage property, any items in the patient's possession, or the patient's service animal, for contraband at any time. ¶

(7) Upon the completion of a search of a patient's room, living area, or personal or property, excess property for contraband, and storage property, OSH staff shall return the area to a neat and orderly condition and ensure that any property except for contraband is returned in the same condition.¶

(78) Contraband, including prohibited items, shall be handled as provided in OAR 309-108-0015.¶

(89) For safety and security reasons, patients, family members or friends may only purchase items through the OSH Market for the patient, except the patient may purchase printer paper at cost from OSH. OSH will not profit from the sales from the OSH Market. If the OSH Market does not have the desired item, the patient may request authorization from OSH to purchase an item through OSH's ordering system. OSH shall only grant authorization for requests to purchase items if:¶

(a) It is not contraband, including but not limited to prohibited items;¶

(b) It is patient clothing, personal bedding, reading material, cultural food/items, or religious items; and¶

(c) It can be stored in the designated storage areas in the patient's room or patient property room.¶

(910) The patient may contest the application of these rules under OSH's grievance and review process in OAR chapter 309, division 118.

Statutory/Other Authority: ORS 179.040, 413.042, ORS 179.360
Statutes/Other Implemented: ORS 179.321, 426.385

AMEND: 309-108-0015

RULE SUMMARY: OAR 309-108-0015 removes the text of subsection to be moved to a new rule.

CHANGES TO RULE:

309-108-0015
Procedures ¶
for Property
(1) All personal property that a patient brings into the hospital at the time of admission must be itemized in writing with an accompanying description, regardless of where or how the item is stored or otherwise disposed.¶
(2) OSH staff shall encourage and assist patients to mark all personal property in such a way which identifies it as an individual patient's possession.¶
(3) OSH staff shall consult with OSH's Spiritual Care Department regarding religious items that the patient wants to bring into the hospital upon admission. For safety and security reasons, OSH Security shall review the religious items brought by the patient for contraband. ¶
(4) Patient may request religious items from the OSH Spiritual Care Department, which will accommodate the request unless the item is contrary to their treatment plan, is unavailable, cost prohibitive, constitutes contraband, presents a safety or security risk, or otherwise violates applicable OSH policies or rules.¶
(5) OSH staff shall consult with OSH Native Services or the OSH Diversity liaison regarding cultural items that the patient wants to bring into the hospital upon admission. For safety and security reasons, OSH Security shall review the cultural items brought by the patient for contraband.¶
(6) Patient may request cultural items, not constituting contraband, from OSH Native Services or the OSH Diversity liaison, which will accommodate the request unless the item is contrary to their treatment plan, is unavailable, cost prohibitive, constitutes contraband, presents a safety or security risk, or otherwise violates applicable OSH policies or rules.¶
(7) Any medications brought by the patient at the time of admission should be given to the patient's guardian, legal representative, or family member if possible. If this is not possible, the medication shall be placed in the medical waste barrel for later destruction. Any controlled substances shall be destroyed and logged in the pharmacy record.¶
(8) If OSH identifies a prohibited item in the possession of the patient, in the patient's room or living area, or in their personal/excess property, OSH shall:¶
(a) Store the item as excess personal property;¶
(b) Provide the item to an individual listed in OAR 309-108-0010(2); or¶
(c) Dispose of any prohibited items that may pose a safety or security risk. Disposal shall be documented and shall be witnessed by two OSH staff members.¶
(9) If OSH identifies any controlled substances, drug paraphernalia, or weapons in the possession of the patient, in the patient's room or living area, or in their personal/excess property, then OSH shall:¶
(a) Create a chain of custody and hold the item in a secure area;¶
(b) Contact law enforcement and turn over the contraband, if law enforcement is willing to accept it, and document the action taken;¶
(c) If law enforcement declines to investigate further or accept the contraband, then dispose of the contraband in the presence of at least two OSH staff, and document the action taken.¶
(10) If OSH identifies any drugs not prescribed to the patient, drugs not prescribed or authorized by OSH, or unauthorized currency in the possession of the patient, in the patient's room or living area, or in their personal/excess property, OSH shall:¶
(a) Follow the process in section (8) of this rule if OSH does not have a good cause belief that the drugs not prescribed to the patient, drugs not prescribed or authorized by OSH, or the unauthorized currency are evidence of a crime or attempted crime; or¶
(b) Follow the process in section (9) of this rule if OSH has a good cause belief that the drugs not prescribed to the patient, drugs not prescribed or authorized by OSH, or the unauthorized currency are evidence of a crime or attempted crime.¶
(11) Searches shall adhere to the following restrictions:¶
(a) Searches of a patient that require physical contact shall be conducted by a physician, a nurse, or a same-sex OSH staff member (who is not a physician or a nurse), except in cases of emergencies.¶
(b) Searches of the patient that require digital or internal examination shall be conducted by a physician or a nurse and only upon authorization of the Superintendent or designee, except in emergencies where harm or injury may occur to the patient by delaying the search;¶
(c) Upon the completion of a search of a patient's room, living area or personal/excess property, OSH staff shall return the area to a neat and orderly condition and ensure that the personal/excess property is returned in the

~~same condition.¶~~
(12) OSH shall develop written procedures for handling missing personal or excess property. These procedures may include the involvement of law enforcement authorities.¶
(1~~3~~2) The patient may contest the application of these rules under OSH's grievance and review process in OAR chapter 309, division 118.
Statutory/Other Authority: ORS 179.040, 413.042, ORS 179.360
Statutes/Other Implemented: ORS 179.321, 426.385

REPEAL: 309-108-0020

RULE SUMMARY: removes redundant info

CHANGES TO RULE:

309-108-0020
Notice to Patients and OSH Staff ¶

(1) Upon admission to OSH, patients shall be informed of their rights under these rules, both verbally and in writing, and will be provided instructions on how to obtain a copy of these rules. Information about these rules shall also be prominently displayed in areas frequented by patients.¶
(2) OSH staff shall be notified in writing at the commencement of their employment, or for existing OSH staff, within a reasonable time of the effective date of these rules, of the rights, policies, and procedures set forth in these rules. OSH staff shall review the rules, policies, procedures, and updates annually.¶
(3) Violation of these rules and any related OSH policies or procedures by OSH staff may constitute cause for disciplinary action.
Statutory/Other Authority: ORS 179.040, 413.042, ORS 179.360
Statutes/Other Implemented: ORS 179.321, 426.385

ADOPT: 309-108-0025

RULE SUMMARY: OAR 309-108-0025 is added to address patient searches. Specifically, the rule the modes of searches ranging from visual to device assisted searches and internal searches of a patient; when patients may be subjected to searches and when increased levels of searches are appropriate; how patients may comply with searches to prevent escalated search procedures; when reasonable cause exists to support a search; when searches are mandatory; how searches are to be conducted to protect staff and ensure that patient's rights are protected during the search; when authorization for an increased level of search of a patient's person is required; how skin searches must be conducted to ensure staff safety and to protect patient rights; when seclusion or restraints are appropriate if a patient refuses a search in violation of the rules; when reasonable cause exists to conduct an internal search of a patient; the protocols for internal searches to protect staff and patient rights; who may authorize and conduct an internal search; and how patients may contest or grieve a search.

CHANGES TO RULE:

309-108-0025
Patient Searches
(1) Security inspection and search procedures of patients include: security inspection (visual inspection, metal detection screening, and wanding), no-contact searches, pat-downs, skin searches, and internal searches.¶
(2) Patients may be subject to a security inspection (visual inspection, metal detection screening, and wanding) at any time for the purpose of maintaining the safety and security of the hospital. Security inspections are conducted as follows:¶
(a) Patients must be in a single or base level of clothing. All additional items such as hats, gloves, coats, multiple layers of shirts, extra socks and shoes must be removed. Patients must turn out their pockets, and their sleeves and cuffs must be unrolled.¶
(b) For wanding, patients must stand with legs approximately shoulder-width apart and their arms outstretched. ¶
(c) Patients are required to cooperate with the instructions of security staff or direct care staff in order to facilitate the security inspection process, such as requests to turn out pockets, unroll cuffs, or turn around.¶
(d) Patients may be subject to searches if they do not participate with a security inspection, or as otherwise required or permitted under these rules.¶
(3) Patients are subject to routine pat-downs for the purpose of maintaining the safety and security of the hospital. Reasonable cause to believe there is contraband is not required. Routine pat-downs must occur:¶
(a) Before and after a patient leaves the secure perimeter for any reason, except when conducting a pat-down would delay a patient leaving the secure perimeter to address a medical emergency;¶
(b) Before and after a patient attends an in-person visitation; and¶
(c) Before a unit search or a patient's room search.¶
(4) Patients are subject to a non-routine pat-down if, after conducting a security inspection, security staff or direct care staff have reasonable cause to believe that the patient may have contraband.¶
(5) Pat-downs must be conducted as follows:¶
(a) A minimum of two OSH staff members, comprised of either security staff or direct care staff, must conduct pat-downs of patients.¶
(b) The security staff or direct care staff member making physical contact with the patient to conduct the pat-down must be the same sex as the patient. If patient expresses a preference for a staff member of their same gender identity to conduct the pat-down, a security staff or direct care staff member of that gender identity must conduct the pat-down. However, if a security staff or direct care staff member of the patient's preferred sex or gender identity is not immediately available to conduct the pat-down, a physician, nurse practitioner, or registered nurse, who is not the patient's preferred sex or gender identity, may conduct the pat-down. But if waiting for a physician, nurse practitioner, or registered nurse would pose a safety or security risk, then a security staff or direct care staff member, who is not the patient's preferred sex or gender identity, may conduct the pat-down. Other security staff or direct care staff, who are involved in the pat-down but who are not making physical contact with the patient, do not need to be the patient's preferred sex or gender identity.¶
(c) Patients must be in a single or base level of clothing. All additional items such as hats, gloves, coats, multiple layers of shirts, extra socks and shoes must be removed. Patients must turn out their pockets, and sleeves and cuffs must be unrolled.¶
(d) Patients must stand with legs approximately shoulder-width apart and their arms outstretched.¶
(e) Pat-downs must be conducted within view of the camera surveillance system, except when it is conducted outside of the secure perimeter of the hospital (e.g., on a community outing or outside medical appointment).¶

(f) Pat-downs of patients must occur outside the presence of their peers when possible.¶

(g) Patients are required to cooperate with the instructions of security staff or direct care staff in order to facilitate the pat-down process, such as requests to turn out pockets, unroll cuffs, shake out their clothing, or turn around.¶

(h) Patients may be subject to additional searches if the patient does not participate in the pat-down, or as otherwise required or permitted under these rules.¶

(i) Security staff or direct care staff may use seclusion or restraint, as permitted in OAR chapter 309, division 112, to conduct a pat-down when staff have reasonable cause to believe the patient is concealing contraband that might pose a safety or security risk to the patient or others. ¶

(6) Patients with no-contact search approval from Risk Review are exempt from routine pat-downs described in section (2) of this rule, except as otherwise described in this rule. No-contact searches must be conducted as follows:¶

(a) Patient must go through a security inspection prior to a no-contact search.¶

(b) A minimum of two OSH staff members, comprised of either security staff or direct care staff, must conduct no-contact searches of patients.¶

(c) The security staff or direct care staff member performing the no-contact search on the patient must be the same sex as the patient. If patient expresses a preference for a staff member of their same gender identity to conduct the no-contact search, a security staff or direct care staff member of that gender identity must conduct the no-contact search. However, if a security staff or direct care staff member of the patient's preferred sex or gender identity is not immediately available to conduct the no-contact search, a physician, nurse practitioner or registered nurse, who is not the patient's preferred sex or gender identity, may conduct the no-contact search. But if the delay from waiting for a physician, nurse practitioner or registered nurse would pose a safety or security risk, then a security staff or direct care staff member, who is not the patient's preferred sex or gender identity, may be used to conduct the no-contact search. Other security staff or direct care staff, who are involved in the no-contact search but who are not inspecting the clothing currently on the patient's body, do not need to be the patient's preferred sex or gender identity.¶

(d) Patients must be in a single or base level of clothing. All additional items such as hats, gloves, coats, multiple layers of shirts, extra socks and shoes must be removed. Patients must turn out their pockets, and sleeves and cuffs must be unrolled.¶

(e) Patients must stand with legs approximately shoulder-width apart and their arms outstretched.¶

(f) No-contact searches must be conducted within view of the camera surveillance system, except when it is conducted outside of the secure perimeter of the hospital (e.g., on a community outing or outside medical appointment).¶

(g) No-contact searches of patients must occur outside the presence of their peers when possible.¶

(h) Patients are required to cooperate with the instructions of security staff or direct care staff in order to facilitate the no-contact search process, such as requests to turn out pockets, unroll cuffs, shake out their clothing, or turn around.¶

(i) Patients may be subject to a pat-down or other searches if they do not participate in the no-contact search, or as otherwise required or permitted under these rules.¶

(7) Patients are subject to a skin search if, after attempting to conduct a security inspection and pat-down, security staff or direct care staff have reasonable cause to believe that the patient is concealing contraband that might pose a safety or security risk to the patient or others. Skin searches must be conducted as follows:¶

(a) The Chief Medical Officer or Superintendent must authorize in writing that a skin search may occur before the search is conducted.¶

(b) After written approval for a skin search, a physician or nurse practitioner must provide a written order for the search.¶

(c) The rationale for the search, Chief Medical Officer or Superintendent approval, physician or nurse practitioner order, and outcome of the search must be documented in an incident report and a progress note.¶

(d) A minimum of two OSH staff members must be present to conduct skin searches of patients.¶

(e) Only a physician, nurse practitioner, or registered nurse may conduct a skin search. If available, a physician, nurse practitioner or registered nurse of the same sex as the patient must conduct the skin search. If the patient expresses a preference for a staff member of their gender identity to conduct the skin search, a physician, nurse practitioner or registered nurse of that gender identity must conduct the search. However, if a physician, nurse practitioner, or registered nurse of the patient's preferred sex or gender identity is not immediately available to conduct the search, then a physician, nurse practitioner or registered nurse, who is not of the preferred sex or gender identity of the patient, may conduct the skin search. Other security staff or direct care staff, who are present for safety during the skin search but who are not making physical contact with the patient, do not need to be the patient's preferred sex or gender identity.¶

(f) Skin searches must be conducted within view of the camera surveillance system.¶

(g) Skin searches of patients must occur outside the presence of their peers.¶

(h) Patients are required to cooperate with the instructions of security staff or direct care staff in order to facilitate the skin search process.¶

(i) Patients may be subject to additional searches if the patient does not participate in the skin search, or as otherwise required or permitted under these rules.¶

(j) As permitted in OAR chapter 309, division 112, the Chief Medical Officer or Superintendent may approve in writing the use of seclusion or restraints to conduct the skin search when staff have documented in writing a reasonable cause to believe that the patient is concealing contraband and might pose a safety or security risk to the patients or others. ¶

(k) The Chief Medical Officer or Superintendent authorization, documented reasonable cause, and outcome of the skin search must be documented in an incident report and progress note.¶

(8) Patients are subject to an internal search if, after attempting to conduct a security inspection, pat-down and skin search, security staff or direct care staff have documented that reasonable cause to believe that the patient is concealing contraband that might pose a safety or security risk to the patient or others. Internal searches must be conducted as follows:¶

(a) The Chief Medical Officer or Superintendent must authorize in writing that an internal search may occur before the search is conducted.¶

(b) After written approval for an internal search, a physician or nurse practitioner must provide a written order for the search.¶

(c) A minimum of two OSH staff members must be present to conduct internal searches of patients.¶

(d) Only a physician, nurse practitioner, or registered nurse may conduct an internal search. If available, a physician, nurse practitioner or registered nurse of the same sex as the patient must conduct the internal search. If the patient expresses a preference for a staff member of their gender identity to conduct the internal search, a physician, nurse practitioner or registered nurse of that gender identity must conduct the search. However, if a physician, nurse practitioner, or registered nurse of the patient's preferred sex or gender identity is not immediately available to conduct the search, then a physician, nurse practitioner or registered nurse, who is not of the preferred sex or gender identity of the patient, may conduct the internal search. Other security staff or direct care staff, who are involved in the internal search but who are not engaged in the visual or digital inspection of the patient's body cavities, do not need to be the patient's preferred sex or gender identity.¶

(e) Internal searches must be conducted within view of the camera surveillance system.¶

(f) Internal searches of patients must occur outside the presence of their peers.¶

(g) Patients are required to cooperate with the instructions of security staff or direct care staff in order to facilitate the internal search process.¶

(h) As permitted in OAR chapter 309, division 112, the Chief Medical Officer or Superintendent may approve in writing the use of seclusion or restraints to conduct the internal search when staff have documented in writing a reasonable cause to believe that the patient is concealing contraband and may pose a safety or security risk to the patients or others. ¶

(i) The Chief Medical Officer or Superintendent authorization, documented reasonable cause, and outcome of the internal search must be documented in an incident report and progress note.¶

(9) The patient may contest the application of these rules under OSH's grievance and review process in OAR chapter 309, division 118.

Statutory/Other Authority: ORS 179.040, 413.042, 179.360

Statutes/Other Implemented: ORS 179.321, 426.385

# EXHIBIT 6

# Pause to Comingling FAQS

**1.** **Is it true that we are no longer co-mingling?**
Yes, temporarily, services offered at the Salem hospital will no longer be co-mingling. This includes the treatment mall, mass and church services, the market, dining, clothing store, and other services.

**2.** **Can we still go to dining and market?**
You will eat, with alternating days, between the dining room and on the units. This is similar to the pandemic. New schedules will be posted on each unit. There will be no in person market days, but all orders will be fulfilled on Mondays.

**3** **Can I still have visitors?**
Each patient can only have two adult visitors at a time. There is not a limit on child visitors. Visitors may still buy food at the Kirkbride Café to eat during the visit.

**4** **Will there still be mall?**
Yes, but only with one unit at a time. We will receive a daily activity schedule, outlining what groups and activities will be offered in Kirkbride mall, where we will now be stationed. There will also be groups held on the unit.

**5** **What services are being suspended?**
Patient NEO Panel, PAC, NA/AA/DDA, Plural, Muser, Open mic, Pride Festival (postponed), In-person shopping at the market, In-person café & coffee shop groups, Native Services groups, Mall to Mall referrals, SO treatment programs, Worship services gatherings (they will come to the unit and meet individually)

# Pause to Comingling FAQS

**1.** **Can I still go to school, work, and use privileges?**
At this time supported education and vocational services are still ongoing, but only with patients from the same unit. On and off grounds privileges are still happening, for now, with patients from the same unit.

**2.** **Why is this happening?**
Contraband was found inside the secure perimeter; we are taking steps to stop it from happening again and to keep patients safe.

**3** **When will things go back to normal?**
At this time we are not sure, but this will take effect on **June 12th.**

**4** **Will there be pat downs and mandatory drug tests?**
Not at this time.

**5** **When things go back to normal, how will it look?**
When we return to normal operations at OSH, we will resume the group offerings and schedule that we are currently working with. In the meantime, please be patient as this is new to everyone, and we are all trying to adjust to keep everyone safe.

**5** **What will security look like?**
There will be routine checks of bathrooms and group rooms before and after people leave.

**If you have any more questions, please refer to your unit and nurse manager. Information is constantly changing and being updated, so please be patient.**

# EXHIBIT 7

https://www.oregonarchive.org/state-hospital-patients-upgraded-housing/

**The Cottage Program at Oregon State Hospital: A Transitional Housing Initiative**

In February 2009, the Oregon State Hospital (OSH) launched a remodeled cottage program on its central Salem campus to serve as transitional housing for patients nearing release. This initiative repurposed six century-old cottages, previously used as staff residences, into homes designed to bridge the gap between institutional care and community reintegration.

The cottages were tailored to support patients who had shown significant progress in their treatment programs and were considered low-risk to themselves and others. Key features of the program included:

1. **Residential Capacity and Layout:**
    - The six cottages collectively housed 36 patients, with each unit accommodating six to eight individuals.
    - The cottages offered a more residential environment compared to the hospital's institutional treatment wards, providing 2,100 square feet of living space in some cases, complete with oak furniture and a home-like atmosphere.
2. **Selection of Residents:**
    - Patients selected for the program included those under civil commitment transferred from OSH's Portland campus and criminally committed patients from Salem's forensic program.
    - Residents were chosen based on their progress in treatment and readiness for discharge, ensuring that only individuals deemed to pose minimal risk were admitted.

3. **Program Staffing and Security:**
   - Staff were on duty 24/7 to oversee operations and ensure safety within the cottages.
   - Security measures included alarm systems to alert staff of unauthorized departures.

4. **Community Engagement and Oversight:**
   - Hospital officials engaged with local neighbors and stakeholders, addressing concerns about security and the placement of residents with criminal histories.
   - Commitments were made to conduct independent security audits and maintain appropriate staffing levels, although some requests, such as excluding residents with histories of violent crimes, were not guaranteed.

5. **Program Integration with OSH Modernization Efforts:**
   - The cottage remodel was part of a larger $458 million initiative to modernize OSH facilities, which also included the construction of new psychiatric hospitals in Salem and Junction City.

The cottage program marked a step forward in creating environments that promote autonomy and dignity for patients preparing to re-enter the community. By offering a setting that felt more like a home than a hospital, the program provided residents with an opportunity to develop the skills and confidence necessary for successful reintegration.